# In the United States Court of Federal Claims

Nos. 17-96C; 18-1043C (Filed: October 18, 2018)

| | |
|---|---|
| VANQUISH WORLDWIDE, LLC, | ) Keywords: Contract Disputes Act; |
| | ) Duty of Good Faith and Fair Dealing; |
| | ) Subcontractors; Breach of Implied |
| Plaintiffs, | ) Warranty; Termination for Cause |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |
| | ) |

*Michael D. Maloney*, Williams Mullen, P.C., Tysons, VA, with whom were *William A. Wozniak*, Williams Mullen, P.C., Tysons, VA, and *Todd W. Miller*, Miller & Miller, LLC, Golden, CO, for Plaintiff.

*James W. Poirier*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Franklin E. White, Jr.*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Chad A. Readler*, Acting Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN**, **Judge.**

The plaintiff in this case, Vanquish Worldwide, LLC ("Vanquish"), is a service-disabled, veteran-owned small business that provides trucking and logistics services to the Department of Defense, both domestically and abroad. Pl.'s Second Am. Compl. ("2d Am. Compl.") ¶ 8, ECF No. 27. At issue in this case is the default termination of twelve transportation missions the U.S. Transportation Command ("USTRANSCOM") assigned to Vanquish pursuant to an indefinite delivery/indefinite quantity ("IDIQ") contract for trucking services in Afghanistan under the National Afghanistan Trucking II Contract ("NAT 2.0"). Vanquish contends that the default termination "was not based on good grounds or solid evidence and, as a result, was arbitrary, capricious, an abuse of discretion, and breach of contract." 2d Am. Compl. at 32. It requests that the Court enter an order converting the partial termination for cause to a termination for convenience. Id. The government, in turn, has filed nine counterclaims, asserting various breaches of contract by Vanquish during its performance of both the NAT 2.0 contract and its predecessor, the NAT 1.5 contract.

Currently before the Court is Vanquish's Motion for Partial Summary Judgment as to Count II of its second amended complaint, and as to seven of the government's nine

counterclaims. ECF No. 33. The government has filed a cross-motion for partial summary judgment as to all counts in Vanquish's second amended complaint. ECF No. 45.

For the reasons set forth below, the government's motion for partial summary judgment is **GRANTED** as to Count I of the second amended complaint, but **DENIED** without prejudice as to Counts II and III. Vanquish's motion for partial summary judgment is **GRANTED** as to government's seventh counterclaim; otherwise it is **DENIED**.

## BACKGROUND[1]

### I.     The NAT 1.5 Contract

#### A.     <u>Contract Terms</u>

On June 10, 2014, USTRANSCOM executed a contract with Vanquish under which Vanquish would provide trucking services in support of U.S. military operations in Afghanistan. <u>See</u> Pl.'s Mem. App. Ex. H, at 133, ECF No. 33-2; <u>id.</u> Ex. I, at 169 (Performance Work Statement). The NAT 1.5 Contract was an IDIQ contract with a minimum order guarantee of $1,000 and a maximum value of $37,000,000 over a six-month base period. Pl.'s Mem. App. Ex. H, at 136. The performance period on the contract lasted from June 16, 2014 until December 15, 2014. Decl. of David Stevens, Def.'s Response to Pl.'s Mot. for Partial Summ. J. & Def.'s Cross Mot. for Partial Summ. J. ("Def.'s Cross-Mot.") at A756, ECF No. 45-2.

Under the contract's Performance Work Statement (PWS), Vanquish was to provide "the secure ground transportation of" a variety of cargo "throughout Afghanistan." Pl.'s Mem. App. Ex. I, at 171. In particular, Vanquish would supply "all management and logistics support resources necessary to pickup [sic] material and equipment at origin and deliver material and equipment at destination on the dates required by the USG [i.e., United States Government]," as well as "all non-personal services, including but not limited to, personnel, equipment, tools, materials, supervision, and other items necessary" to ship the government's cargo. <u>Id.</u> Vanquish was also charged with "ensur[ing] the integrity and safety of the materials and equipment being transported," and was "responsible for providing armed security escorts for all missions, unless otherwise specified by the USG." <u>Id.</u>

To order trucking services under the NAT 1.5 contract (as well as the subsequent NAT 2.0 contract), the government issued Transportation Movement Requests, or "TMRs." <u>Id.</u> at 172, 201. For administrative purposes, the distances covered by a

---

[1] Unless otherwise indicated, the facts set out in this section are not in dispute.

particular TMR would be expressed in terms of "mission units," with one mission unit allowed "for every 50 km of distance travelled within Afghanistan."[2] Id. at 172.

The contract provided that "the Contractor shall ensure that all missions have security support, unless otherwise specified by the USG." Id. If a mission required security support, the TMR would specify whether such support would be "USG provided" or "Government Islamic Republic of Afghanistan (GIRoA)" provided. Id. GIRoA-provided security support would be supplied by the "Afghan Public Protection Force (APPF) or [an]other force specified by the Afghan Government." Id. Under the contract, Vanquish agreed to "assume[] responsibility for acts of non-USG security elements that result in loss of cargo or damage to private or personal property." Id.

Finally, the NAT 1.5 contract included several terms concerning payment. As relevant here, the contract incorporated by reference FAR § 52.232-4 (APR 1984), which provides that "[t]he Government shall pay the Contractor upon the submission of properly certified invoices or vouchers, the amount due for services rendered and accepted, less deductions, if any, as herein provided." Id. Ex. H, at 140; FAR § 52.232-4 (2017). Further, the contract included a policy covering "cancelled" missions, which would be classified as "prorated pay, partial pay, [or] no pay." Pl.'s Mem. App. Ex. I, at 176. Vanquish would receive pro-rated pay only if its "asset[s] [were] attacked and destroyed" during the mission. Id. It would be eligible for partial pay under "two (2) circumstances": first, if "the USG cancels the mission within 48 hours of the [Required Spot Date (RSD)]"—i.e., the date the truck was required to arrive at the pickup location; and second, if "the USG cancels the mission after the asset has reached RSD." Id. In a partial pay situation, Vanquish was entitled to "be paid up to two (2) mission units at the rate for the assigned asset type in addition to any demurrage charges due for that mission if the mission is cancelled under the aforementioned circumstances."[3] Id.

## B. USTRANSCOM's Review of Payments Made Under the NAT 1.5 Contract

The government issued hundreds of TMRs to Vanquish and other contractors under the NAT 1.5 contract. See Def.'s Cross-Mot. at A739–42. On December 17, 2015, contracting officer (CO) David Stevens issued a memorandum addressed to all NAT 1.5 contractors regarding possible overpayments made under the contract. Id. at A583. CO Stevens noted that missions under the contract were required to "have security support, unless otherwise specified by the USG"; that such support "often require[d] APPF security"; and that the TMRs broke the missions down into mission units and

---

[2] The PWS noted that "[a]ll mission units w[ould] be rounded up to the next higher 50 km increment." Pl.'s Mem. App. Ex. I, at 172. Thus, "a 51 km mission w[ould] be calculated as two (2) mission units." Id.

[3] The contract defined "demurrage" as payments made "for delay caused by the USG," and set forth specific parameters under which demurrage would be paid. See Pl.'s Mem. App. Ex. I, at 178.

"identifie[d] . . . the security requirements for those mission units." Id. (quotation omitted).

According to CO Stevens, however, the government had "become aware [that] NAT 1.5 contractors may not have provided security from the origin point and the destination point designated in the TMR." Id. Thus, he continued, "contractor[s] should have only invoiced the Government at the 'GIRoA Security' rate for the mission units that APPF actually escorted the truck and the remaining mission units at the 'No Security' rate." Id. And to the extent contractors had invoiced the government for security services that were not provided, "the Government has the right to a price reduction." Id. CO Stevens therefore ordered the contractors to either (1) attest "that all security services were performed in accordance with contract terms (provided from origin to destination), that invoices only contained charges for security services performed, and that no overpayments [we]re being retained for security services that were not performed"; or (2) to review their invoices and provide the government with "a detailed audit of the security services provided under the contract that were non-conforming" that would "include a summary of overpayments that will be refunded to the Government." Id.

Vanquish responded to CO Stevens on January 7, 2016. Id. at A592; see also id. at A584 (email to which the response was attached). In its response, Vanquish's president, Eric Barton, stated that he was "unaware of any irregularities" in Vanquish's invoicing. Id. at A592. He did not, however, provide the requested attestation that Vanquish had, in fact, provided security services from origin to destination for all its shipments under the NAT 1.5 contract. See id. Rather, he "assure[d]" CO Stevens that Vanquish was "not paid for security for missions submitted unless dispatch sheets were provided," and that it had "relied exclusively upon TMR and mission sheet MU values for contract payment." Id. He also indicated that if CO Stevens "still [felt] that an independent audit of all invoices [was] necessary, [Vanquish] would welcome its findings and hope[d] that the US Government [would] correct any net underpayments, just as [Vanquish would] correct any net overpayments." Id.

