# In the United States Court of Federal Claims

Nos. 17-96C; 18-1043C; 19-310C

(Filed: March 6, 2020)

| | |
|---|---|
| VANQUISH WORLDWIDE, LLC, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> THE UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) <br> ) | Keywords: Motion to Dismiss; Motion for Summary Judgment; Breach of Contract; Government Contracts; Performance Work Statement. |

*Todd W. Miller*, Miller & Miller, LLC, Denver, CO, and *Michael D. Maloney*, Williams Mullen, P.C., Tysons, VA, for Plaintiff.

*James W. Poirier* and *Eric J. Singley*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Franklin E. White, Jr.*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, and *Joseph H. Hunt*, Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN**, Judge.

The plaintiff in these consolidated cases is Vanquish Worldwide, LLC ("Vanquish"), a service-disabled, veteran-owned small business that provides trucking and logistics services to the Department of Defense, both domestically and abroad. See Vanquish Worldwide, LLC v. United States (Vanquish I), 140 Fed. Cl. 460, 464 (2018). The cases arise out of Vanquish's claims that the U.S. Transportation Command ("USTRANSCOM") breached and/or improperly terminated for default aspects of two indefinite delivery/indefinite quantity ("IDIQ") contracts under which Vanquish provided trucking services in support of U.S. military operations in Afghanistan.

In a decision and order issued on October 18, 2018, this Court granted the government's motion for partial summary judgment as to Count I of Vanquish's second amended complaint in the lead case (No. 17-96) (alleging breach of an implied warranty). See id. at 475–76. It denied the parties' cross-motions for summary judgment as to Counts II and III (challenging the propriety of the default termination of twelve transportation missions assigned to Vanquish and alleging a violation of the duty of good faith and fair dealing with respect to the same). Id. at 476–81. It granted Vanquish's

motion for partial summary judgment as to the government's seventh counterclaim, but denied that motion as to the government's other counterclaims. Id. at 481–84.

In Nos. 18-1043 and 19-310, Vanquish claims additional breaches of both IDIQ contracts. See 3d Am. Compl. No. 18-1043, ECF No. 120; Am. Compl. No. 19-310, ECF No. 105. Currently before the Court are: 1) the government's Motion to Dismiss in Part and for Partial Summary Judgment in No. 18-1043, ECF No. 136 ("Def.'s Mot. No. 18-1043"); and 2) its Motion to Dismiss Counts I–IV in No. 19-310 for lack of subject-matter jurisdiction, ECF No. 125 ("Def.'s 12(b)(1) Mot. No. 19-310"), or, in the alternative, for failure to state a claim, ECF No. 90 ("Def.'s 12(b)(6) Mot. No. 19-310").

For the reasons set forth below, the government's motions to dismiss Counts I–IV in No. 19-310 for lack of subject-matter jurisdiction or for failure to state a claim are **DENIED**. ECF Nos. 90, 125. Its motion to dismiss in part and for partial summary judgment in No.18-1043, on the other hand, is **GRANTED**. ECF No. 136.

## BACKGROUND[1]

The two contracts at issue in these cases are the National Afghanistan Trucking 1.5 Contract ("NAT 1.5") and the National Afghanistan Trucking II Contract ("NAT 2.0"). Both were IDIQ contracts between USTRANSCOM and Vanquish under which Vanquish transported a variety of cargo by truck to support U.S. military operations in Afghanistan. See Vanquish I, 140 Fed. Cl. at 464–65. The performance period for NAT 1.5 lasted from June 16, 2014 until December 15, 2014, and the performance period for the first option year of NAT 2.0 was from December 16, 2014 to December 15, 2015. Id. at 464, 466.

As noted in Vanquish I, to order trucking services under the NAT 1.5 contract (as well as the subsequent NAT 2.0 contract), the government issued Transportation Movement Requests, or "TMRs." Id. at 465. For each mission, the TMR would specify a Required Spot Date ("RSD")—that is, the date the truck was required to be at the pickup location; a Required Load Date—i.e., the date that the truck had to be ready for loading; and a Required Delivery Date ("RDD")—the date when the truck would need to arrive at the destination location. Id. at 467.

In No. 18-1043, Vanquish claims that USTRANSCOM breached the NAT 1.5 contract when it: 1) failed to provide Vanquish with payments for a number of completed transportation missions, and 2) failed to make payments at demurrage rates where the actions of the U.S. government caused delays at the pickup and/or delivery locations. See 3d Am. Compl. No. 18-1043 ¶¶ 26–29. Vanquish also alleges that the agency violated its duty of good faith and fair dealing by failing to make these payments. Id. ¶¶ 31–32.

---

[1] The facts set out in this section are based on the allegations in the amended complaints which the Court accepts as true for purposes of ruling on the government's motions to dismiss.

Vanquish seeks damages in the amount of $304,691.77 as compensation for the alleged breaches of contract. Id. ¶ 29.

The government has moved to dismiss Vanquish's payment claims in No. 18-1043 under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"). Def.'s Mot. No. 18-1043 at 7. The government contends that a number of Vanquish's demurrage claims must be dismissed because they are based on delays that were caused by the Afghan Public Protection Force ("APPF") and the contract expressly disclaims liability for demurrage based on APPF-caused delays. Id. at 10. The government further argues that another ninety-nine demurrage claims must be dismissed for failure to state a claim because they are based on a misinterpretation of language in the contract governing demurrage payments. Id. at 12. Finally, the United States seeks summary judgment as to some sixty-eight other claims on the grounds that Vanquish failed to provide the data required by the contract to establish its entitlement to demurrage payments. Id.

In Counts I and III of its amended complaint in No. 19-310, Vanquish contends that USTRANSCOM violated contractual fair consideration procedures governing the assignment of transportation missions among the contractors competing for TMRs under NAT 1.5 and NAT 2.0. Am. Compl. No. 19-310 ¶¶ 111–17, 122–26. As a result, according to Vanquish, it was not assigned as many missions as it was entitled to receive. In Counts II and IV Vanquish alleges that the failure to assign it the requisite number of missions was the result of the government's bad faith and was motivated by a specific intent to cause Vanquish injury. Id. ¶¶ 118–21, 127–31. Vanquish seeks an unspecified amount in damages for these breaches.[2]

## DISCUSSION

**I. The Government's Motion to Dismiss Counts I–IV of Vanquish's Complaint in Case No. 19-310**

### A. Vanquish's Allegations

In its amended complaint in No. 19-310, Vanquish alleges that USTRANSCOM breached its obligations under NAT 1.5 and NAT 2.0 to use the Order of Merit List ("OML") process to determine the number of missions assigned to each contractor on a weekly basis. Its claim under NAT 1.5 is based on an implied-in-fact agreement to use the procedure, while its claim under NAT 2.0 is based on the express provisions of that contract. Am. Compl. No. 19-310 ¶¶ 115, 125.

With respect to the claimed breaches during the administration of NAT 1.5, Vanquish alleges that USTRANSCOM originally intended that the NAT 2.0 contract

---

[2] In Count V of the amended complaint in No. 19-310, Vanquish seeks a declaratory judgment that USTRANSCOM's evaluation of its performance under the contract was arbitrary, capricious, and contrary to law. That claim is not before the Court on consideration of the government's motions to dismiss.

would immediately follow NAT 1, but protest activity required USTRANSCOM to create NAT 1.5 as a bridge contract. Id. ¶¶ 7–8. It further alleges that at the time the bridge contract was issued, the contracting officer "made it clear to all contractors that the NAT 1.5 contract was simply a continuation of the NAT 1 contract, and that the NAT 1.5 contract would have the same terms and conditions as the NAT 1 contract." Id. ¶ 9.

Vanquish states that under the OML process specified in NAT 1, which it alleges USTRANSCOM in fact continued to follow under NAT 1.5, the relative performance and pricing of the various contractors were compared and "OML Sheets" were issued to each contractor every week. Id. ¶¶ 10, 11. These documents, according to Vanquish, "specified what percentage of the total missions under each Suite would be assigned that week to the contractor." Id. ¶ 10. According to Vanquish, "[b]y issuing OML Sheets each week specifying a percentage of missions that Vanquish would receive that week, the Government was creating a contractual obligation under NAT 1.5 to assign that percentage of missions to Vanquish that week." Id. ¶ 14.

In Count I of its amended complaint in No. 19-310, Vanquish alleges that, according to its analysis of mission assignments under NAT 1.5, it "received far less than an average, pro rata assignment of missions." Id. ¶ 113. It contends that while it "was entitled to the percentage of missions specified in the weekly OML Sheets, and was not entitled merely to an average, pro rata allocation, the analysis showing that Vanquish did not receive even an average allocation indicates that Vanquish did not receive the missions it should have received." Id. It further states that "based on the fact that Vanquish received far fewer than a pro rata allocation even though its performance of the Contract was not far below average, and based on the long conduct of bad faith treatment of Vanquish by TransCom . . . and on information and belief," USTRANSCOM breached the terms of the NAT 1.5 contract. It also alleges a breach of the implied covenant of good faith and fair dealing based on USTRANSCOM's failure "to assign Vanquish the number of missions to which it was entitled under the Contract." Id. ¶¶ 113–14. In Count II, Vanquish contends that USTRANSCOM administered the OML process under NAT 1.5 in bad faith with a specific intent to harm Vanquish. Id. ¶ 119–20.

In Count III, Vanquish alleges a breach of the express provisions of section 5.2.4.2 of the performance work statement ("PWS") for the NAT 2.0 contract. That provision states that:

> A Transportation Mission Request (TMR) issued to the carrier will be based on an internally established fair opportunity procedure which ranks the providers according to various factors to include past performance, price, or other relevant factors where non-price factors are more important than price considerations. This fair opportunity performance based rank-ordered list of providers is known as the Order of Merit List (OML) and the specific methodology for placing orders is at the [United States government]'s discretion.

Id. ¶ 18. Vanquish alleges: 1) that the agency "implemented its contractual obligation to use an OML in assigning missions by sending out weekly OML Sheets, and by specifying in those OML Sheets the percentage of missions each contractor would

4

receive that week based on the OML list," id. ¶ 21, and 2) that "[t]he specification in Vanquish's OML Sheets of the percentage of work that would be assigned to Vanquish each week represented a promise by the Government to Vanquish to assign that amount of work to Vanquish that week," id. ¶ 22. Based again on an analysis of mission assignments, Vanquish alleges that it "received far less than an average, pro rata assignment of missions under the NAT 2.0 Contract." Id. ¶ 124. It further alleges that "[n]either Vanquish's performance on the NAT 2 Contract, nor its pricing, relative to the other Contractors on the Contract, were such that it should have received a mission allocation well below average." Id. Based on this analysis, as well as what Vanquish characterizes as the "long conduct of bad faith treatment of Vanquish" by USTRANSCOM, Vanquish alleges that it "did not assign missions to Vanquish in the manner specified by PWS § 5.2.4.2." Id. ¶ 124.

In Count IV, Vanquish contends, as it did in Count II with respect to NAT 1.5, that USTRANSCOM's failure to follow the OML process in the assignment of missions under NAT 2.0 was the product of a specific intent to harm Vanquish. Id. ¶ 128. It also contends that USTRANSCOM acted in bad faith when it failed to award option period two to Vanquish under NAT 2.0. Id. ¶ 130.

### B. The Government's Motion to Dismiss for Lack of Subject-Matter Jurisdiction

As noted, the government has filed a motion to dismiss Counts I–IV of Vanquish's complaint for lack of subject-matter jurisdiction pursuant to RCFC 12(b)(1). Def.'s 12(b)(1) Mot. No. 19-310, ECF No. 125. For the reasons set forth below, the Court concludes that the government's jurisdictional arguments lack merit.

When ruling on a motion to dismiss under RCFC 12(b)(1), the Court "consider[s] the facts alleged in the complaint to be true and correct." Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 747 (Fed. Cir. 1988) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). "If a motion to dismiss for lack of subject-matter jurisdiction, however, challenges the truth of the jurisdictional facts alleged in the complaint, the [court] may consider relevant evidence in order to resolve the factual dispute." Id.

Under the Tucker Act, 28 U.S.C. § 1491(a)(2), the Court of Federal Claims has jurisdiction "to render judgment upon any claim by or against, or dispute with, a contractor arising under section 7104(b)(1) of title 41," i.e. the Contract Disputes Act (the "CDA"). The CDA, in turn, gives this Court jurisdiction to hear claims relating to "any express or implied contract . . . made by an executive agency for . . . the procurement of services." 41 U.S.C. § 7102(a)(2). It also provides that "in lieu of appealing the decision of a contracting officer . . . to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary." 41 U.S.C. § 7104(b)(1).

"[F]or the Court of Federal Claims to have jurisdiction under the CDA, the contractor must submit a proper claim—a written demand that includes (1) adequate notice of the basis and amount of a claim and (2) a request for a final decision."

5

M. Maropakis Carpentry, Inc. v. United States, 609 F.3d 1323, 1328 (Fed. Cir. 2010) (citing James M. Ellett Constr. Co., Inc. v. United States, 93 F.3d 1537, 1541–42 (Fed. Cir. 1996)). The CDA also requires "the contractor [to] have received the contracting officer's final decision on [its] claim." Id.

In this case, it is undisputed that Vanquish filed written demands with the contracting officer posing the same breach of contract claims presented in Counts I–IV of its amended complaint and that it received final decisions denying those claims. Further, the government acknowledges that the breach of contract claims pressed in Counts I–IV are "within the general ambit of the CDA." Def.'s 12(b)(1) Mot. No. 18-1043 at 7. Nonetheless, the government has moved to dismiss Counts I–IV for lack of jurisdiction on the grounds that the "general jurisdiction" afforded by the CDA has been "divested by the specific provisions of [10 U.S.C. § 2304c]." Id.

This argument (or a variation of the same) has been rejected each time the government has presented it. See, e.g., Digital Techs., Inc. v. United States, 89 Fed. Cl. 711 (2009); Cmty. Consulting Int'l, ASBCA No. 53489, 02-2 BCA ¶ 31,940; SIA Constr., Inc., ASBCA No. 57693, 14-1 BCA ¶ 35,762; see also 16 Ralph C. Nash & John Cibinic, Nash & Cibinic Rep. ¶ 49 (2002). This Court similarly finds the argument lacks merit.

Section 2304c(b) of title 10 was enacted as part of the Federal Acquisition Streamlining Act of 1994 ("FASA"), Pub. L. No. 103-355, 108 Stat. 3243. It provides, with exceptions not relevant here, that where an agency enters multiple task award contracts for the same services, "all contractors awarded such contracts shall be provided a fair opportunity to be considered, pursuant to procedures set forth in the contracts, for each task or delivery order in excess of $2,500 that is to be issued under any of the contracts." § 2304c(b). Indeed, the contractually mandated OML process that Vanquish alleges was violated in this case appears to have been intended to provide the "fair opportunity to be considered" that is required under § 2304c(b) as well as Federal Acquisition Regulation ("FAR") 48 C.F.R. 16.505(b)(1). § 2304c(b); see Am. Compl. No. 19-310 ¶ 18 (section 5.2.4.2 of the NAT 2.0 contract) (stating that "TMR[s] issued to the carrier will be based on an internally established fair opportunity procedure").

Subsection (e) of § 2304c precludes contractors—except in specified circumstances—from pursuing "protest[s] . . . in connection with the issuance or proposed issuance of a task or delivery order" before either the Government Accountability Office ("GAO") or this court. It provides that such "[a] protest is not authorized" except where "the order increases the scope, period, or maximum value of the contract under which the order is issued," or where the order is valued in excess of $25,000,000. § 2304c(e)(1).

Subsection (f), in turn, establishes an alternative process that contractors may use to register complaints about an unfair allocation of task orders. § 2304c(f). It states that the heads of agencies that award multiple task or delivery order contracts are required to "appoint or designate a task and delivery order ombudsman." Id. That ombudsman, according to subsection (f), "shall be a senior agency official who is independent of the

contracting officer for the contracts." Id. He or she "shall be responsible for reviewing complaints from the contractors on such contracts and ensuring that all of the contractors are afforded a fair opportunity to be considered for task or delivery orders when required under subsection (b)." Id.

Under § 2304c, in circumstances where subsection (e) precludes a contractor from filing a protest with GAO or this court, resort to the agency ombudsman is the putative protester's only recourse. The Court notes that the ombudsman's remedial authority is unspecified, but it is undisputed that he or she is not authorized to award damages for breach of contract. Instead, the ombudsman is tasked with conducting a review and "ensuring" in some unspecified fashion that "all . . . contractors are afforded a fair opportunity to be considered." § 2304c(f).

As is readily apparent, § 2304c(e) and (f) govern contractors' rights to file "protests," not their rights to pursue claims for breach of contract. The government does not appear to contend, however, that Vanquish is attempting to pursue a "protest" in this Court. § 2304c(e). Nor could it. Vanquish seeks money damages as compensation for breaches of specific contractual provisions, not bid protest remedies such as injunctive relief setting aside an award to a competitor. In addition, Vanquish is not complaining that it was denied some generic "fair opportunity to be considered" as described in subsection (f) of § 2304c. It is alleging breaches of specific contractual obligations regarding the prescribed method by which task orders are to be assigned under the NAT 1.5 and 2.0 contracts.

Indeed, the contracting officer certainly understood that Vanquish was not pursuing a protest. He did not refer Vanquish to the "[t]ask and delivery order ombudsman." § 2304c(f). Instead, he properly treated Vanquish's complaints as asserting claims under the CDA and resolved them on that basis.

Further, because Vanquish is pursuing a CDA claim for breach of contract, this case does not implicate the animating purposes of FASA—which were to "reform federal procurement activities 'by greatly streamlining and simplifying [the federal government's] buying practices.'" A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 133 (2006) (quoting 140 Cong. Rec. H9240 (1994) (statement of Rep. Conyers)). As one commentator has explained, "[a] claim is not a protest" because "[t]he objectives of claims and protests are entirely different." 20 Vernon J. Edwards, Nash & Cibinic Rep. ¶ 59 (2006). "A protest is filed by a noncontractor seeking to prevent contract award to a competitor; a claim is filed by a contractor seeking money, time, and/or a contract interpretation." Id. For these reasons, protests (but not claims) "are highly disruptive to Government operations" because they may require the government to "suspend an award or performance pending resolution." Id. (citing 31 USCA § 3553(c) and (d)(3); FAR 33.104(b) and (c)). In addition, in a protest "[t]he Court of Federal Claims can issue a temporary restraining order, preliminary injunction, and permanent injunction against performance or award and can grant declaratory relief by ordering the agency not to exercise options or even to terminate any contract awarded." Id. In FASA, "Congress banned protests against the award of delivery orders and task orders under multiple award

IDIQ contracts to streamline the contract formation process by preventing those kinds of disruptions of agency operations." Id.

"Claims," by contrast, "do not disrupt ongoing operations because under the CDA, a board or court cannot suspend award or performance, issue a temporary restraining order, or provide injunctive relief." Id. "All that a claim involves is an assertion that the agency breached its contract and the contractor should be given damages for the breach." Id. Unlike protests, "[c]laims have virtually no impact on contract performance because the CDA gives Contracting Officers at least 60 days to make a final decision after receipt of the claim, 41 USCA § 605(c)(2), and litigation occurs months if not years later." Id.

Given these considerations, the Court cannot discern anything in either the language, scheme, or underlying purposes of FASA which suggests that Congress intended to strip this Court of jurisdiction to hear CDA claims for damages that allege the government has violated contractual procedures governing the assignment of task orders. Nor does it believe that Vanquish's claims are of the type that Congress intended to be subject to disposition by the agency "[t]ask and delivery order ombudsman" who is assigned to review complaints under FASA, but who has no authority to award damages. § 2304c(e).

The Court has considered the government's remaining arguments, including its lengthy discussion of the legislative history of FASA (with particular focus on the deliberations and recommendations of the so-called "Section 800 Panel"), and finds them unavailing. See Def.'s 12(b)(1) Mot. No. 19-310 at 16–22. This Court has jurisdiction over Counts I–IV of Vanquish's complaint in No. 19-310 under the CDA. The provisions of FASA on which the government relies did not divest the Court of such jurisdiction. The government's motion to dismiss pursuant to RCFC 12(b)(1) is therefore denied.

    **C.**    **The Government's Motion to Dismiss Based on Failure to State a Claim**

The government has also moved to dismiss Counts I–IV of Vanquish's amended complaint in No. 19-310 for failure to state a claim. Def.'s 12(b)(6) Mot. No. 19-310, ECF No. 90. It contends that Vanquish's theory that it was entitled to TMR assignments in accordance with the OML methodology is inconsistent with the express minimum order provisions of the contracts. Id. at 17. Those provisions obligated USTRANSCOM to guarantee Vanquish orders worth at least $1,000 under NAT 1.5 and $2,500 under NAT 2.0. See Am. Compl. No. 19-310 Ex. A, at 3, ECF No. 105-1; Am. Compl. No. 19-310 Ex. B, at 3, ECF No. 105-2. According to the government, once those minimums were satisfied, USTRANSCOM had no obligation to place additional orders with Vanquish. Def.'s 12(b)(6) Mot. No. 19-310 at 19. The government further argues that even assuming that USTRANSCOM was under an obligation to apply the OML, Vanquish has not alleged sufficient facts to establish a violation of that obligation. Finally, the government moves to dismiss Vanquish's allegations in Count IV that USTRANSCOM acted in bad faith when it decided not to award Option Period 2 under the NAT 2.0 contract to Vanquish. Id. at 35. It argues that, as a matter of law, it cannot be

8

sued for breach of contract based on a bad-faith decision not to exercise an option that it has complete discretion to decide whether or not to exercise. Id. It also contends that Vanquish has failed to allege sufficient facts to demonstrate that USTRANSCOM's decision was made in bad faith. Id. at 41.

A complaint may be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint," and "must indulge all reasonable inferences in favor of the non-movant." Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted). The Court, however, is not required to "accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

"To avoid dismissal under RCFC 12(b)(6), a party need only plead 'facts to state a claim to relief that is plausible on its face,' with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" TrinCo Inv. Co. v. United States, 722 F.3d 1375, 1380 (Fed. Cir. 2013) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim is plausible on its face when 'the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

The Court concludes for the reasons set forth below that Vanquish has met its burden of pleading facts that state facially plausible claims in Counts I–IV. The Court therefore rejects the government's motion to dismiss under RCFC 12(b)(6).

First, the Court is unpersuaded by the government's argument that there is no viable legal theory underlying Counts I and III of the amended complaint, which rely upon the existence of an implied duty under NAT 1.5 to assign TMRs to Vanquish on the basis of the OML process, and an express duty to do so under NAT 2.0. The government contends that no such implied or express duty can exist because imposing such duties would conflict with other terms of NAT 1.5 and NAT 2.0, specifically the provisions in NAT 1.5 setting a minimum order requirement of $1,000, and the parallel $2,500 minimum order requirement specified in NAT 2.0. It argues that, under an IDIQ contract, the government "'is required to purchase the minimum quantity stated in the contract, but when the government makes that purchase its legal obligation under the contract is satisfied,'" that "[o]nce the minimum order requirement is met, the United States has an unfettered right to award orders to other contractors," and that the government may then "'at its discretion and for its benefit, make its purchases for similar supplies and/or services from other sources.'" Def.'s 12(b)(6) Mot. No 19-310 at 19 (quoting Travel Ctr. v. Barram, 236 F.3d 1316, 1319 (Fed. Cir. 2001)). Put another way, according to the government, it had "no remaining contractual obligation to place orders with Vanquish" after the minimum order requirement was satisfied. Id.

9

This argument lacks merit. The minimum order requirements and the alleged implied and express requirements that USTRANSCOM assign missions pursuant to the OML process are separate and independent contractual obligations. USTRANSCOM was not free to ignore the latter requirement once the former one was satisfied. Cmty. Consulting Int'l, ASBCA No. 53489, 02-2 BCA ¶ 31,940 (explaining that "[w]hile the minimum quantity represents the extent of the Government's purchasing obligation . . . it does not constitute the outer limit of all of the Government's legal obligations under an indefinite quantity contract"); Burke Court Reporting Co., CBCA No. 3058, 97-2 BCA ¶ 29,323 at 145,801 (observing that "[w]hile the indefinite quantities clause of the contract only obligates respondent to order a specified dollar amount of services, a bidder has a right to rely on other contract provisions implying that it will be fairly considered for additional work, if required by the government").

In arguing to the contrary, the government relies on cases in which the court of appeals has opined that an agency's legal obligation was "satisfied" (or words to that effect) once it ordered the minimum quantity required under an IDIQ contract. See Def.'s 12(b)(6) Mot. No. 19-310 at 18–21 (citing Varilease Tech. Grp., Inc. v. United States, 289 F.3d 795 (Fed. Cir. 2002) and Barram, 236 F.3d 1316); see also id. (citing Abatement Contracting Corp. v. United States, 58 Fed. Cl. 594, 604 (2003)). These cases are inapposite, however, because the statements upon which the government relies were made only to distinguish the obligations imposed by IDIQ contracts from those imposed by requirements contracts.[3] Neither the court of appeals, nor any other tribunal, has ever suggested that once the minimum quantity requirement has been met under an IDIQ contract, the government may ignore independent contractual requirements that are intended to ensure fairness in the assignment of task orders among multiple contractors.

---

[3] In Varilease, for example, the court of appeals rejected the plaintiff's argument that the government was obligated to order the minimum quantity of services during the option period for an IDIQ contract, as well as during the initial term of the contract. 289 F.3d at 800–01 (observing that because the contract was an IDIQ contract, and not a requirements contract, the agency's "only obligation was to order at least the minimum quantity of relevant computer maintenance during the initial six-month term of the contract"). Similarly, in Barram, 236 F.3d 1316, the court of appeals was merely distinguishing IDIQ contracts from requirements contracts when it observed that "under an IDIQ contract, the government is required to purchase the minimum quantity stated in the contract, but when the government makes that purchase its legal obligation under the contract is satisfied." See also Abatement Contracting Corp. v. United States, 58 Fed. Cl. 594, 604 (2003) (distinguishing between IDIQ and requirements contracts; noting that in the former, the government "does not promise to fill all of its needs by purchasing from the contractor; it commits only to purchase the minimum quantity stated in the contract" so that "with the purchase of at least the Contract minimum, the government's obligations thereunder were extinguished and plaintiff's claim for breach of contract fails as a matter of law").

Indeed, as described above, the government is required by FASA and by FAR 16.505(b) to include such procedural fairness provisions in IDIQ contracts.

Further, the Court rejects the government's argument that Vanquish has failed to allege sufficient facts to state a claim that USTRANSCOM breached the contracts or its duty of good faith and fair dealing. Vanquish has alleged that USTRANSCOM was contractually obligated to follow the OML process in administering NAT 1.5 and NAT 2.0, that it did not do so, and that Vanquish received fewer TMRs than it would have had the agency followed the agreed-upon procedures. Taken as true, and with all inferences drawn in favor of Vanquish, these allegations are sufficient to state a claim for breach of contract. See Bell/Heery v. United States, 739 F.3d 1324, 1330 (Fed. Cir. 2014) (observing that "[a] breach of contract claim requires two components: (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty").

The Court also finds that Vanquish has stated claims that USTRANSCOM violated the implied duty of good faith and fair dealing, which "requires a party to refrain from . . . acting to destroy another party's reasonable expectations regarding the fruits of the contract." Bell/Heery, 739 F.3d at 1334–35. Specifically, Vanquish alleges that the government failed to award it the share of the TMRs as required under the OML process.

In challenging the sufficiency of Vanquish's factual allegations, the government makes much of Vanquish's acknowledgement that it lacks sufficient information to identify precisely the number of missions it would have been assigned under a proper application of the OML procedures. Instead, Vanquish relied upon an analysis that it conducted which showed that it received far less than a pro rata share of the missions assigned but that its performance and pricing were such that—if the OML process were followed—it would not have received an allocation well below the average.

The government argues that—because it could not provide greater certainty in its complaint—Vanquish's breach claims are based on mere "suspicions" which under Twombly are "not sufficient to meet the pleading requirements of RCFC 8." Def.'s 12(b)(6) Mot. No. 19-310 at 23. The Court disagrees. Fairly read, Vanquish's complaint alleges as a matter of fact that USTRANSCOM did not follow the OML process and that, had it been followed, Vanquish would have been assigned more missions than in fact it was assigned. To be sure, Vanquish makes this allegation "on information and belief." Am. Compl. No. 19-310 ¶ 113. But that does not preclude it from meeting the Twombly plausibility standard, as the government contends. See Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (observing that "[t]he Twombly plausibility standard . . . does not prevent a plaintiff from 'pleading facts alleged on information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible"); 5 Arthur R. Miller et al., Federal Practice and Procedure § 1224 (3d ed. 1998) ("Although there is no express authorization in the federal rules for pleading on information and belief, allegations in this form have been held to be permissible, even after the Twombly and Iqbal decisions."); see also Exergen Corp. v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1330 (Fed. Cir. 2009) (reasoning that a plaintiff is permitted to make allegations based on

11

information and belief even under heightened pleading standards, such as those established for fraud under Fed. R. Civ. P. 9(b), "when essential information lies uniquely within another party's control," at least "if the pleading sets forth the specific facts upon which the belief is reasonably based").

It may well turn out that Vanquish's analysis is flawed and that it will be unable to prove that USTRANSOM did not follow the OML process or that it did not receive its fair share of the TMRs. But that is of no moment now as this case is before the Court on a motion to dismiss which requires it to treat Vanquish's factual allegations as true and to draw reasonable inferences in Vanquish's favor. For these reasons, the Court concludes that Vanquish's allegations that USTRANSCOM did not follow the OML process and failed to award it a fair share of the TMRs, thus depriving Vanquish of the reasonably expected fruits of the contracts, are sufficient to state claims for breach of contract.

Finally, the Court is not persuaded by the government's motion to dismiss Vanquish's claim that USTRANSCOM acted in bad faith when it failed to exercise an option to extend Vanquish's NAT 2.0 contract. The Court agrees with the government that the language of NAT 2.0, incorporating FAR 52.217-9, affords USTRANSCOM essentially unfettered discretion regarding whether to exercise the option. It provides in pertinent part that "[t]he Government may extend the term of this contract by written notice to the Contractor" within a specified period, "provided that the Government gives the Contractor a preliminary written notice of its intent to extend" within a specified time "before the contract expires." Am. Compl. No. 19-310 Ex. B, at 11. As the court of appeals ruled when examining identical contract language in Government Systems Advisors, Inc. v. United States, 847 F.2d 811, 813 (Fed. Cir. 1988), nothing in the provision "commits the government to renewal, or regulates the conditions under which it could decide to forego the exercise of its option to renew." To the contrary, the provision "plainly evidence[d] that renewal of the contract was within the complete discretion of the government." Id.

But notwithstanding the foregoing, the government's motion to dismiss Vanquish's breach claim concerning USTRANSCOM's failure to exercise its option under NAT 2.0 lacks merit. For while the government has complete discretion to decide whether or not to exercise an option, "[a] contractor can recover for the government's failure to exercise an option if the government's failure was in bad faith." Dekatron Corp. v. United States, 128 Fed. Cl. 115, 118 (2016) (quoting Bannum, Inc. v. United States, 80 Fed. Cl. 239, 249 (2008)).[4]

---

[4] The government finds support for its contention that a contractor may not recover damages for even a bad faith decision not to exercise an option in Sundowner 102, LLC v. United States, 108 Fed. Cl. 737 (2013). Def.'s 12(b)(6) Mot. No. 19-310 at 38–39. In that case, the court observed that "[b]ecause the agency was under no contractual obligation to continue exercising option years, it could not have been bad faith for the agency to end the contract." 108 Fed. Cl. at 743. This Court agrees with the court in Dekatron that the Sundowner court's observation regarding the duty of good faith and fair dealing was dicta, because the plaintiff in that case did not argue that the government

Of course, as this Court observed in Vanquish I as to Vanquish's allegations of bad faith regarding USTRANSCOM's termination for default of certain missions at issue in that case, Vanquish's decision not to exercise the option must also surmount the presumption that government officials discharge their duties in good faith. 140 Fed. Cl. at 480 (citing Rd. & Highway Builders, LLC v. United States, 702 F.3d 1365, 1368 (Fed. Cir. 2012)). As noted there, "'a high burden must be carried to overcome this presumption,' amounting to clear and convincing evidence to the contrary." Id. (quoting Rd. & Highway, 702 F.3d at 1368). "In fact, a challenger seeking to prove that a government official acted in bad faith in the discharge of his or her duties must show a 'specific intent to injure the plaintiff' by clear and convincing evidence." Id. (quoting Rd. & Highway, 702 F.3d at 1369).

Nonetheless, for reasons similar to those expressed in Vanquish I, the Court declines to dismiss Vanquish's allegations of bad faith before Vanquish has the opportunity for discovery. Id. at 481. It therefore rejects the government's argument that Vanquish has failed to state a claim alleging that USTRANSCOM acted in bad faith when it decided not to exercise the option to extend Vanquish's contract.

## II.    The Government's Motion to Dismiss in Part in Case No. 18-1043

In No. 18-1043 Vanquish alleges that USTRANSCOM breached NAT 1.5 by failing to provide it with payment for demurrage and certain trucking missions units. 3d Am. Compl. No. 18-1043 ¶¶ 25–29, ECF No. 120.[5] These allegations were part of a certified claim in the amount of $773,910.02 that Vanquish submitted to the contracting officer on December 7, 2015. Id. ¶ 3. On July 19, 2017, the contracting officer issued a final decision concluding that Vanquish was entitled to payment of $177,998.47 of the total claim. Id. Vanquish asks this Court to award it damages in the amount of $304,691.77, plus interest, for these alleged breaches. Id. at 9.

The claims the government asks the Court to dismiss in No. 18-1043 fall into two broad categories. The first category includes Vanquish's claims that the contracting officer wrongly denied it demurrage for missions that were delayed due to the actions of the Government of the Islamic Republic of Afghanistan ("GIRoA") security forces (i.e. the APPF). See id. ¶¶ 13, 18. The government alleges that "[a]ny delay in a GIRoA-secured mission that was completed by Vanquish was caused by the United States because it forced Vanquish to perform that mission using GIRoA security that Vanquish could not control." Id. ¶ 19. The second category of claims involve allegations that the contracting officer misinterpreted the terms of the contract describing the circumstances under which demurrage would be paid. Id. ¶ 24. For the reasons set forth

---

specifically intended to injure it by not exercising the option. See 128 Fed. Cl. at 118 n.3. Similarly, this Court elects to instead follow the reasoning of Bannum. Id.

[5] Vanquish's allegations with respect to these claims are set out in summary form in spreadsheets in the appendices to its Third Amended Complaint in No. 18-1043. Apps. to 3d Am. Compl. No. 18-1043, ECF No. 120.

13

below, the Court agrees with the government that all of these claims must be dismissed because they are not grounded in viable legal theories.

### A. Claims for Demurrage Based on Delays Caused by GIRoA Security Forces

As noted, in its complaint, Vanquish seeks demurrage payments for delays that were allegedly caused by GIRoA or APPF, a "United States Government-directed subcontractor." 3d Am. Compl. No. 18-1043 ¶¶ 18, 28. According to the government, based on its review of the spreadsheets supplied in Appendix 1 to Vanquish's Third Amended Complaint, there are at least ten claims that fall into this category. See Def.'s Mot. No. 18-1043, ECF No. 136. These are the claims made for the following missions: ADG0728, ADG1602, ADG1718, ADG1748, ADG2690, ADH0065, ADH0082, ADH0082C, ADH243, and AHD252.

Vanquish takes issue with the government's analysis of its spreadsheets and states that at least some of the ten claims the government identified are based on delays that were within areas controlled by the U.S. government and were not caused by actions taken by the APPF. Pl.'s Resp. to Def.'s Mot. to Dismiss in Part and Mot. for Partial Summ. J. in No. 18-1043C ("Pl.'s Resp. No. 18-1043") at 6–7, ECF No. 152. And even in those instances where Vanquish would acknowledge that the delays were caused by APPF's actions, it attributes responsibility for those delays to the U.S. government because the contracts required Vanquish to use APPF to provide security notwithstanding that Vanquish had no control over APPF's actions.

The Court finds that to the extent that Vanquish is claiming demurrage for delays attributable to actions of the APPF, Vanquish is not eligible for payment under the contract's plain language. Thus, as described in some detail in Vanquish I, 140 Fed. Cl. at 465, the PWS required that all missions have security support and that such support be provided by forces specified by the Afghan government. See 2d Am. Compl. No. 18-1043 Ex. C, at 3, ECF No. 104-3 (PWS § 1.5.9 entitled "Security Requirements") (stating that "[t]he Contractor shall ensure that all missions have security support, unless otherwise specified by the [United States government]" and that "[r]equired security support will be specified in the individual mission sheet as [the United States government] provided, . . . [GIRoA] (i.e. . . . APPF[] or other force specified by the Afghan Government) security, or none."). The PWS, however, explicitly disclaimed any government liability for the acts of the Afghan-supplied security forces, stating that "[t]he Contractor assumes responsibility for acts of non-[United States government] security elements that result in loss of cargo or damage to private or personal property." Id.

Most pertinent to the demurrage claims that the government seeks to dismiss, the PWS explicitly disclaims U.S. government responsibility for delays caused by the actions of the APPF. See id. at 9 (PWS § 5.8 "Entry Control Point (ECP) Laytime"); id. (PWS § 5.9 "Truck Demurrage"); id. at 13 (PWS § 5.11.5.5 "Container Laytime"); id. (PWS § 5.11.5.6 "Container Demurrage"); id. at 15 (PWS § 5.12.5.5 "Container Laytime"); id. (PWS § 5.12.5.6 "Container Demurrage") (all stating, in large part, that "[the United

States government] is not responsible for any delays or deviation to mission timelines caused by GIRoA (APPF)").

Based on the foregoing, the Court agrees with the government that Vanquish cannot pursue claims for demurrage that arise out of delays caused by the actions or decisions of the APPF. It also rejects Vanquish's argument that the government may be held responsible for APPF-caused delays on the grounds that the government "nullified Vanquish's ability to control those missions" by requiring it to use the APPF for security. See Pl.'s Resp. No. 18-1043 at 7. Claims based on those theories, accordingly, must be dismissed.

### B.   Claims for Demurrage Where Delays Were Less than Three Days Either at the Point of Origin or at the Destination

As noted, the government also moves to dismiss another ninety-nine of Vanquish's demurrage claims on the grounds that they are based on a misinterpretation of the demurrage provisions of the NAT 1.5 contract. Def.'s Mot. No. 18-1043 at 12. Specifically, it is Vanquish's position that when it experienced more than three days of laytime at either the cargo loading or unloading point, it became entitled to demurrage payments for every additional day of laytime calculated cumulatively at both points. Pl.'s Resp. No. 18-1043 at 10. Thus, in Vanquish's view, if a contractor were to spend five days of laytime at the point of origin (where cargo was loaded) and two days of laytime at the destination (unloading) point, it would be entitled to demurrage payments for a total of four days—the two extra days at the point of origin and the two days of laytime at the destination point.

The government, on the other hand, takes the position that demurrage is payable where the contractor experiences more than three days of laytime at the loading point or more than three days of laytime at the unloading point, and that laytime must be totaled separately at each location to determine the number of days for which demurrage is payable. Def.'s Mot. No. 18-1043 at 12. Thus, in the example above, the contractor would be entitled to a total of two days of payment at demurrage rates (rather than four): two days of demurrage at the point of origin where the total layover time was five days, but none at the destination because the laytime there did not exceed the three-day threshold.

It is well established that "[c]ontract interpretation starts with the language of the contract." SUFI Network Servs., Inc. v. United States, 785 F.3d 585, 593 (Fed. Cir. 2015) (citing Coast Fed. Bank, FSB v. United States, 323 F.3d 1035, 1038 (Fed. Cir. 2003)). If a contract's provisions are "clear and unambiguous, they must be given their plain and ordinary meaning." Coast Fed. Bank, 323 F.3d at 1040 (quoting Landmark Land Co. v. Fed. Deposit Ins. Corp., 256 F.3d 1365, 1373 (Fed. Cir. 2001)). Further, "[w]hen interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434–35 (Fed. Cir. 1996)).

The Court finds that the government's position is consistent with the language of the contract and that, unlike Vanquish's position, it harmonizes all of its provisions. PWS section 5.9, entitled "Truck Demurrage" states in pertinent part as follows:

> Demurrage is paid for delay caused by the [United States government], according to the following parameters. After three (3) days of laytime at the origin or three (3) days of laytime at the destination, the Contractor is entitled to receive payment of the daily truck demurrage rate for every additional day of laytime.

2d Am. Compl. No. 18-1043 Ex. C, at 9. According to Vanquish, the use of the disjunctive "or" in this provision, rather than the conjunctive "and" means that the contractor must receive the demurrage rate for every day of laytime at either point if it exceeds three days at either the origin point or the destination. Pl.'s Resp. No. 18-1043 at 10.

The Court finds Vanquish's reading of the provision unpersuasive. The use of the disjunctive "or" simply establishes that the obligation to pay demurrage is triggered where there have been more than three days of laytime at the origin or more than three days of laytime at the destination. The use of the disjunctive "or" is not relevant to the question of which days are included in the "additional day[s] of laytime" paid at demurrage rates once either threshold has been reached. 2d Am. Compl. No. 18-1043 Ex. C, at 9 (PWS § 5.9). Indeed, contrary to Vanquish's argument, if the conjunctive "and" had been used instead of the disjunctive "or" then the language would have meant that no laytime was available until there were more than three days of laytime at each location—i.e., more than three days at the point of origin and more than three days at the point of delivery.

Further, the government's reading, but not Vanquish's, is consistent with the other relevant provisions of the contract governing demurrage. Specifically, the same provision of the PWS that contains the language on which Vanquish relies also states that "[t]ruck demurrage shall not be paid until after three (3) days of laytime, which will be totaled separately at the origination point or delivery point." Id. Totaling the laytime "separately" at the origination and delivery points is inconsistent with Vanquish's contention that the laytime would be considered cumulatively once it exceeded three days at either point. See id.

Finally, and perhaps most significantly, PWS section 5.8 sets forth explicitly the government's rationale regarding the three-day time period used to trigger its obligation to pay demurrage. It provides as follows:

> [Entry Control Point ("ECP")] Laytime is the time period that the Contractor experiences with trucking assets at the loading point ECP waiting for the [United States government] to load, and at the unloading point ECP waiting for the [United States government] to unload. The [United States government] has determined reasonable ECP laytime, for

16

> both loading and unloading, to be three (3) days at the origin and three (3) days at destination.

2d Am. Compl. No. 18-1043 Ex. C, at 9 (emphasis supplied). Given the stated rationale for using a three-day threshold, it would make no sense for the government to obligate itself to pay at demurrage rates for laytime whether at the origin or destination point where the time does not exceed the three-day threshold it has determined to be reasonable.

In short, those claims of Vanquish that are based on this misinterpretation of the contract lack merit. Accordingly, the government is entitled to their dismissal.

### III.    The Government's Motion for Partial Summary Judgment in No. 18-1043

The government requests partial summary judgment covering sixty-eight of Vanquish's TMRs on the grounds that the undisputed facts establish that Vanquish did not supply the agency with the verification required for payment under the PWS. Def.'s Mot. No. 18-1043 at 15. Section 5.8 of the PWS states that "ITV[6] snapshots using 1/50KM resolution with header and footer data showing the date time group are required for contractors to be eligible for demurrage payments." 2d Am. Compl. No. 18-1043 Ex. C, at 9. Section 5.9 similarly states that "[t]he carrier shall provide ITV snapshots using 1/50KM resolution for the [United States government] to verify and approve all demurrage charges for payment," and also states that "[d]emurrage charges that cannot be verified via GDMS[7] will not be approved for payment." Id.; see also id. at 7 (PWS § 4.4.1) (stating that "ITV snapshots using 1/50KM resolution with header and footer data showing the date time group of the snapshot is required to validate RSD/[RDD] and daily Demurrage invoicing").

The government contends that sixty-eight of the TMRs for which Vanquish seeks additional payment could not be verified via GDMS as required by the contract. Def.'s Mot. No. 18-1043 at 15. It has submitted an appendix to its motion in No. 18-1043 on a DVD. That DVD contains the documents that Vanquish submitted to the contracting officer in support of its claims related to these and other TMRs. It also includes a declaration from the contracting officer identifying the sixty-eight TMRs that he asserts lacked the supporting data. Vanquish has not submitted any evidence in response to the declaration and documents.

Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the

---

[6] "ITV" stands for "In-Transit Visibility." 2d Am. Compl. No. 18-1043 Ex. C, at 31 ("Technical Exhibit 5 [to the PWS]: Acronyms, Definitions, and References").

[7] "GDMS" stands for "Global Distribution Management System." Id.

outcome of the suit under the governing law." Andersen, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmoving party and all reasonable factual inferences should be drawn in favor of the nonmoving party. Id. at 255. The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). It "may discharge its burden by showing the court that there is an absence of evidence to support the nonmoving party's case." Dairyland Power Co-op. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Celotex, 477 U.S. at 325).

"Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Andersen, 477 U.S. at 248). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)); see also Dairyland Power Co-op, 16 F.3d at 1202 ("A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law.").

In this case, the government met its burden of demonstrating the absence of a genuine issue of material fact by submitting a declaration from the contracting officer, along with the documents that Vanquish submitted for the sixty-eight TMRs in question. Vanquish submitted no evidence to challenge the contracting officer's assertions. It did not submit additional documents. It did not provide a declaration from a competent individual stating that the documents on the DVD submitted by the government included the ITV snapshots required under PWS sections 5.8 and 5.9. Instead, Vanquish responded with an opaque assertion by counsel that the DVD submitted by the government in fact includes evidence that "Vanquish did provide . . . ITV data supporting the claim, or other supporting information where ITV data were unavailable." Pl.'s Resp. No. 18-1043 at 13. But assertions by counsel are not evidence; they are "mere allegations." Crown Operations, 289 F.3d at 1375. And "supporting information"—which is nowhere defined—would not meet contractual requirements. Pl.'s Resp. No. 18-1043 at 13.

Vanquish observes in its brief that "[t]ypically, the ITV data is provided in the form of 'ping shots,' that is, visual depictions of ITV data showing where the truck with the transmitter was at particular times in a mission." Id. It further states that "[t]he data were presented as a collection of computer screen shots, [which were] typically the last file contained in [the] folder for each TMR." Id. But this again is an assertion by counsel, not evidence, and even then Vanquish fails to cite any particular document or combination of documents in the record that it claims were sufficient to meet the ITV snapshot requirement set forth in the PWS.

Vanquish has the burden of proving that it met the data requirements of the PWS. It failed to respond to the government's motion with any evidence to dispute the government's assertion that the required ITV snapshots were not provided to USTRANSCOM for any of the sixty-eight claims in dispute. The government's motion for partial summary judgment as to those claims must therefore be granted.

## CONCLUSION

On the basis of the foregoing, the government's motions to dismiss Counts I–IV in No. 19-310, ECF Nos. 90, 125, are **DENIED**.

The government's motion to dismiss in part in No. 18-1043, ECF No. 136, is **GRANTED** with respect to the following claims for payment:

1. Claims for demurrage that arise out of delays caused by the actions or decisions of GIRoA and/or the APPF, as described above; and

2. Claims for demurrage that are based on Vanquish's misinterpretation of the contractual provisions governing the number of days for which demurrage shall be paid, as described above.

It is not clear to the Court based on the submissions of the parties which of the TMRs for which Vanquish claims it is entitled to additional payment fall into these two categories. Therefore, the parties shall include a list of those TMRs in the Joint Status Report to be filed within thirty days of this decision, as described below.

In addition, the government's motion for partial summary judgment in No. 18-1043, ECF No. 136, is **GRANTED**.

Finally, also pending before the Court is Vanquish's opposed motion for an extension of time to complete discovery. ECF No. 156. The Court will address scheduling matters at a future status conference. Vanquish's motion is therefore **DENIED without prejudice**.

The parties shall file a joint status report within thirty days of this decision, proposing a schedule going forward in these consolidated cases. In that status report, the parties shall also include a stipulation regarding which TMRs at issue in No. 18-1043 include claims for payment that fall within the two categories set forth above, which the Court has concluded fail to state a claim on which relief may be granted.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge