# In the United States Court of Federal Claims

|   |   |   |
|---|---|---|
| VANQUISH WORLDWIDE, LLC, | ) ) ) | |
| Plaintiff, | ) ) | Nos. 17-96C; 18-1043C; 19-310C; 20-346C |
| v. | ) ) | Consolidated |
| THE UNITED STATES OF AMERICA, | ) ) ) | (Filed: August 10, 2021) |
| Defendant. | ) ) | |

*Michael D. Maloney*, Williams Mullen, P.C., Tysons, VA, with whom were *William A. Wozniak*, Williams Mullen, P.C., Tysons, VA, and *Todd W. Miller*, Miller & Miller, LLC, Golden, CO, for Plaintiff.

*James W. Poirier* and *Eric J. Singley*, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were *Franklin E. White, Jr.*, Assistant Director, *Martin F. Hockey, Jr.*, Acting Director, and *Brian M. Boynton*, Acting Assistant Attorney General, for Defendant.

**OPINION AND ORDER**

**KAPLAN, Chief Judge.**

The plaintiff in these consolidated cases is Vanquish Worldwide, LLC ("Vanquish"), a small business that provides trucking and logistics services to the United States Department of Defense, both domestically and abroad. See Vanquish Worldwide, LLC v. United States (Vanquish II), 147 Fed. Cl. 390, 393 (2020); Vanquish Worldwide, LLC v. United States (Vanquish I), 140 Fed. Cl. 460, 464 (2018). Currently before the Court is the government's amended motion to dismiss in part Case Number 20-346 under Rule 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC") and for partial summary judgment in that case in accordance with RCFC 56. Def.'s Am. Mot. to Dismiss in Part and Mot. for Partial Summ. J. ("Def.'s Mot."), ECF No. 179.[1]

For the reasons set forth below, the government's motion to dismiss in part and its motion for partial summary judgment are **GRANTED**.

---

[1] Case Number 20-346 has been consolidated with Case Numbers 17-96, 18-1043, and 19-310. See Order, Case No. 20-346, ECF No. 8. Unless otherwise noted, all citations are to the docket for the lead case, Number 17-96.

# DISCUSSION

## I. Motion to Dismiss

In its complaint in Case Number 20-346, Vanquish alleges that the United States breached its obligations under the National Afghanistan Trucking 1.5 Contract ("NAT 1.5") and the National Afghan Trucking II Contract ("NAT 2.0") by failing to pay certain demurrage charges and mission unit payments to which Vanquish claims it is entitled. Compl. ¶¶ 19, 30, Case No. 20-346, ECF No. 1. There are two claims at issue with respect to the government's motion to dismiss, both of which were submitted to the Contracting Officer ("CO") on November 13, 2018. Id. ¶¶ 16, 27.

Vanquish's claim under NAT 1.5 ("NAT 1.5 claim") was for $823,080.65, primarily for demurrage amounts allegedly due under the contract. Id. ¶¶ 16–17; App. to Def.'s Am. Mot. to Dismiss in Part and Mot. for Partial Summ. J. ("App. to Def.'s Mot.") at A88–102 (NAT 1.5 claim letter), ECF No. 180. On March 19, 2020, the CO determined that Vanquish was entitled to payment of $3,767.09 for the NAT 1.5 claim. Compl. ¶ 18, Case No. 20-346.

The second claim, which arose under NAT 2.0 ("NAT 2.0 claim") was for $173,847.70, again primarily for demurrage amounts. Compl. ¶ 27–28, Case No. 20-346; App. to Def.'s Mot. at A105–20 (NAT 2.0 claim letter). On August 7, 2019, the CO issued a final decision on the NAT 2.0 claim, Compl. ¶ 29, Case No. 20-346, concluding that Vanquish owed $2,630.85 to the government because of erroneous overpayments, Def.'s Mot. at 2.

In this action, Vanquish contends that the failure to pay the balance of the claims represented a breach of the express terms of the contract. Compl. ¶¶ 48–51, 56–58, Case No. 20-346. It also claims that it is owed damages based on a breach of the implied covenant of good faith and fair dealing, id. ¶¶ 52–55, 65–68.[2]

Vanquish now seeks an award of damages equal to the amounts that it sought in both November 2018 claims, that is, the $1,136.24 awarded by the CO ($3,767.09 minus the $2,630.85 overpayment), plus $995,792.11. Def.'s Mot. at 3 (citing App. to Def.'s Mot. at A88–102 (NAT 1.5 claim letter), id. at A105–20 (NAT 2.0 claim letter)).

According to the government, the complaint in Case Number 20-346 encompasses 374 individual claims for demurrage payments. Id. Two hundred fifty-seven of the claims arise under NAT 1.5, and 117 under NAT 2.0. Id. The government contends that 138 of these 374 claims should be dismissed because they are based on the theory that the United States is liable for delays that were caused by the actions or inactions of the Afghan Public Protection Force ("APPF") or the Government of the Islamic Republic of Afghanistan ("GIRoA"). Id.; see also App. to Def.'s Mot. at A98 (NAT 1.5 claim letter alleging that "any GIRoA-caused delay in completing a

---

[2] The complaint also includes a claim that the government improperly imposed payment deductions for fuel pilferage in breach of NAT 2.0. Compl. ¶¶ 59–64, Case No. 20-346. This claim is not addressed in the government's motion.

GIRoA-secured mission on time is attributable to the United States, and [Vanquish] is entitled to demurrage payments"); id. at A116 (NAT 2.0 claim letter making the same allegation). In addition, the government contends, another 118 of the claims must be dismissed because they are premised upon a misinterpretation of the contracts concerning the calculation of laytime, Def.'s Mot. at 4, under the Court's decision in Vanquish II, see 147 Fed. Cl. at 403–05.

When considering a motion to dismiss for failure to state a claim upon which relief may be granted, the Court "must accept as true all the factual allegations in the complaint," and "indulge all reasonable inferences in favor of the non-movant." Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (citations omitted); see also Huntleigh USA Corp. v. United States, 63 Fed. Cl. 440, 443 (2005). A complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

### A.  Demurrage Claims Based on Delays Caused by GIRoA or APPF

The Court agrees that a significant portion of Vanquish's demurrage claims are based on a misinterpretation of the demurrage provisions, and rely on legal arguments the Court rejected in Vanquish II. Def.'s Mot. at 16–19. First, this Court has already held that Vanquish is not entitled to demurrage payments based on delays allegedly caused by the actions or inactions of the APPF or GIRoA. Vanquish I, 140 Fed. Cl. at 475–76; Vanquish II, 147 Fed Cl at 402–03. Those delays are not compensable, the Court held in Vanquish I and Vanquish II, because both NAT 1.5 and NAT 2.0 expressly disclaimed the government's liability for delays or deviations from mission timelines caused by the Afghani government or its security forces. See App. to Def.'s Mot. at A9 (PWS for NAT 1.5 §§ 5.8, 5.9), A13 (PWS for NAT 1.5 §§ 5.11.5.5, 5.11.5.6), A15 (PWS for NAT 1.5 §§ 5.12.5.5, 5.12.5.6) (each stating, in large part, that "[the United States government] is not responsible for any delays or deviation to mission timelines [under NAT 1.5] caused by GIRoA," i.e., "APPF"); see id. at A70 (PWS for NAT 2.0 § 5.2.4.13.1) ("The [United States government] shall not be responsible for any delays or deviations to mission timelines caused by GIRoA" under NAT 2.0).

It is unclear, however, which of the claims that Vanquish is pressing are dismissible on this basis. According to the government's opening brief, of Vanquish's 374 individual demurrage claims in Number 20-346, at least 138 claims are based on delays caused by APPF or GIRoA. Def.'s Mot. at 13 (citing Compl. at 29–36 (Appendix 1), 38–41 (Appendix 2), Case No. 20-346) (consisting of spreadsheets and documents that Vanquish supplied to the CO when it filed its claims, and which it incorporated by reference into its complaint). But in its response, Vanquish points out that the spreadsheets upon which the government relies show that the United States provided security for nine of the 138 missions at issue. Pl.'s Resp. to Def.'s Mot. to Dismiss in Part and Mot. for Partial Summ. J. ("Pl.'s Resp.") at 5, ECF No. 200. In reply, the government does not admit any error in its characterization of the nine missions in question, but has withdrawn its request that claims for those nine missions be dismissed. Def.'s Reply in Supp. of Def.'s Mot. to Dismiss in Part and Mot. for Partial Summ. J. ("Def.'s Reply") at 4–5, ECF No. 205.

3

The Court agrees with the government that its prior decisions foreclose any claims for demurrage payments that are based on delays caused by GIRoA or APPF, and that any such claims should be dismissed. However, the Court is not able to reliably determine from the parties' filings which claims fall into that category. The Court will therefore task the parties with entering a stipulation that identifies the claims which are predicated on delays caused by GIRoA or APPF and therefore must be dismissed on the basis of Vanquish II.

### B. Claims Based on a Rejected Interpretation of the Contract

The government has also moved to dismiss another 118 of Vanquish's demurrage claims on the grounds that they are based on a misinterpretation of the contractual demurrage provisions, which the Court rejected in Vanquish II. Def.'s Mot. at 16–19; see also Vanquish II, 147 Fed Cl at 403–05. Specifically, in that case, Vanquish argued that when it experienced more than three days of laytime at either the cargo loading or unloading point, it became entitled to demurrage payments for every additional day of laytime calculated cumulatively at both points. Vanquish II, 147 Fed. Cl. at 403–04. In other words, the Court explained in Vanquish II, it was Vanquish's position that if a contractor spent five days of laytime at the point of origin (where cargo was loaded) and two days of laytime at the destination (unloading) point, it would be entitled to demurrage payments for a total of four days—the two extra days at the point of origin and the two days of laytime at the destination point. Id. The Court, however, held that demurrage was payable under NAT 1.5 where the contractor experienced more than three days of laytime at the loading point or more than three days of laytime at the unloading point, and that such laytime must be totaled separately at each location to determine the number of days for which demurrage is payable. Id. at 404–05.

Vanquish has not presented the Court with any new argument that supports its interpretation of the demurrage provisions of the contracts. Accordingly, the government's present motion to dismiss those claims will be granted for the same reason the Court granted a similar motion to dismiss in Vanquish II. Id.

## II. Summary Judgment

Finally, the government seeks summary judgment with regard to 248 of Vanquish's demurrage claims because Vanquish failed to meet what the government contends was a contractual requirement that it submit In-Transit Visibility ("ITV") snapshots to support those claims. Def.'s Mot. at 7–9, 19–24. For the reasons set forth below, the Court agrees.

### A. Summary Judgment Standards

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Id. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The moving party "may discharge its burden by showing the court that there is an absence of evidence to support the non-moving party's case." Dairyland Power Co-op. v. United States, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing Celotex, 477 U.S. at 325). In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. Anderson, 477 U.S. at 255; Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970). Nonetheless, "[a] nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." Dairyland Power Co-op, 16 F.3d at 1202.

"Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 248). The court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

**B.     Merits**

Section 4.4 of the PWS for NAT 1.5, App. to Def.'s Mot. at A6, and section 4.7 of the PWS for NAT 2.0, id. at A49–50, provide that a contractor's ITV system must "fully integrate" with the government's "current asset visibility system," which "is the Global Distribution Management System [("GDMS")] developed and manufactured by Tapestry Solutions." Under both NAT 1.5 and NAT 2.0, the contractor is required to provide both: (1) transponder equipment that is "produced by Tapestry or verified by Tapestry [as] compatible with GDMS"; and (2) "[a] communications services plan" that is "provided by Tapestry or verified by Tapestry [as] capable of feeding all needed information into GDMS." App. to Def.'s Mot. at A3 (NAT 1.5 PWS § 4.4); id. at A49–A50 (NAT 2.0 PWS § 4.7). In addition, contractors were required to provide a transponder that was "fully operational," that had "a ping rate no longer than once every fifteen minutes," and that "operat[ed] continuously while on mission." App. to Def.'s Mot. at A7 (NAT 1.5 PWS §§ 4.4.1, 4.4.2); id. at A50 (NAT 2.0 PWS §§ 4.7.1, 4.7.2). It was the contractor's responsibility, moreover to "ensure full operational capability of ITV equipment until download of cargo has been completed." App. to Def.'s Mot. at A7 (NAT 1.5 PWS § 4.4.1); id. at A50 (NAT 2.0 PWS § 4.7.1).

In addition to imposing these equipment and maintenance requirements, both contracts placed the onus on the contractor to supply the government with GPS data to support their demurrage claims. Section 4.4.1 of the PWS for NAT 1.5 provided that "ITV snapshots using 1/50KM resolution with header and footer data showing the date time group of the snapshot [are] required to validate . . . daily Demurrage invoicing." App. to Def.'s Mot. at A7 (NAT 1.5 PWS § 4.4.1); id. at A50 (NAT 2.0 PWS § 4.7.1); see also id. at A9 (NAT 1.5 PWS § 5.9) (stating that "[t]he carrier shall provide ITV snapshots using 1/50KM resolution for the [United States government] to verify and approve all demurrage charges for payment" and that "[d]emurrage

charges that cannot be verified via GDMS will not be approved for payment"). Similarly, NAT 2.0 explicitly provided that "ITV snapshots . . . shall be required for each day of daily demurrage charges claimed by the Contractor." Id. at A50 (NAT 2.0 PWS § 4.7.1 entitled "Use of ITV").

Citing the Declaration of CO David Stevens, the government contends that it is undisputed that Vanquish did not submit ITV snapshots to the government for 248 of its demurrage claims. Def.'s Mot. at 19–21. In his Declaration, CO Stevens identifies each of the claims for demurrage that he denied because it lacked supporting GPS data, along with the pages in the Appendix that contained Vanquish's allegedly inadequate supporting documents. App. to Def.'s Mot. at A122–34, Decl. of David Stevens ¶ 7.

Vanquish does not challenge the facts alleged in CO Stevens' Declaration. Instead, focusing on the statement in section 5.9 of the PWS for NAT 1.5, which warned that "[d]emurrage charges that cannot be verified via GDMS will not be approved for payment," App. to Def.'s Mot. at A9, it argues that "the Contracts obligated the government to pay for demurrage claims that can be verified by GDMS data generally, and not merely the ITV snapshots from Vanquish," Pl.'s Resp. at 16. According to Vanquish, "[u]ntil that data is produced in discovery," and it "is able to determine whether the government's data confirms Vanquish's demurrage claims, it would be premature to dismiss the challenged claims by summary judgment." Id. This argument lacks merit.

"Summary judgment need not be denied merely to satisfy a litigant's speculative hope of finding some evidence [through discovery] that might tend to support a complaint." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1566 (Fed. Cir. 1987). Moreover, "[a] party may not simply assert in its brief that discovery was necessary and thereby overturn summary judgment when it failed to comply with the requirement of Rule 56(f) to set out reasons for the need for discovery in an affidavit." Id. at 1567. Vanquish has not supplied an affidavit that explains why further discovery is needed to respond to the government's motion,

In addition, and in any event, Vanquish's interpretation of the contractual language is unpersuasive and inconsistent with this Court's interpretation of the relevant contractual language in Vanquish II, 147 Fed. Cl. 405–06. The warning statement upon which Vanquish relies, Pl.'s Resp. at 15–16—which states that "[d]emurrage charges that cannot be verified via GDMS will not be approved for payment," App. to Def.'s Mot. at A9 (NAT 1.5 PWS § 5.9)—did not modify or negate the explicit requirement that the contractor supply ITV snapshots. Instead, it reinforced that requirement. Both contracts, in short, required Vanquish to supply its own ITV snapshots as a condition of receiving demurrage payments; they did not contemplate that Vanquish could rely upon records held by the government's subcontractor, Tapestry. See Pl.'s Resp. at 16.

Vanquish also argues that summary judgment should be denied because "there are factual disputes about whether the government made it impossible for Vanquish to provide the necessary snapshots." Id. Specifically, Vanquish alleges that the government sometimes "confiscated ITVs during Vanquish missions, thereby preventing the driver on the mission from transmitting the GPS signals necessary to generate ITV snapshots." Id. (citing Pl.'s Resp. Ex. A, at 1–3, Decl. of Leigh Anne Pentecost ("Pentecost Decl.") ¶ 1, ECF No. 200-1). In addition, Vanquish contends, the government "often" provided corrupted GDMS data to Vanquish, which allegedly made "it

impossible for Vanquish to generate ITV snapshots." Id. It contends that, "[i]f the GDMS data provided to Vanquish by the government's subcontractor were corrupted, the government should not be allowed to deny demurrage claims based on the inability to provide ITV [snapshots]." Id.

But Vanquish cites no provision of either contract that allows it to shift responsibility to the government for its failure to provide the required snapshots. And even if there were such a provision, the evidence Vanquish cites in support of these generic allegations does not create a dispute of material fact regarding the specific claims at issue in this lawsuit. That evidence consists of the Declaration of Leigh Ann Pentecost, who worked first for Vanquish and then for one of its consultants on the development, submission, and prosecution of claims for payment under NAT 1.5 and 2.0. Pentecost Decl. ¶ 1. Ms. Pentecost states that she was "asked to review Vanquish's business records to determine whether there was information that related to the effort by Vanquish to obtain ITV snapshots to support its claims for demurrage." Id. ¶ 2. Attached to her Declaration as Exhibits D, E, and F are the documents that she found in Vanquish's records. Id. ¶ 3 (citing Pl.'s Resp. Ex. A, at 10–27 (Pentecost Decl. Ex. D–F)).[3]

Ms. Pentecost states that she was "personally involved in trying to obtain ITV snapshots to support the demurrage claims at issue in the United States' motion" and that she "encountered many problems with corruption of the data available from Tapestry Solutions." Id. ¶ 4. Those problems, she states, are addressed in an attached Exhibit G. Id. Ms. Pentecost further states that she "also found a record from July 2014 indicating a problem with obtaining GDMS data from Tapestry during the NAT 1.5 Contract." Id. (citing Pl.'s Resp. Ex. A, at 38 (Pentecost Decl. Ex. H)). Vanquish alleges that these assertions show that "there are factual disputes about whether the government made it impossible for Vanquish to provide the necessary snapshots" to qualify for demurrage under the contracts. Pl.'s Resp. at 16.

Ms. Pentecost's Declaration is inadequate to show that the government prevented Vanquish from meeting its obligation to supply ITV snapshots to prove its entitlement to demurrage payments. In it, Ms. Pentecost fails to identify which, if any, of the "Transportation Movement Requests" that are the subject of the government's motion, Def.'s Mot. at 4, were affected by the matters that are the subject of her allegations. Exhibits D and F, for example, discuss missions that are not at issue in the government's motion for summary judgment. See Pl.'s Resp. Ex. A, at 10–19 (Pentecost Decl. Ex. D); id. at 27 (Pentecost Decl. Ex. F). They therefore do not create a genuine dispute of material fact with regard to whether the government prevented Vanquish from complying with the requirement that it submit ITV snapshots to support the demurrage claims it makes in this case. See also Def.'s Reply at 13 n.3 (discussing contention in Exhibit E to Ms. Pentecost's Declaration regarding "confiscation" of ITV transponder for one of the missions for which a demurrage claim was filed) (citing Pl.'s Resp. Ex. A, at 20–21 (Pentecost Decl. Ex. E)).

Further, Vanquish fails to explain the relationship between the emails contained in the exhibits referenced in Ms. Pentecost's Declaration and the claims at issue here. Because the emails and Ms. Pentecost's assertions regarding the "many problems" she encountered with corruption

---

[3] The page numbers cited by the Court correspond with the page numbers generated by the court's CM/ECF filing system.

of Tapestry's data lack specificity, Pentecost Decl. ¶ 4, the government is entitled to partial summary judgment as to those claims for which ITV snapshots were not supplied.

## CONCLUSION

On the basis of the foregoing, the government's amended motion to dismiss in part and its motion for partial summary judgment in Case Number 20-346, ECF No. 179, are **GRANTED.** Vanquish's demurrage claims based on delays caused by GIRoA or APPF are dismissed for failure to state a claim under RCFC 12(b)(6), as are its claims based on the interpretation of the contractual demurrage provisions that the Court rejected in Vanquish II. In addition, in accordance with RCFC 56, summary judgment is entered in favor of the government with respect to the demurrage claims for which Vanquish did not submit ITV snapshots as required by NAT 1.5 and NAT 2.0, and which are identified in CO Stevens' Declaration.

The parties shall confer and, within the next thirty days, submit a joint stipulation identifying the claim numbers that are subject to dismissal under section I of this Opinion, above.

**IT IS SO ORDERED.**

s/Elaine D. Kaplan<br>
ELAINE D. KAPLAN<br>
Chief Judge