## II.     The NAT 2.0 Contract

### A.     Relevant Terms

On August 12, 2014, the government executed a new agreement with Vanquish, the NAT 2.0 contract. See Pl.'s Mem. App. Ex. A, at 8. Like the NAT 1.5 contract, the NAT 2.0 contract was an IDIQ contract for trucking services within Afghanistan. See id. at 8–10. The contract had a minimum value of $2,500 and a maximum value of $680,000,000. Id. at 11. The performance period for the first option year was from December 16, 2014 to December 15, 2015. Def.'s Cross-Mot. at A756.

During the first option year there were a total of eight contractors. Id. A single task order was issued under Vanquish's IDIQ contract for the first option year. Id. TMRs were issued on a daily basis pursuant to that single task order. Id.

The PWS for the NAT 2.0 contract provided a detailed explanation of the contract's scope. See Pl.'s Mem. App. Ex. B, at 74–75. Under the contract, Vanquish would provide "timely, reliable and secure distribution of all classes of supply or assets except Class V (Ammunition)." Id. at 74. The PWS specified that "[t]he Contractor shall be responsible and accountable for the integrity of the entire transportation process and the protection of the cargo from loss or damage while cargo [is] in the Contractor's care." Id. Vanquish was thus required to provide "proactive and competent management; well-maintained logistics support resources[;] and trustworthy employees and Subcontractors as necessary to facilitate dependable movement of cargo from origin to destination." Id. Further, Vanquish was to "notify the USG immediately upon learning [that] it, the Contractor, may be unable to meet any of the PWS requirements, as any delay or failure in contract performance could impact Department of Defense (DoD) personnel and the DoD's mission." Id.

The contract also included a detailed discussion of the "mission requirements and standards" that would apply to trucking services provided under the contract. Id. at 92–105. Among other things, the contract described how TMRs would be used to order trucking services (id. at 92–94); set forth the basic services required under the contract (id. at 95–96); established payment policies for cancelled and failed missions (id. at 97–100); and established mandatory security requirements (id. at 102).

The NAT 2.0 contract specified that "[e]ach TMR represents a mission for a single asset." Id. at 92. For each mission, the TMR would specify a Required Spot Date (RSD)—that is, the date the truck was required to be at the pickup location; a Required Load Date (RLD)—i.e., the date that the truck had to be ready for loading; and a Required Delivery Date (RDD)—the date when the truck would need to arrive at the destination location. Id. at 93. The RDD could be adjusted under certain circumstances. Id. at 93–94.

With respect to basic services, the contract specified that the contractor was required to "be responsible, timely (i.e. meet all RSDs, RLDs and RDDs) and adhere to all assigned movement requirements." Id. at 95. Contractors would need to "operate single assets [i.e., trucks] or convoys to and from any location within [Afghanistan]" and were responsible for "provid[ing] assets and drivers able to accomplish missions anywhere in" the country. Id.

The NAT 2.0 contract provided that "the USG may cancel any mission for any reason." Id. at 97. It established three categories of cancelled missions: pro-rated pay, partial pay, and no pay. Id. As pertinent here, pro-rated pay would be effective "when a mission is not completed without Contractor's negligence." Id. "One example is when the Contractor's asset is attacked and destroyed and the Contractor submits the required reports documenting the incident." Id. The contract further provided that "the Contractor has the burden to provide documentation illustrating absence of fault by substantial evidence to be eligible for 'pro-rated' pay." Id.

The Contract also addressed "failed mission[s]." It stated as follows:

When placing orders for service and allocating missions, the USG will consider whether the Contractor has provided services in accordance with this PWS. A Contractor's repeated or sustained substandard performance may result in suspension of the Contractor from further mission allocations until the Contractor demonstrates its ability to rectify the unacceptable performance. The USG may also pursue administrative or contractual remedies to address non-performance.

Id. at 98. "Failed missions" fell into two categories: failed no pay and failed partial pay. Id. at 98–100. As relevant here, the contract permitted the government to "designate [a] mission as a 'failed mission'" if the contractor "fail[ed] to provide the basic services" specified above. Id. at 98. Further, a mission would be considered "failed no pay" if (among other things) "[c]argo is delivered to [an] incorrect location, not delivered at all, or is unaccounted for" or if a "mission was cancelled . . . due to Contractor's negligence or failure to perform in accordance with this PWS or any other contract terms and conditions." Id. According to the contract, "[a] Failed/No Pay mission shall not receive any compensation unless otherwise approved by the [contracting officer]." Id.

Finally, regarding security, the contract required contractors to "ensure that all missions have security support, unless otherwise specified by the USG." Id. at 102. "Required security support w[ould] be specified in the individual TMR" as follows: "Government of the Islamic Republic of Afghanistan (GIRoA)" provided, "USG provided," or "[u]nescorted." Id. APPF provides security on behalf of GIRoA. Def.'s Cross-Mot. at A756. It consists of approximately 6,000 guards "who provide security for international, government and non-governmental entities, sites and facilities." Id. at A757. Under NAT 2.0, "if a contractor required TMR security escort that was not provided by the USG, then the contractor would subcontract with APPF to provide that security in accordance with Afghan law." Id.

The contract warned that "[t]he Contractor assumes responsibility for acts of non-USG security elements that result in loss of cargo or damage to private or personal property." Pl.'s Mem. App. Ex. B, at 102. Further, "[w]hen security is provided by GIRoA," the contract stated that "[t]he USG shall not be responsible for any delays or deviations to mission timelines caused by GIRoA." Id.

## B.     Vanquish's Failure to Deliver Twelve TMRs

Between August 27, 2015, and September 30, 2015, the government issued twelve TMRs to Vanquish, as set forth in the table below:

| TMR # | RLD | RDD | Citation |
|---|---|---|---|
| TMR AEI0021 (TMR 21)<br><br>Jalabad-Bagram | September 3, 2015 | September 5, 2015 | Def.'s Cross-Mot. at A463 |

| | | | |
|---|---|---|---|
| TMR AEJ0080 (TMR 80)  Kandahar-Bagram | October 3, 2015 | October 9, 2015 | Def.'s Cross-Mot. at A466 |
| TMR AEJ0081 (TMR 81)  Kandahar-Bagram | October 3, 2015 | October 9, 2015 | Def.'s Cross-Mot. at A467 |
| TMR AEJ0082 (TMR 82)  Kandahar-Bagram | October 3, 2015 | October 9, 2015 | Def.'s Cross-Mot. at A468 |
| TMR AEJ0083 (TMR 83)  Kandahar-Bagram | October 3, 2015 | October 9, 2015 | Def.'s Cross-Mot. at A469 |
| TMR AEJ0084 (TMR 84)  Kandahar-Bagram | October 3, 2015 | October 9, 2015 | Def.'s Cross-Mot. at A470 |
| TMR AEJ0070 (TMR 70)  Kandahar-Bagram | October 3, 2015 | October 9, 2015 | Def.'s Cross-Mot. at A471 |
| TMR AEJ0079 (TMR 79)  Kandahar-Bagram | October 3, 2015 | October 9, 2015 | Def.'s Cross-Mot. at A472 |
| TMR AEJ0085 (TMR 85)  Kandahar-Bagram | October 3, 2015 | October 9, 2015 | Def.'s Cross-Mot. at A473 |
| TMR AEJ0086 (TMR 86)  Kandahar-Bagram | October 3, 2015 | October 9, 2015 | Def.'s Cross-Mot. at A474 |

| TMR AEJ0109 (TMR 109)  Kandahar-Bagram | October 6, 2015 | October 12, 2015 | Def.'s Cross-Mot. at A475 |
|---|---|---|---|
| TMR AEJ0126 (TMR 126)  Kandahar-US Embassy | October 6. 2015 | October 12, 2015 | Def.'s Cross-Mot. at A476 |

The paper TMRs were issued to contractors from the NAT Program office, located at Bagram Air Field. Def.'s Cross-Mot. at A761. The contractors would typically pick up the paper TMRs on a daily basis and place their signatures on sign-out sheets to confirm that they had done so. Id.

Each of the twelve shipments was loaded on or before the RLD set forth in the TMR. See Def.'s Cross-Mot. at A463, A466–76. Further, the escort type specified for each TMR was "GIRoA." Id.

On October 6, 2015, the final load date for the TMRs listed above, several USTRANSCOM personnel received a somewhat cryptic email from Khalid Mujadidi, an Afghan national. Id. at A493–94. He claimed that he was a principal for Emporium International Transportation Services ("Emporium"), and contended that Emporium was the current subcontractor on Vanquish's NAT 2.0 contract. Id. at A494; see also id. at A763 (declaration of contracting officer stating that Emporium was Vanquish's "primary transportation subcontractor under their NAT 2.0 contract" and had also been a subcontractor under Vanquish's NAT 1.5 contract). Mr. Mujadidi asserted that Vanquish had "not paid [Emporium] for APPF and Missions for over 6 months." Id. at A494. He advised that Emporium had "ongoing missions that need to be delivered" and that it "would like to deliver our loaded trucks directly to the USG contact person at the destination as we feel [Vanquish] will not pay us for the work." Id.

The next day, Lieutenant Henry Castillo responded to Mr. Mujadidi. Id. at A493. He asked to "see a list of the TMRs that you have on hand right now that you haven't delivered" along with "a list of the TMRs that [Vanquish] ha[sn't] paid you for." Id. Mr. Mujadidi replied later that day with a list of undelivered TMRs, which included the twelve TMRs described above. Id. at A496.

A week later, on October 13, 2015, Lt. Castillo emailed Vincent Hall, Vanquish's Deputy Program Manager, requesting a meeting to "discuss the situation with Emporium." Id. at A509. He stated that USTRANSCOM was "tracking about 15 missions that are still on the hands of Emporium" and that "we don't want to jeopardize the delivery of this cargo." Id. at A509–10. He therefore stated that he was "looking . . . to see your plan of action to ensure we will receive these TMRs." Id. at A510. It is unclear from the record whether this meeting took place.

Ten days later, on October 23, 2015, Lt. Castillo again emailed Mr. Hall. Id. at A515. He noted that "[a]s days go[] by my concern regarding the missions . . . grows" and asked Vanquish to "[p]lease provide updates." Id. Mr. Hall replied that he needed time "to conference again with both my management (Matt), and the ownership of my sub-contractor (Khalid)." Id. at A514. A few days later, on October 25, 2015, Lt. Castillo received another email from Mr. Mujadidi, who claimed that "due to the non payment issues we have been having . . . with Vanquish," Emporium "d[id] not have the necessary funds to complete [the] missions." Id. at A518. "If you are not able to send us the funds to move the missions," he went on, "please make arrangements to pick them up." Id.

After this exchange, on October 28, 2015, USTRANSCOM's contracting officer, Tina Ellis, sent Vanquish a formal letter of concern regarding the missing TMRs.[4] Id. at A486. She noted that Vanquish's "subcontractor[,] Emporium . . . informed our office that they are unable to complete the delivery of cargo because Vanquish . . . has not paid for previous completed missions." Id. CO Ellis advised that the "payment issue is between the prime and subcontractor to resolve" and cautioned that "the prime contractor Vanquish . . . is still responsible for the on-time delivery of [the] cargo." Id. She then gave Vanquish until November 4, 2015 to deliver the missions and requested a response within twenty-four hours. Id.

Over the next two days, on October 29 and 30, Mr. Barton and Mr. Mujadidi exchanged emails. Id. at A522–23. Mr. Barton demanded that Emporium deliver the twelve TMRs by the following Sunday, November 1, and stated that if it did not, then Vanquish would report them stolen. Id. at A523. Mr. Mujadidi responded that Emporium was not holding the shipments in order to "blackmail" Vanquish (as Mr. Barton had alleged) but rather because it did not have the funds to deliver them as a result of Vanquish's failure to pay Emporium. Id. at A522. He requested that Mr. Barton "please set up an arrangement for the 12 TMRs because we may be the subcontractor but [Vanquish has] all the money for it." Id.

Vanquish responded to the government's October 28, 2015 letter of concern on November 3, 2015. Id. at A553–54. It acknowledged that "[i]t [was] evident that we had some issues with our sub-contractor Emporium . . . regarding the handling of" the missing TMRs. Id. at A553. In particular, Vanquish asserted that Emporium itself had taken the TMRs that Vanquish had issued to them and subcontracted the missions to another Afghan outfit, Omar Belal Logistics Services ("OBLS"), in contravention of Vanquish's "no subcontracting policy." Id. (quotation omitted). According to Vanquish, OBLS was refusing to deliver the TMRs because Emporium had not paid OBLS for work

---

[4] Although Emporium stated that it was holding all twelve of the TMRs at issue in this case (see Def.'s Cross-Mot. at A496), the letter of concern referenced only eleven of the twelve TMRs (see id. at A486). In addition, the copy of the letter contained in the government's appendix has an incorrect date in the address block at the top of the page, but the time stamp generated with the contracting officer's electronic signature contains the correct date. See id. at A486.

it had previously performed for Emporium.[5] Id.; see also id. at A559–66 (email correspondence between Vanquish and Izat Ullah, a purported agent of OBLS, regarding the missing TMRs). Vanquish declared that it "understands that the completion of these missions and the delivery of the cargo withheld by OBLS falls within its responsibility" and averred that it was "currently taking steps to come to an agreement with OBLS and make arrangements to return this cargo." Id. at A554. And "to assure [USTRANSCOM] that [it was] handling this situation," Vanquish offered to "provid[e] all parties involved with as much documentation and evidence as required to bring this to a resolution." Id.

A week later the TMRs remained undelivered; and on November 10, 2015, USTRANSCOM issued a cure notice.[6] Id. at A549–50. It notified Vanquish that Vanquish had "fail[ed] to comply with the [PWS], Section 5.2.4.2 'Basic Services,' in that it failed to deliver supplies and perform the contracted services within the time specified in the task order." Id. at A549. Further, USTRANSCOM determined that Vanquish had "failed to provide adequate assurances of future performance." Id. USTRANSCOM again noted that "[t]he issue of non-payment from your subcontractor does not release your company from delivering . . . the . . . missions on time as designated in the [TMRs]." Id. at A550. It therefore warned Vanquish that if the missions were not delivered within forty-eight hours, "[t]he U.S. Government may terminate[] for cause under the terms and conditions of FAR 52.212-4(m)."[7] Id.

Vanquish responded to the cure notice that same day. Id. at A546–48. The letter indicated that Vanquish believed that the shipments were in the hands of OBLS, Emporium's unauthorized subcontractor, and that Vanquish had issued letters to both OBLS and Emporium demanding the immediate return of the cargo. Id. at A546. Vanquish contended that under the FAR it should be given a ten-day period to cure, and set forth an "action plan as an assurance[] of contract performance," which would involve

---

[5] The Court notes that this is essentially the same claim that Emporium was making vis-à-vis Vanquish. See Def.'s Cross-Mot. at A494, A518.

[6] As with the October 28, 2015 letter of concern, the cure notice stated that eleven missions were uncompleted, not twelve. See Def.'s Cross-Mot. at A549–50.

[7] FAR § 52.212-4(m) provides:

> The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Government for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

terminating Emporium and obtaining the services of a new subcontractor. Id. at A547. On November 13, 2015, the government acceded to Vanquish's request for additional time, stating that it would allow Vanquish "until 20 November 2015 to deliver the cargo before terminating the task order[s] . . . for default and reprocur[ing] the services with another contractor." Id. at A555.

Five days later, on November 18, 2015, Mr. Hall emailed CO Ellis to request another extension of time to retrieve the cargo from the TMRs. Id. at A557–58. According to Mr. Hall, Vanquish had spoken with Izat Ullah, who identified himself as an employee of OBLS, and who stated that OBLS had been given the TMRs by Emporium and that OBLS had used the TMRs to load the cargo, which OBLS was holding. Id. He stated that Vanquish had come to believe that the cargo had been "sent to an A[fghan] N[ational] P[olice] compound" and was "not with APPF." Id. at A557. Further, "because of the corrupt nature of some entities within the Afghan government and Afghan companies," Mr. Hall opined that "it [would] be extremely difficult to get the cargo back to origin, while still doing things the correct way without bribery and payoffs, and meet a deadline of 20 November." Id. at A558.

By November 24, 2015, the government still had not received the missing cargo. See id. at A589. That day, CO Ellis emailed Mr. Hall, informing him that USTRANSCOM had placed Vanquish's "invoices submitted . . . on hold until we receive the cargo from the 12 missions." Id. For the next month, the cargo remained missing, and USTRANSCOM did not pay Vanquish's outstanding invoices. See id. at A588 (December 23, 2015 email from Vanquish president Eric Barton stating that Vanquish had "several invoices that need to be invoiced").

On December 24, 2015, CO Stevens (who had in the interim assumed responsibility over the contract, replacing CO Ellis) emailed Mr. Barton, requesting "the status and current physical location" of the missing TMRs. Id. at A588. He also reminded Mr. Barton that "PWS paragraph 5.2.2.8. states [that] the 'contractor shall be financially liable for the replacement value of all unaccounted for or damaged cargo.'" Id.

Mr. Barton responded later that day. Id. at A586–87. Notwithstanding Mr. Hall's November 18, 2015 email (expressing Vanquish's belief that the TMRs had been sent to an Afghan National Police compound and were not with APPF), Mr. Barton claimed that "[w]hether the TMRs are still with the APPF . . . or are a combat loss while under APPF security is unknown to me." Id. at A587. He also noted that he was "not authorized to use force to recover TMRs held or secured by the APPF," and opined that "[t]he APPF is responsible for the cargo and the APPF should pay for the USG property under its charge." Id. In his reply, CO Stevens noted that Vanquish's "in-country manager ha[d] made statements . . . that contradict[] your inference regarding [the] APPF and previously stated [that] this cargo was NOT under APPF escort at the time of disappearance." Id. at A586.

Several days later, on January 7, 2016, Mr. Barton formally notified USTRANSCOM that the missing TMRs "ha[d] been lost or destroyed as a result of a combat loss while in the care, custody and control of APPF." Id. at A591; see also id. at

A584 (email to which the notification letter was attached). Mr. Barton also asserted that the loss "occurred without the fault or negligence of V[anquish]" and was "a result of an act of God or the public enemy and/or as a result of an act of the Government in either its sovereign or contractual capacity." Id. at A591.

CO Stevens replied to Mr. Barton on January 9, 2016. Id. at A594. He observed that under the contract, Vanquish was "financially liable for the replacement value of all unaccounted for or damaged cargo." Id. (quoting PWS ¶ 5.2.2.8). Further, he stated that it appeared that what was involved was a subcontracting issue between Vanquish and APPF, which was "not within [his] purview." Id. CO Stevens advised that because Vanquish had "officially made the determin[ation] the cargo is unaccounted for," Mr. Barton could expect to "hear[] back from [him] shortly regarding the path forward as the Government processes this cargo as being unaccounted for." Id.

Mr. Barton replied in an email of January 11, 2016. He chastised CO Stevens for "com[ing] in guns blazing to prove that a US small business is somehow responsible for a combat loss and the poorly managed APPF security apparatus." Id. at A593. Mr. Barton opined that CO Stevens "appear[ed] as if [he was] set on damaging [Vanquish] and its employees." Id. "The challenge we are faced with," he claimed, "is that we loaded the equipment, the equipment was then secured by the APPF . . . and the equipment was either stolen, sold, or otherwise disposed of by the US Government mandated security force." Id. And "once armed men with government authority take over the trucks and move the trucks to their secure location," he protested, the situation went "beyond [his] control." Id.

Several days after this exchange, on January 22, 2016, CO Stevens issued a for-cause termination of the twelve TMRs. Id. at A620–21. He first reviewed the facts surrounding the TMRs' disappearance and the government's cure requests. Id. Based on those facts, he concluded that the government had "tendered [the] subject cargo to [Vanquish] in good order and condition" and that Vanquish had "failed to deliver the cargo by the required delivery date." Id. at A621. Vanquish thus "failed to complete the requirements of [the] subject contract and TMRs." Id. Accordingly, "the subject TMRs [we]re terminated for cause in accordance with [FAR] 52.212-4(m)." Id.[8]

## C.   The Recovery of the Cargo

Ultimately, the government was able to recover the cargo shipped under the twelve TMRs without Vanquish's further involvement. See Def.'s Cross-Mot. at A720–31, A779–81. More specifically, on January 30, 2016, the cargo for one of the missions was delivered to Bagram Air Field. Id. at A780. The cargo for another mission was also delivered there on February 17, 2016. Id. The shipments for the remaining ten missions

---

[8] By the time the termination for cause of the twelve missions was effected, the first option year on the NAT 2.0 contract had expired. Def.'s Cross-Mot. at A758. In addition, the government had advised Vanquish on October 30, 2015 that it did not intend to exercise Vanquish's second option year. Id.

were apparently recovered as a result of enforcement activity undertaken by the Special Inspector General for Afghan Reconstruction ("SIGAR") and local police. See 2d Am. Compl. Ex. D, at 120–21, ECF No. 27-1.

Thus, according to a Declaration by CO Stevens, on March 1, 2016 he met with an individual who identified himself as Izat Ullah, a subcontractor for Emporium. Def.'s Cross-Mot. at A780. Mr. Ullah advised CO Stevens "that the shipments were being held because of a longstanding payment dispute." Id. Excerpts from a SIGAR report submitted by Vanquish suggest that this meeting was arranged as part of "an elaborate undercover operation to recover the containers." 2d Am. Compl. Ex. D, at 121. The report states that an "Afghan national" (presumably Mr. Ullah) had apparently contacted CO Stevens claiming to be in possession of the missing shipments. Id. The Afghan national provided photographs of the cargo and advised CO Stevens that he could arrange for the delivery of the cargo in exchange for a payment of $500,000. Id. On the same day that he met with CO Stevens, the Afghan national was interviewed by special agents, and arrested. Id. According to the report, "he made arrangement from jail for the delivery of the 10 remaining containers to [Kandahar Air Force Base], which occurred on March 7, 2016." Id.

Because the shipments were ultimately recovered, the government has not asserted a claim for damages related to the shipments. Def.'s Cross-Mot. at A779–80. The government is also not pursuing a claim for reprocurement costs because the shipments were ultimately moved by other contractors at cheaper rates. Id.

### III.   This Action

Vanquish filed its complaint in this Court on January 23, 2017. ECF No. 1. It has since amended its complaint twice. ECF Nos. 8, 27. As relevant to the pending cross-motions, it alleges that by requiring Vanquish to use APPF for security, the government warranted that APPF was capable of securing the cargo associated with Vanquish's missions and that APPF's "inability to secure the cargo was a breach of the Government's warranty under the contract." 2d Am. Compl. ¶¶ 143–45. Vanquish also contends that the government's termination of the twelve TMRs for cause was arbitrary, capricious, and an abuse of discretion because it was based on the erroneous assumption that the cargo had been lost, when in fact it had been hijacked, and because the delay in the government's receipt of the cargo "was the result of events beyond Vanquish's reasonable control and without Vanquish's fault or negligence." Id. ¶¶ 147–48. Finally, Vanquish alleges that the contracting officer's decision to terminate the twelve missions for cause was made in bad faith and with a specific intent to harm Vanquish. Id. ¶¶ 154–57.

On May 3, 2017, the government filed an answer to Vanquish's first amended complaint (which was then the operative complaint) and asserted eight counterclaims against Vanquish. ECF No. 11. It then amended its answer to include a ninth counterclaim. ECF No. 14.

Vanquish filed a second amended complaint on September 8, 2017. ECF No. 27. A few weeks later, it filed the motion for partial summary judgment that is currently before the Court. ECF No. 33. In it, Vanquish requests that the Court grant summary judgment in its favor as to its claim that the termination for default violated the contract, and on the government's first, third, fourth, fifth, seventh, and eighth counterclaims. See Pl.'s Mem. at 11–12. The government has filed its own cross-motion for partial summary judgment as to all claims in Vanquish's second amended complaint. ECF No. 45. Oral argument was held on the cross-motions on October 10, 2018.

## DISCUSSION

### I.      Standards for Summary Judgment

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The moving party "may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power Co-op. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Celotex, 477 U.S. at 325). In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. Anderson, 477 U.S. at 255; Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970). Nonetheless, "[a] nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power Co-op, 16 F.3d at 1202.

"Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 248). The court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

### II.      Government's Motion for Summary Judgment as to Count I

In Count I of Vanquish's second amended complaint, it claims that when the government required it to use APPF to provide security, it warranted that APPF was capable of securing the cargo associated with the twelve terminated missions at issue in

this case. "APPF's inability to secure the cargo," according to Vanquish, "was a breach of the Government's warranty." 2d Am. Compl. ¶¶ 143–45.

The government seeks summary judgment as to this claim. It contends that the United States did not provide any warranty of performance by APPF and that, in any event, Vanquish has failed to provide any evidence that APPF was ever hired to perform any services on the twelve missions at issue in this case. Def.'s Cross-Mot. at 15–16. The Court agrees with the government.

"To recover for a breach of implied warranty, a plaintiff must allege and prove (1) that a valid warranty existed, (2) the warranty was breached, and (3) the plaintiff suffered harm caused by the breach." Lakeshore Eng'g Servs., Inc. v. United States, 748 F.3d 1341, 1348–49 (Fed. Cir. 2014) (citing Hercules, Inc. v. United States, 24 F.3d 188, 197 (Fed. Cir. 1994)). The court of appeals "ha[s] found implied warranties only where the circumstances strongly supported a factual inference that a warranty was implied." Agredano v. United States, 595 F.3d 1278, 1281 (2010) (internal quotations and citation omitted).

It is noteworthy that Vanquish has not produced evidence to establish that it employed APPF on the twelve missions at issue in this case as would be required to establish a breach of an implied warranty. Such evidence would be expected to be within Vanquish's control.[9]  But in any event, even assuming that Vanquish employed APPF to provide security, and assuming further that APPF's actions resulted in the shipments falling into the wrong hands, its contention that the government warranted APPF's performance lacks merit. While the TMRs required Vanquish to provide security through GIRoA, § 5.2.4.13 of the contract disclaims any warranty of performance, stating that "the Contractor assumes responsibility for acts of non-USG security elements that result in loss of cargo or damage to private or personal property." Def.'s Cross-Mot. at A397. The contract further specifies at § 5.2.4.13.1 that "[t]he USG shall not be responsible for any delays or deviations to mission timelines caused by GIRoA." Id. In light of these express disclaimers, "[t]he meeting of the minds required to form an implied-in-fact warranty . . . could not have occurred." Agredano, 595 F.3d at 1281. The government,

---

[9] According to the Declaration of CO David Stevens, "APPF issued callsigns to the NAT contractors prior to escorting trucks" and "NAT contractors were responsible for directly coordinating with APPF for all required escort services." Def.'s Cross-Mot. at A763. CO Stevens notes that Vanquish did not provide the government with copies of the call-sign sheets when it invoiced the government for APPF's services. Id. And he further asserts that "[i]n some cases, Vanquish never provided APPF call sign sheets to the Government at all, including for the 12 TMRs terminated for cause." Id. CO Stevens also declares that on January 12, 2016, he was advised by an Australian company that had been hired by GIRoA "to provide better governance and fight corruption in the APPF" that there was "no evidence of the APPF issuing callsigns for" the twelve missions. Id. at A779; see also id. at A617 (letter from RED-RMC-AFG).

accordingly, is entitled to summary judgment as to Count I of the second amended complaint.

## III.    Vanquish's Motion for Summary Judgment as to Count II

Vanquish has moved for partial summary judgment as to Count II of its second amended complaint, which challenges the default termination of the twelve missions as arbitrary, capricious, and an abuse of discretion. In particular, Vanquish argues that it is entitled to summary judgment because the termination for cause violated Section 6 of the NAT 2.0 contract. Therefore, Vanquish contends, the default termination did not have a reasonable contract-related basis. This contention lacks merit.

A contracting officer has broad discretion to terminate a contract for default. Consol. Indus., Inc. v. United States, 195 F.3d 1341, 1343 (Fed. Cir. 1999). Nonetheless, a termination for default is a "drastic sanction" that must be based on "good grounds and on solid evidence." Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987) (quoting J.D. Hedin Constr. Co. v. United States, 408 F.2d 424, 431 (Ct. Cl. 1969)).

When a contractor challenges a default termination, the government bears the burden of proof to show that the contractor was in default when the government terminated the contract. Lisbon Contractors, 828 F.2d at 765; see also Gen. Injectables & Vaccines, Inc. v. Gates, 519 F.3d 1360, 1363 (Fed. Cir.), opinion supplemented on denial of reh'g, 527 F.3d 1375 (Fed. Cir. 2008). "If the government succeeds in proving default, the plaintiff then must demonstrate 'that the default was excusable under the terms of the contract.'" Keeter Trading Co. v. United States, 79 Fed. Cl. 243, 253 (2007) (quoting Airport Indus. Park, Inc. v. United States, 59 Fed. Cl. 332, 338 (2004)); see also Gen. Injectables, 519 F.3d at 1363.

According to Vanquish, the failure to deliver the twelve shipments cannot be considered a breach of the contract because the express terms of the contract reflected an understanding that such failures would occur, given that the deliveries would be taking place in a war zone. It cites Section 6 of the contract, which is entitled "Performance Requirements Summary." That provision states that "[w]hile the Contractor is fully expected to comply with all the requirements in the [Performance Work Statement]," the government's "assessment of Contractor performance will focus mainly on the objectives listed in the Performance Requirements Summary." Pl.'s Mem. App. Ex. B, at 106. Further, it identifies certain percentage thresholds that would be used to determine whether—for purposes of monthly performance reviews and eligibility for performance awards—the contractor has successfully performed four specific contractual obligations including, as relevant here, meeting specified required delivery dates. Id.

Vanquish notes that the minimum performance threshold established for meeting contractually required delivery dates is 90%. Id. It contends that this threshold for acceptable performance reflects the parties' recognition "that there would be failed missions on this trucking contract in the war-zone of Afghanistan." Pl.'s Mem. at 8. It argues that it was an abuse of discretion for the contracting officer to terminate the twelve

missions for default because—despite its failure to complete those missions and its loss of control over the cargo—its performance on the contract overall met the minimum performance standards for on-time delivery of shipments.

Vanquish's argument lacks merit. FAR § 52.212-4(m), which is incorporated into the contract by reference, provides that "[t]he Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance" (emphasis supplied). The fact that Vanquish's performance on the contract as a whole met minimum performance standards for on-time delivery did not preclude USTRANSCOM from terminating the twelve individual missions for default. In fact, Section 6.5 of the contract states that "the absence of any performance objective and threshold from this table shall not detract from the enforceability or limit the USG's rights or remedies afforded under this contract." Pl.'s Mem. App. Ex. B, at 107.

Further, it is not accurate to identify a failure to meet required delivery dates as the sole reason why USTRANSCOM issued a default termination of the twelve missions. Vanquish did not merely fail to make timely delivery of the shipments. USTRANSCOM terminated the contract for default because it believed that Vanquish had lost control over the cargo and because—despite repeated opportunities—it was unable to provide the government with any assurances as to when (if at all) the shipments would be delivered. To the contrary, it eventually advised USTRANSCOM that the shipments were "lost."

To be sure, Section 5.2.4.6.1 of the contract provides that where "cargo is delivered to incorrect location[s], not delivered at all, or is unaccounted for" the mission may be characterized as a "failed" one for which the contractor will receive no compensation. Def.'s Cross-Mot. at A393. Arguably, USTRANSCOM could have used this contractual mechanism to address the failure to deliver the twelve missions. But the contract did not make designation as a failed mission the exclusive recourse for the government. The contract preserves the government's right—in appropriate circumstances—to terminate failed missions for default, stating that USTRANSCOM "may also pursue administrative or contractual remedies to address non-performance." Id.

In short, Section 6 does not preclude the government from terminating the twelve missions based on default, irrespective of whether Vanquish's performance on the contract as a whole met minimum performance standards for compliance with delivery date requirements. For these reasons, Vanquish's motion for summary judgment as to Count II of its complaint must be denied.

## IV.    The Government's Cross-Motion for Summary Judgment as to Count II

As noted, in Count II of its amended complaint, Vanquish claims that the contracting officer's decision to terminate for default "was not based on good grounds or solid evidence." 2d Am. Compl. at 32. In particular, Vanquish alleges, the default termination decision "was erroneously based on the assertion that the cargo at issue was lost, ignoring that the cargo had been high-jacked and held for ransom." 2d Am. Compl.

at ¶ 147. Citing FAR § 52.212-4(f), it contends that "[a]ny delay in the Government's receipt of the cargo was excusable as it was the result of events beyond Vanquish's reasonable control and without Vanquish's fault or negligence." Id. ¶¶ 21, 148. Vanquish also contends that it would be premature to rule on the government's motion for summary judgment regarding whether the default termination was justified because it has not yet had the opportunity for any discovery.

The government urges the Court to enter summary judgment in its favor as to Count II. It argues that it is undisputed that Vanquish was assigned the twelve missions at issue; that it accepted the missions and took possession of paper copies of the TMRs; that it provided the paper TMRs to its representatives; that those representatives presented the TMRs at the origin sites and took custody of the cargo; and that Vanquish's representatives then failed to deliver the cargo for any of the twelve missions to their delivery sites. Def.'s Cross-Mot. at 18–19.

The Court agrees that it appears from the documents that the government has submitted, including certain sign-out logs and the paper TMRs, that Vanquish accepted the missions at issue and took possession of paper copies of the TMRs. See Def.'s Cross-Mot. at A687–89 (Vanquish's sign-out sheets); see also id. at A761 (statement of CO David Stevens explaining that signatures on sheets document Vanquish employees taking possession of paper TMRs). It is also not disputed that these same paper TMRs were then presented at the origin sites and that the shipments were released on the basis of their presentation.

It is unclear, however, who presented the paper TMRs and took possession of the shipments. In particular, it is unclear whether the shipments were actually picked up by Emporium in the first instance and then fell into the hands of OBLS, or whether, instead, OBLS picked up the shipments. It is also not clear who was holding the shipments and for what period of time. To be sure, there are numerous emails in the record which suggest that Vanquish's subcontractor Emporium picked up and was holding the shipments at issue because of Vanquish's failure to pay Emporium for prior assignments. But there are also emails which suggest that Emporium had enlisted OBLS as an unauthorized subcontractor and that it was OBLS that picked up and held the shipments.

Further, Vanquish claims that "pings" from the trucks suggest that the shipments were being held at some point in the vicinity of an APPF facility, but if so it is unclear how they arrived there or who was holding them. Mr. Barton, for his part, claimed that they were being held by APPF, whom he characterized as "armed men with government authority" who had "take[n] over the trucks and move[d] the trucks to their secure location," thereby creating a situation that was "beyond [his] control." Id. at A593.

Ultimately, it appears that at least some of the shipments were recovered as a result of an undercover theft investigation conducted by SIGAR and local Afghan law enforcement. But the excerpts of the SIGAR report that are publicly available and have been placed in the record by Vanquish do not shed light on when or how the shipments fell into the hands of the individual who was arrested and charged with their theft. And

the Court is acutely aware of the fact that the contract was administered in a war zone, where violence, theft, and hijackings might not be unusual.

"[T]he normal rule under the FAR is that the contractor is responsible for the unexcused defaults of its subcontractors or suppliers." Gen. Injectables & Vaccines, Inc. v. Gates, 527 F.3d 1375, 1378 (Fed. Cir. 2008) (citing John Cibinic, Jr., Ralph C. Nash, Jr., & James F. Nagle, Administration of Government Contracts 555 (4th ed. 2006)) ("Under the clauses currently in use . . . before the contractor can be excused, it must be shown that the cause of delay was beyond the control and without the fault or negligence of the contractor and all intervening contractors including the delayed subcontractor."). To the extent that the actions or inactions of Emporium were responsible for the cargo falling into the hands of unauthorized third parties, Emporium's negligence or fault would be attributable to Vanquish for purposes of the contract, even in the absence of actual fault or negligence on Vanquish's part.

Arguably, the record as it now stands supports the conclusion that the shipments were not delivered (at least initially) because of a payment dispute between Vanquish and Emporium and/or because Emporium improperly entrusted the shipments to OBLS, an unauthorized subcontractor. If so, then it is difficult to imagine how Vanquish would be able to show that its failure to ensure the delivery of the twelve shipments "was caused by an occurrence beyond [Vanquish or Emporium's] reasonable control . . . and without its fault or negligence." See FAR § 52.212-4(f); see also 2d Am. Compl. at ¶ 148.

Nonetheless, the record before the Court is unclear as to precisely what happened to the twelve shipments after they were picked up in late September and early October of 2015, and over the course of the next few months, culminating with their recovery as a result of an undercover SIGAR investigation. As noted, Vanquish has argued that it is premature to rule on the government's motion for summary judgment as to Count II because it has not yet had the opportunity to conduct any discovery. It states that it knows "virtually nothing" about the "circumstances under which the government recovered the stolen cargo and the degree to which that information disproves the government's assertion that Vanquish was in default under the contract." Pl.'s Reply in Supp. of Mot. for Partial Summ. J. and Opp. to Def.'s Cross-Mot. for Summ. J. ("Pl.'s Reply") at 19, ECF No. 59.

The Court agrees that it would be premature for it to resolve the government's motion for summary judgment as to Count II in Vanquish's complaint. In fact, during a status conference held on August 16, 2017,[10] and by order of that same day (ECF No.

---

[10] The telephonic status conference ("TSC") held on August 16, 2017 was recorded by the court's electronic digital recording ("EDR") system. The times noted in this Opinion and Order refer to the EDR record of the TSC.

22),[11] the Court authorized <u>Vanquish</u> to file a <u>limited</u> motion for summary judgment, to raise the purely legal issue identified above, as well as any similar purely legal issues regarding the government's counterclaims. <u>See generally</u> 2:17:30–23:00. The Court did so with the understanding that the parties would engage in limited discovery (i.e., the exchange of documents) while Vanquish's motion was being decided. <u>See</u> 2:21:00–55 (Def.'s Counsel) (proposing exchanging documents and holding off on additional discovery until Vanquish's motion was decided); 2:21:55–2:23:00 (counsel for both parties and Judge confirming understanding of procedure to be followed). The purpose of permitting any summary judgment motion at all was to potentially narrow the ultimate scope of discovery based on the Court's ruling on the purely legal issues. 2:18:55–19:40 (exchange between Judge and Vanquish's counsel regarding narrowing the scope of discovery through the filing of Vanquish's motion for summary judgment). The government did not indicate during the status conference that it also intended to seek summary judgment on the grounds articulated in the motion currently before the Court. <u>See generally</u> 2:17:30–23:00.

In any event, as the court of appeals has noted, "[u]nder the Federal Rules of Civil Procedure," upon which the Rules of the Court of Federal Claims are based, "the parties must be afforded adequate time for general discovery before being required to respond to a motion for summary judgment." <u>Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.</u>, 527 F.3d 1330, 1336–37 (Fed. Cir. 2008) (citations omitted); <u>see also</u> <u>Burnside-Ott Aviation Training Ctr., Inc. v. United States</u>, 985 F.2d 1574, 1582 (Fed. Cir. 1993) (observing that "'[t]he Supreme Court has made clear that summary judgment is inappropriate unless a tribunal permits the parties adequate time for discovery'") (quoting <u>Dunkin' Donuts of Am. v. Metallurgical Exoproducts Corp.</u>, 840 F.2d 917, 919 (Fed. Cir. 1988) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 326 (1986))). Further, where, as in this case, "there has been no adequate initial opportunity for discovery, a strict showing of necessity and diligence that is otherwise required for a Rule 56[(d)] request for additional discovery . . . does not apply." <u>Metro. Life Ins.</u>, 527 F.3d at 1337 (citations omitted).

Accordingly, the Court will deny without prejudice the government's motion for summary judgment as to Count II of Vanquish's complaint because the motion was prematurely filed, before Vanquish had any opportunity for discovery.[12] Once discovery is completed, the Court may entertain motions for summary judgment as to Count II, as appropriate.

---

[11] The Court's order explicitly contemplated that only Vanquish would file an early motion for summary judgment. <u>See</u> Order, ECF No. 22 ("[T]he plaintiff shall file any motion for summary judgment by September 15.").

[12] <u>See</u> 10A Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 2728 (4th ed. Sept. 2018 Update) ("[A]fter the pleadings are closed courts have denied summary judgment without prejudice to renewing the motion after discovery . . . .").

**V.      The Government's Motion for Summary Judgment as to Count III**

In Count III of its amended complaint, Vanquish claims that the termination for cause letter dated January 22, 2016 "was issued based on TransCom's bad faith and specific intent to harm Vanquish." 2d Am. Compl. at ¶ 154; see also id. at ¶ 156 (alleging that "TransCom's bad faith termination of the 12 TMRs constituted a breach of contract and a breach of TransCom's duty of good faith and fair dealing"). The government has filed a motion for summary judgment with respect to Count III. It contends that the subjective motivations or bad faith of a contracting officer are irrelevant to whether a termination for default is arbitrary, capricious, or an abuse of authority. According to the government, if it was objectively reasonable for the contracting officer to terminate the twelve missions for cause, the contracting officer's motivation for doing so is irrelevant.

The government's argument is inconsistent with precedent governing the "abuse of discretion" standard. It is well established that a contracting officer is not required to terminate a contract based on an unexcused default; the default "merely gives the procuring agency the discretion to do so." Darwin Constr. Co. v. United States, 811 F.2d 593, 596 (Fed. Cir. 1987). And "that discretion must be reasonably exercised." Id. In particular, the contracting officer "may not use default as a pretext for terminating a contract for reasons unrelated to performance." McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1329 (Fed. Cir. 1999), cert. denied, 529 U.S. 1097 (2000). In fact, "[a] termination for default that is unrelated to contract performance is arbitrary and capricious, and thus an abuse of the contracting officer's discretion." Id. at 1326. "This proposition itself is but part of the well established law governing abuse of discretion by a contracting official." Id. (citing U.S. Fidelity & Guaranty Co. v. United States, 676 F.2d 622, 630 (Ct. Cl. 1982)). As summarized in McDonnell Douglas, in United States Fidelity & Guaranty Co. the court of appeals:

> list[ed] four factors to be used in determining if conduct by a government official is arbitrary and capricious: (1) evidence of subjective bad faith on the part of the government official, (2) whether there is a reasonable, contract-related basis for the official's decision, (3) the amount of discretion given to the official, and (4) whether the official violated an applicable statute or regulation.

Id.

The burden of showing that the contracting officer acted in bad faith when he terminated the contract for default falls on Vanquish. Thus, the Federal Circuit and its predecessor court "have long upheld the principle that government officials are presumed to discharge their duties in good faith." Rd. & Highway Builders, LLC v. United States, 702 F.3d 1365, 1368 (Fed. Cir. 2012) (citing Am–Pro Protective Agency v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002); T & M Distribs., Inc. v. United States, 185 F.3d 1279, 1285 (Fed. Cir. 1999); Torncello v. United States, 681 F.2d 756, 770–71 (Ct. Cl. 1982); Schaefer v. United States, 633 F.2d 945, 948–49 (Ct. Cl. 1980); Kalvar Corp. v. United States, 543 F.2d 1298 (Ct. Cl. 1976); Librach v. United States, 147 Ct. Cl. 605, 614 (1959); Knotts v. United States,121 F.Supp. 630, 631 (Ct. Cl. 1954)). Moreover, "'a

high burden must be carried to overcome this presumption,' amounting to clear and convincing evidence to the contrary." Id. (quoting Am-Pro, 281 F.3d at 1239–40). In fact, "a challenger seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a 'specific intent to injure the plaintiff' by clear and convincing evidence." Id. (quoting Am-Pro, 281 F.3d at 1240).

In its complaint, Vanquish alleges that the terminations of the twelve missions "were motivated by TransCom's animus toward Vanquish (and its owner, Eric Barton) and out of a specific intent by Transcom's officials to harm Vanquish." 2d Am. Compl. at ¶ 65; see also id. at ¶ 67 (alleging that "TransCom officials believe that Mr. Barton is dishonest and through their collective actions, including their actions in terminating for cause the 12 TMRs that are the subject of this matter, have sought to 'give him a black eye' and cause harm to his business"). Vanquish recounts a variety of what it alleges were bad faith acts by USTRANSCOM which were intended "to harm Vanquish at every opportunity, including efforts to block Vanquish from receiving award of a contract, improper allocations of missions and improper suspensions on the NAT 1.5 and NAT 2 contracts, refusing to award Vanquish option year work on NAT 2 and terminating for cause 12 TMRs." Id. at ¶ 69; see id. at ¶¶ 70–141 (detailing allegations of bad faith against USTRANSCOM).

According to Vanquish, the animus against it "is based on events that occurred in Iraq in 2006 and 2007 when Mr. Barton was caught up in an alleged scandal involving a TransCom contracting officer." 2d Am. Compl. at ¶ 66. It further alleges that "TransCom officials have harbored an animus against Mr. Barton and Vanquish even though Mr. Barton was determined to be a 'presently responsible contractor' by the U.S. Army Suspension and Debarment Official ('SDO')" and that "Transcom officials believe that Mr. Barton should have been debarred as a result of those actions in Iraq in 2006 and they continue to harbor that belief to this day—even though Mr. Barton successfully demonstrated his responsibility to the U.S. Army SDO during debarment proceedings in 2007." Id.

Vanquish has not submitted any direct evidence to substantiate its allegations that the default termination of the twelve missions was in fact based on a desire to harm Vanquish or its owner. Further, the evidence submitted by the government, which includes a series of emails documenting USTRANSCOM's efforts to secure assurances of performance from Vanquish, culminating in the contracting officer's default termination letter, appear to reflect good faith attempts by USTRANSCOM to give Vanquish more time to recover the cargo. It also appears to provide a reasonable performance-based justification for the default termination.

Nonetheless, as discussed with respect to the government's motion for summary judgment as to Count II, Vanquish has not yet had a chance to conduct any discovery regarding the contracting officer's decision to terminate for default. It has not, for example, had the opportunity to probe the reasons why the contracting officer decided to terminate the twelve missions for cause rather than using an option that might have been less harmful to Vanquish's business, such as the designation of the 12 TMRs as failed missions.

The Court recognizes that a nonmovant's "mere hope" of developing further evidence is an inadequate reason to grant discovery under Rule 56(d). Serdarevic v. Advanced Med. Optics, Inc., 532 F.3d 1352, 1364 (Fed. Cir. 2008). But here, given that Vanquish has had no opportunity to discover the circumstances under which the contracting officer made the "drastic decision" to terminate the twelve missions for default, the 56(d) standard does not apply and, therefore, it would be inappropriate to grant the government's motion at this juncture in the proceedings. See Metro. Life Ins., 527 F.3d at 1336–37.

Accordingly, as it did with respect to the government's motion for summary judgment as to Count II, the Court denies the government's motion for summary judgment as to Count III of the second amended complaint without prejudice, because it was prematurely filed. Once discovery is completed, the Court may entertain motions for summary judgment as to Count III, as appropriate.

## VI.    Vanquish's Motion for Partial Summary Judgment as to the Government's Counterclaims

Vanquish has filed a motion for partial summary judgment as to seven of the government's nine counterclaims. Its bases for seeking summary judgment fall into three categories. First, as to counterclaims one, four, five, and eight, Vanquish contends that the contracting officer's decision to accept and pay the invoices on the TMRs at issue was "final and binding and barred the subsequent [contracting officers' final decisions]."[13] Pl.'s Mem. App. at 35. Second, it argues that it is entitled to summary judgment as to counterclaims one, three, four, and eight because the government allegedly "did not exercise its post-acceptance rights within a reasonable time after the alleged defects in Vanquish's performance were known or should have been known." Id. at 39. Finally, it seeks summary judgment as to counterclaim seven on the grounds that the government "failed to follow the Defense Transportation Regulations as required by the NAT 2 contract." Id. at 43. The Court addresses each of these contentions below.

### A.    Final and Binding Prior Decisions

The government's first and fifth counterclaims seek damages "for security services paid for by the United States but not provided by the plaintiff." Def.'s Answer to Pl.'s 2d Am. Compl. & Def.'s Countercls. as Previously Alleged ("Def.'s Answer") at ¶¶ 161, 198, ECF No. 34. The contracting officer issued final decisions asserting claims in the amounts of $197,865.00 for damages resulting from the alleged breach of contract by Vanquish described in counterclaim one and $36,510.00 for damages resulting from plaintiff's breach of contract as set forth in counterclaim five. Id.

The government's fourth counterclaim "seeks $20,978.74, plus interest pursuant to the CDA, for excessive amounts billed by the plaintiff, and paid by the United States,

---

[13] For purposes of all quotations in this paragraph, the Court omits capitalization of words in sentences taken from section headings.

for canceled missions." Id. ¶ 189. Specifically, for a number of missions, Vanquish billed the United States (and the government paid) two "mission units" for TMRs "which were cancelled after the Required Spot Date (RSD), even though each such TMR was only for the transportation of cargo the distance of one MU." Id. ¶ 192. The contracting officer issued a final decision asserting a claim in the amount of $20,978.74 for damages resulting from Vanquish's refusal to return these overpayments. Id. ¶ 196.

Finally, in counterclaim eight, the government alleges that "[o]n numerous occasions during the NAT 2.0 period of performance, plaintiff failed to meet the RLD or RDD." Id. ¶ 230. Then, "[i]nstead of invoicing for the reduced contract rate, plaintiff invoiced for, and received, more payment from the United States than plaintiff was entitled to receive." Id. The contracting officer issued a final decision asserting a claim in the amount of $66,755.20 for damages resulting from these alleged breaches. Id. ¶ 232.

Vanquish contends that the contracting officer's final determinations as to these counterclaims constituted "an improper attempt to avoid a prior contracting officer's determination that was made within that contracting officer's authority—specifically, the determination, after the contractually mandated invoicing procedure, to accept and pay Vanquish for the performances of various TMRs." Pl.'s Mem. at 36. "These determinations are final," Vanquish claims, "and the subsequent [contracting officer's final decisions] that reverse the determinations are improper as a matter of law." Id. It contends that "the government is bound by the acts of its authorized representatives, even if their decisions are erroneous or a successor contract[ing officer] may exercise judgment that he or she deems superior." Id. (citations omitted).

Vanquish's argument—that mere payment of an invoice forecloses any subsequent effort by the government to collect amounts erroneously paid—lacks merit. "It is a well-settled principle that the Government has inherent authority to recover sums illegally or erroneously paid, and that it cannot be estopped from doing so by the mistakes of its officers or agents." Aetna Cas. & Sur. Co. v. United States, 526 F.2d 1127, 1130 (Ct. Cl. 1975) (citing, inter alia, United States v. Wurts, 303 U.S. 414, 415 (1938)); see also Amtec Corp. v. United States, 69 Fed. Cl. 79, 88 (2005), aff'd, 239 F. App'x 585 (Fed. Cir. 2007) (government is entitled to recover fixed fee that it erroneously approved for payment). Indeed, FAR § 32.601(a)(1) defines "contract debts" as "amounts that [h]ave been paid to a contractor to which the contractor is not currently entitled under the terms and conditions of the contract." And FAR § 32.602(a) requires the contracting officer to identify and collect such debts.

Perhaps recognizing the flaws in this argument, Vanquish has attempted recast it in its reply. It no longer argues that "the government is bound by the acts of its authorized representatives, even if their decisions are erroneous." Pl.'s Mem. App. at 36. Instead, in its reply it asserts that it "does not agree that the claims at issue are for the recovery of sums 'illegally or erroneously paid.'" Pl.'s Reply at 27 (quoting Def.'s Cross-Mot. at 60 (quoting Aetna, 526 F.2d at 1130)). It then presents its arguments why the approval and payment of the invoices at issue was proper. Pl.'s Reply at 27–30.

The underlying propriety or merits of the payment of the invoices was not the subject of Vanquish's motion for partial summary judgment as to the counterclaims at issue. Rather, Vanquish's argument was based on a sort of estoppel theory which posited that whether or not the original payments were appropriate, the government was bound by them.

Because Vanquish's merits arguments were not presented in its opening brief and the government did not have the opportunity to respond to them, the Court declines to address them. Vanquish's motion for partial summary judgment as to counterclaims one, four, five, and eight based on the "final and binding" nature of the decisions to pay the invoices, lacks merit.

### B.   Failure to Exercise Post-Acceptance Rights Within a Reasonable Time

Vanquish contends that it is entitled to summary judgment as to counterclaims one, three, four, and eight because the government allegedly "did not exercise its post acceptance rights within a reasonable time after the alleged defects in Vanquish's performance were known or should have been known." Pl.'s Mem. at 39–40 (citing FAR § 52.212-4). It contends that the failure of the government to act promptly is particularly problematic "because the contracts involve the performance of transportation services through a warzone and defending against TransCom's improper and untimely claims would require additional documentation and substantiation that the passage of time would make it virtually impossible for Vanquish to obtain." Id. at 34.

Vanquish will bear the burden of proving unreasonable delay by the government, as such delay is an affirmative defense to the government's counterclaims. But in moving for summary judgment, it supplies no factual predicate that identifies when the government knew or should have known of the defects that provide the basis for the government's counterclaims. Nor has it provided a factual predicate for what steps, if any, the government took to attempt to recoup the overpayments it alleges. And finally, there are no facts in the record that address the extent to which any delay in time between the discovery of the defects and the government's response was or was not reasonable.

Moreover, the declaration of the contracting officer, submitted by the government, suggests that he acted promptly to notify Vanquish as to several of the alleged defects that serve as the basis for the relevant counterclaims. For example, as to the first counterclaim (concerning alleged overbilling for security services not provided), the contracting officer stated that he did not learn that Vanquish had contracted security services for only part of the assigned route until December 2015, and that he raised the issue with Vanquish that same month. Def.'s Cross-Mot at A781–82. As to the fourth counterclaim, involving overpayments to Vanquish for cancelled missions, evidence in the record indicates that the issue was revealed in July 2016 in the course of a broad audit of records, and that the contracting officer sent Vanquish a demand letter in August. Id. at A783. The eighth counterclaim was also apparently based on information disclosed in a broader audit which was conducted in February of 2017 and a demand letter was sent in March 2017. Id.

In short, Vanquish has not established the absence of a factual dispute as to when the government became aware or should have become aware of the defects that formed the basis for the counterclaims at issue. Nor is the record before the Court sufficient to find that any delay was an unreasonable one. Its motion for summary judgment as to counterclaims one, three, four, and eight on the basis of unreasonable delay therefore lacks merit.

**C.       Failure to Follow the Defense Transportation Regulations Incorporated into the Contract**

The government's seventh counterclaim alleges that Vanquish lost cargo entrusted to its care and seeks $59,556.21 in damages, plus interest. Def.'s Answer at ¶ 220. The lost cargo is related to three TMRs. The discrepancies in the cargo for those three TMRs were discovered in December 2014, March 2015, and June 2015 as evidenced by Transportation Discrepancy Reports. See Pl.'s Mem. App. Ex. R, at 273, 309–12, 331. The government did not notify Vanquish of its claims on these three shipments until 10–16 months after their discovery. See id. at 267 (Contracting Officer's Final Decision stating that Vanquish was notified of debts for the three TMRs in question on May 4, 2016).

Section 5.2.3.6 of the NAT 2.0 contract, entitled "Claims Liability," states that "the Contractor shall be financially liable for the replacement of all unaccounted for or damaged cargo." Def.'s Cross-Mot. at A387. It further provides that "[t]he Government will process cargo claims in accordance with the Defense Transportation Regulation (DTR), Part II, Chapter 210, and the Contractor agrees to cooperate with Government efforts to resolve claims for loss or damage to Government cargo." Id. The DTR, in turn, states that for non-classified or non-protected shipments "[w]hen a TSP [Transportation Service Provider] delivers a shipment and pilferage, theft, damage, or vandalism is apparent, the consignee must notify the TSP in writing by the most expedient means possible (i.e., fax, e-mail) within 3 business days of discovery." Defense Transportation Regulation, Part II, Ch. 210, ¶ H.2.b. The TSP then has the right to inspect the shipment within seven calendar days. Id.

Vanquish argues that the time limits specified in the DTR for notifying it of a claim for lost or damaged cargo were incorporated into the contract and that the government's undisputed failure to comply with those time limits precludes it from pressing its seventh counterclaim. It also contends that the three-day time limit set forth in the DTR should inform the Court's consideration of whether the seventh counterclaim should be barred as untimely under FAR § 52.212-4. In response, the government contends that the DTR is merely a "guidance document" that is not intended to benefit contractors and that such provisions "'supply no remedy for private parties in a judicial forum.'" Def.'s Cross-Mot. at 69 (quoting Am. Tel. & Tel. Co. v. United States, 307 F.3d 1374, 1379–80 (Fed. Cir. 2003) (hereinafter "AT&T")).

Vanquish has the better of this argument. The DoD regulation at issue is incorporated explicitly into the contract and is part of the section on "Claims Liability." Further, the provision in the DTR that was incorporated into the contract cannot be fairly

characterized as a "guidance document." For instance, it establishes mandatory time limits and procedures for resolving claims for damage to government cargo. The regulations at issue in AT&T, on the other hand, were not part of the contract. And the FAR and DoD provisions that the plaintiff sought to enforce were not directives but merely provided guidance for contracting officers in the exercise of their broad discretion to choose the appropriate contracting vehicle. In fact, the court of appeals found it significant that the provisions in AT&T that the plaintiff sought to enforce merely "cautioned" the contracting officer against a fixed-price contract in certain circumstances, noting that "[a] caution . . . is not a prohibition." 307 F.3d at 1380. The DTR provisions at issue in this case are mandatory and not merely cautionary.

In short, Vanquish has established that there are no facts in dispute with respect to the government's failure to comply with the relevant DTR provisions. It is therefore entitled to judgment as a matter of law with respect to counterclaim seven.

## CONCLUSION

On the basis of the foregoing, the government's motion for partial summary judgment is **GRANTED** as to Count I of the second amended complaint, but **DENIED** without prejudice as to Counts II and III. Vanquish's motion for partial summary judgment is **GRANTED** as to the government's seventh counterclaim; otherwise it is **DENIED**.

In light of the Court's ruling, the government's motion to stay decision on cross-motions for partial summary judgment (ECF No. 70) and Vanquish's unopposed motion for an enlargement of time to file a joint preliminary status report (Case No. 18-1043C, ECF No. 11) are **DENIED** as moot.

The parties shall file a joint status report by **November 2, 2018**, proposing a schedule for discovery regarding Counts II and III of the complaint as well as the government's remaining counterclaims.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge