# In the United States Court of Federal Claims

)
VANQUISH WORLDWIDE, LLC,                    )
                                            )
              Plaintiff,                     )
                                            )        Nos. 17-96C; 18-1043C; 19-310C; 20-346C
v.                                          )        Consolidated
                                            )        (Filed: March 23, 2023)
THE UNITED STATES OF AMERICA,               )
                                            )
              Defendant.                     )
                                            )

Michael D. Maloney, Williams Mullen, P.C., Tysons, VA, with whom were William A. Wozniak, Williams Mullen, P.C., Tysons, VA, and Todd W. Miller, Miller & Miller, LLC, Golden, CO, for Plaintiff.

James W. Poirier and Eric J. Singley, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were Franklin E. White, Jr., Assistant Director, Martin F. Hockey, Jr., Acting Director, and Brian M. Boynton, Acting Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN, Chief Judge.**

These consolidated cases are before the Court for the fourth time on cross-motions for partial summary judgment.[1] They arose out of a series of contracts between Plaintiff, Vanquish Worldwide, LLC ("Vanquish") and the U.S. Transportation Command ("USTRANSCOM"). The contracts involved the transportation of U.S. military cargo and fuel in war-torn Afghanistan.

---

[1] See Vanquish Worldwide, LLC v. United States (Vanquish I), 140 Fed. Cl. 460 (2018) (in No. 17-96, granting the government's motion for partial summary judgment as to Count I, denying the parties' cross-motions for summary judgment as to Counts II and III, and granting Plaintiff's motion for summary judgment as to the government's seventh counterclaim, but denying it as to the government's remaining counterclaims); Vanquish Worldwide, LLC v. United States (Vanquish II), 147 Fed. Cl. 390 (2020) (denying the government's motion to dismiss Counts I-IV in No. 19-310, and granting the government's motion to dismiss certain demurrage claims as well as the government's motion for partial summary judgment in No. 18-1043); Vanquish Worldwide, LLC v. United States (Vanquish III), 155 Fed. Cl. 130 (2021) (granting in part the government's motion to dismiss and for partial summary judgment in No. 20-346).

The government's motion for partial summary judgment centers on Vanquish's loss of control over and failure to deliver twelve shipments of cargo in the fall of 2015 and the actions USTRANSCOM took in response. The shipments, which went missing en route to Bagram Airfield and the U.S. Embassy in Kabul, were ultimately recovered in March 2016 by law enforcement. By that time, USTRANSCOM had: (1) elected not to extend Vanquish's contract for a second option year; (2) terminated the twelve shipments for cause; and (3) prepared a negative performance assessment of Vanquish for publication in the online Contractor Performance Assessment Reports ("CPARs") system.

Vanquish alleges that USTRANSCOM took each of these actions for the purpose of harming its business interests, rather than for legitimate reasons. The government contends that Vanquish's evidence of bad faith is insufficient to enable its claims to survive summary judgment.

Also before the Court are the parties' cross-motions for summary judgment as to Vanquish's claim that the government improperly deducted money from payments it was due for some two dozen bulk fuel shipments it delivered in 2015. The government seeks summary judgment as to this claim, contending that the deductions were appropriate based on the thousands of gallons of fuel allegedly lost during these shipments. In its cross-motion, Vanquish contends that it is entitled to summary judgment as to this claim because the government's records do not reflect that its personnel followed prescribed processes for measuring bulk fuel and because the government cannot show that the deductions it made were based upon reliable measurements.

For the reasons set forth below, the government's motion for partial summary judgment is **GRANTED** in its entirety, and Vanquish's cross-motion for partial summary judgment is **DENIED**.

## BACKGROUND[2]

### I.    The National Afghan Trucking Services 2.0 Contract

As described in the Court's earlier decisions in this matter, from 2011 to 2016 USTRANSCOM and Vanquish were parties to a succession of National Afghan Trucking Services ("NAT") contracts. See Vanquish I, 140 Fed. Cl. at 464–67; Vanquish II, 147 Fed. Cl. at 394. The motions now before the Court involve claims stemming from the last of the parties' agreements, the NAT 2.0 contract. See Def.'s Mot. for Partial Summ. J. ("Def.'s Mot.") at 1, ECF No. 248; Pl.'s Corrected Resp. to Def.'s Mot. & Pl.'s Cross-Mot. for Partial Summ. J. ("Pl.'s Cross-Mot.") at 40–41, ECF No. 253.

Under the Performance Work Statement ("PWS") for the NAT 2.0 contract, the contractor was "responsible and accountable for the integrity of the entire transportation process

---

[2] The facts in this section are taken from the parties' filings, including records that the parties compiled in appendices to various motions over the years, as well as from this Court's previously reported decisions. Except where noted, the facts are undisputed.

and the protection of the cargo from loss or damage while cargo [is] in the [c]ontractor's care." Def.'s App. at 369 (PWS § 1.4.).[3] The contract's "Basic Services" provisions similarly included requirements that contractors "be responsible [and] timely," "adhere to all assigned movement requirements," and "provide assets and drivers able to accomplish missions anywhere in Afghanistan." Id. at 390 (PWS § 5.2.4.3.).

The PWS further provided that "[w]hen a [c]ontractor fails to provide the basic services . . . the [government] may designate the mission as a 'failed mission.'" Id. at 393 (PWS § 5.2.4.6.). The government could deny pay for a failed mission for a number of reasons, including where a shipment "is delivered to [an] incorrect location, not delivered at all, or is unaccounted for," or when a contractor "fails to properly coordinate security requirements prior to and during convoy movement." Id. (PWS § 5.2.4.6.1.). The government could also deem shipments "failed" and withhold pay if the government cancelled the shipments "for any other reason due to [a] [c]ontractor's negligence or failure to perform in accordance with this PWS or any other contract terms and conditions." Id. In addition, as described in Vanquish I, the contract preserved the government's right—in appropriate circumstances—to terminate failed missions for default, providing that USTRANSCOM "may also pursue administrative or contractual remedies to address non-performance." 140 Fed. Cl. at 477 (quoting PWS § 5.2.4.6.).

Because of the security risks attendant to the movement of goods by truck in Afghanistan, contractors were required to use armed security forces to escort their convoys. See Def.'s App. at 397 (PWS § 5.2.4.13.). The government could assign its security forces to a mission, or it could require contractors to use the Afghanistan Public Protection Force ("APPF"), a security force affiliated with the Afghan government. See id.; see also id. at 756–57 (Stevens Decl. ¶ 5). The contract placed responsibility on the contractor for APPF actions "that result in loss of cargo." Id. at 397 (PWS § 5.2.4.13.). Further, it disclaimed government responsibility "for any delays or deviations to mission timelines caused by [APPF]." Id. (PWS § 5.2.4.13.1.); see also Vanquish I, 140 Fed. Cl. at 475–76 (rejecting Vanquish's claim that when USTRANSCOM required it to use APPF to provide security, it warranted that APPF was capable of securing the shipments).

Under the contract, USTRANSCOM initiated shipments by issuing a Transportation Movement Request ("TMR") to one of its contractors. See Def.'s App. at 387–89 (PWS § 5.2.4.1.). The TMR contained details about the mission such as the type of trucks that must be used and which security forces would escort them. See, e.g., id. at 466 (TMR #AEJ0080). The

---

[3] In 2017, the government attached a roughly 800-page appendix to its response to a motion for partial summary judgment that Vanquish filed soon after commencing this action. See App. to Def.'s Resp. to Pl.'s Mot. for Partial Summ. J. & Def.'s Cross-Mot. for Partial Summ. J., ECF Nos. 45-1 to 45-2. The government filed the appendix in two parts. Id. The first part includes pages 1 to 484, ECF No. 45-1; the second part includes pages 485 to 784, ECF No. 45-2. In addition, the government filed a supplemental appendix in support of its present motion. See Suppl. App. to Def.'s Mot., ECF No. 248-1. The supplemental appendix uses the same pagination as the earlier appendix and includes pages 785 to 1511. For ease of reference, the Court will refer to these separate filings collectively as "Defendant's Appendix."

TMR identified where to pick up and deliver the shipment, and it set specific dates for arriving at both the pick-up and delivery locations. See id. at 388.

USTRANSCOM allocated TMRs to its contractors on a daily basis in 2015. Vanquish I, 140 Fed. Cl. at 466. It assigned these missions according to the contractors' rankings on USTRANSCOM's Order of Merit Lists. Def.'s App. at 389 (PWS § 5.2.4.2.). The lists, which the government updated weekly for each type of mission, ranked contractors "based on an internally established fair opportunity procedure" that incorporated "various factors to include past performance, price, or other relevant factors." Id.; see also id. at 1283 (Determination to Exercise Option § 2.1.). The "specific methodology" for assigning TMRs, the contract explained, was "at the [government's] discretion." Id. at 389.

## II.    The Decision Not to Exercise Vanquish's Second Option Year

After Vanquish completed the contract's base period of performance in 2014, USTRANSCOM exercised Vanquish's first option period, extending the contract for trucking services until mid-December 2015. Def.'s App. at 681–85 (NAT 2.0 Option Task Order). Throughout 2015, USTRANSCOM assigned Vanquish hundreds of missions, including the twelve at issue in these consolidated cases. See id. at 1434–35.

By memorandum of October 21, 2015, however, the contracting officer representative ("COR") requested a reduction in the number of carriers used for the NAT 2.0 contract. Id. at 1260–61. He observed that there had been a "drastic decline" in overall shipments under the NAT 2.0 contract between 2014 and 2015, from more than 2,000 a month to 500. Id. at 1260. As a result, the COR explained, the government planned to reduce the number of contractors performing under the NAT 2.0 contract. Id. He recommended that the contracting officer ("CO") exclude Vanquish (as well as two other carriers) from the second option year. Id. Vanquish should be excluded, he reasoned, because its performance was "the lowest of all available carriers from February to October 2015." Id.

On October 30, 2015, David Stevens, the CO, adopted the COR's recommendation and notified Vanquish that USTRANSCOM did not intend to exercise its option to extend Vanquish's contract. Id. at 361. In a formal determination, he underscored the reduction in overall shipments under the contract in recent years, and he added that the government "expect[ed] the total number of shipments in 2016 to further decline to approximately 350 per month" as the military "complete[d] its drawdown from Afghanistan." Id. at 1282. He concluded that the government required fewer contractors to meet its needs. Id.

CO Stevens next surveyed contractors' ratings on Order of Merit Lists. See id. at 1283–86, 1321–23. The government calculated separate lists weekly for each of the NAT 2.0 contract's three mission types: bulk fuel, dry cargo, and heavy cargo. Id. at 1283–86. The CO reviewed average ratings from February to October 2015. Id. He found that Vanquish ranked last on two of the three mission types and second from last on the other. Id.

The CO also considered contractors' prices. Id. at 1286–90. Vanquish had the highest price for two of the three mission types. Id. at 1286–88. It had the second-highest price for the

4

other mission type based on the currency exchange rate at the time the government awarded the contract. Id. at 1287. When CO Stevens converted prices based on the exchange rate that the government would use during the second option year, however, Vanquish's price exceeded all others for this mission type as well. Id. Finally, the CO calculated average prices per mission unit. Id. at 1288–90; see also id. at 389 (PWS § 5.2.4.1.). Vanquish remained the most expensive contractor under this measure. Id. at 1288–90.

CO Stevens concluded based on Vanquish's "significantly higher prices" and "poor[] performance" that "it is not in the best interests of the Government to exercise [Vanquish's] second option year." Id. at 1290–91. Vanquish's performance under the NAT 2.0 contract therefore ended in December 2015. See id. at 1434.

## III.   The Twelve Lost Shipments

In the meantime, and as described in detail in Vanquish I, during the fall of 2015 and into the new year, Vanquish lost track of and control over twelve shipments. 140 Fed. Cl. at 468–74. The events surrounding the loss of these shipments are at the heart of the dispute between the parties regarding both USTRANSCOM's termination of those transportation missions for cause and its negative assessment of Vanquish's performance during that period.

### A.   Vanquish's Subcontractor, Emporium, Tells Vanquish that It Lacks the Funds to Complete Delivery Because of Longstanding "Issues of Non-Payment" Between Them

USTRANSCOM issued the twelve TMRs to Vanquish in August and September 2015. Vanquish I, 140 Fed. Cl. at 468. The TMRs specified that Vanquish was to arrange for APPF to escort the shipments. Id. at 468–70. Vanquish was scheduled to deliver the shipments in September and October. Id. at 468–70. By mid-September 2015, however, the delivery deadline for the first shipment had passed, and USTRANSCOM asked Vanquish for an update. Def.'s App. at 1237; see also id. at 718.

Vanquish, in turn, contacted Emporium International Transportation Services ("Emporium"), with whom it had entered a subcontract to perform trucking services under the NAT 2.0 contract. See id. at 1145, 1231–36; Vanquish I, 140 Fed. Cl. at 470. Emporium responded that the shipment was waiting for an APPF escort and that, until the escort arrived, the shipment could not move. Def.'s App. at 1235.

Despite Vanquish's requests, Emporium did not supply documentation (a call sign sheet) to confirm its assertion that the shipment had been assigned to APPF. See id. at 1231–35. Vanquish representatives became increasingly frustrated that Emporium could not explain more precisely why the shipment was stalled, and the relationship between the two continued to worsen in the succeeding weeks. See id. at 1231–35, 1249–58.

On October 3, Vanquish sent Emporium an email seeking information about several other shipments that had been picked up but whose location was then unknown. See id. at 1249–53. Emporium responded about ninety minutes later. Id. at 1250. It stated that "issues of

non-payment have been going on for months now," and it complained that its efforts to obtain more information from Vanquish regarding those issues had been unsuccessful. Id.

The "issues of non-payment" that Emporium raised are a reference to a dispute between itself and Vanquish arising out of Vanquish's failure to pay Emporium for the work it had performed under an earlier NAT contract. See id. at 1163–80, 1208–12, 1239–43. Emporium also complained that it had not been reimbursed for payments it alleged it had made to APPF for security escorts during the NAT 2.0 contract. See id. at 1163–80, 1239–43. As described in more detail below, Vanquish took the position that no payments were due because the subcontract it entered with Emporium allowed it to make deductions from payments owed where Emporium's performance caused Vanquish to incur additional costs and penalties. See id. at 534–35.

Months earlier, as the dispute dragged on through the summer with no resolution, Emporium warned Vanquish that it "need[ed] payment to be issued immediately so that [it could] continue to run the missions successfully." Id. at 1179. In response, Vanquish complained of Emporium's "incompetent service," and contended that Emporium's "invoices from APPF do not add up." Id. at 1178.

In its October 3 response to the inquiries concerning the missing shipments, Emporium advised Vanquish that it could "no longer proceed as normal" and would not be able to respond further until Vanquish's "head office" provided a "resolution to the ongoing issues." Id. at 1250. Emporium threatened to alert the CO to the payment dispute the next day if Vanquish's "head office" did not call or email Emporium. Id. at 1249. It complained that the "head office" had been "giving [Emporium the] run around for [a] few months [by] playing games." Id.

### B. Emporium Notifies USTRANSCOM of Its Payment Dispute with Vanquish; USTRANSCOM Sets November 4, 2015 Deadline for Shipments to be Delivered

On October 6, Emporium told USTRANSCOM that Vanquish had not paid it for more than six months and that—despite "dozens of attempts to either communicate electronically or in person"—Vanquish's response was to "either ask[] for more time" or "say they will get back to us, etc." Def.'s App. at 494. In subsequent exchanges with USTRANSCOM, Emporium stated that it controlled the twelve missing shipments but that it lacked funds to deliver them "due to the non[-]payment issues we have been having for months now with Vanquish." Id. at 518; see also id. at 496–97.

Vanquish emailed Emporium on October 8 and again on October 10, requesting the "current status" and "movement plan" for some fifteen shipments. Id. at 1254–58. In both instances, Emporium responded tersely, directing Vanquish to contact the CO. Id.

In the meantime, while expressing reluctance to get in the middle of the relationship between Vanquish and Emporium, USTRANSCOM pressed Vanquish for an explanation regarding a number of missions that it understood were still in Emporium's control. See id. at 509–10, 514–17. Eventually, in late October 2015, it sent Vanquish a letter of concern regarding

eleven TMRs that had not been timely delivered. Id. at 486.[4] The letter explained that Emporium had advised USTRANSCOM that it could not complete the missions because Vanquish had not paid for previous completed missions. Id. The letter acknowledged that the payment issue was between Vanquish and Emporium to resolve but warned Vanquish that, as the prime contractor, it bore ultimate responsibility for the on-time delivery of the shipments. Id. USTRANSCOM gave Vanquish until November 4 to deliver the shipments. Id.

###    C.    Vanquish and Emporium Remain at Loggerheads Over Payment Issues; Shipments Remain Undelivered

In the meantime, Vanquish's relationship with Emporium had grown still more contentious. See Vanquish I, 140 Fed. Cl. at 471. By the end of October, Vanquish had accused Emporium of "theft and blackmail," and threatened that it would report the twelve shipments stolen if Emporium did not deliver them by November 1. Def.'s App. at 522–23. Emporium disputed that it was hiding the shipments to extract payments. Id. at 522. It maintained that the shipments were available to be picked up but that it lacked funds to move them further. Id. "We worked as long as we could with no payment," Emporium wrote, and "we just can't do it any longer." Id.

Vanquish, for its part, took the position that it did not owe Emporium any money. See id. at 534–35. On October 30, 2015, Vanquish copied the CO and other government officials on an email to Emporium that detailed its position. See id.; see also App. to Pl.'s Cross-Mot. ("Pl.'s App.") at 166–67, ECF No. 253-1. Vanquish explained that its subcontract with Emporium permitted Vanquish to deduct payments to account for fees or penalties that it incurred because of Emporium's poor performance. Def.'s App. at 534–35. Vanquish went on to say that it had audited Emporium's performance over the past several years and found hundreds of thousands of dollars in recoverable costs. Id. at 535; see also id. at 1164–76 (purportedly showing amounts Emporium owed Vanquish for potential demurrage charges that were "not claimable" because Emporium's trucks had not transmitted accurate location data). These costs, according to Vanquish, exceeded the amounts Vanquish owed Emporium for successfully completed missions. See id. at 535.[5]

Emporium disputed the findings in Vanquish's audit. See id. at 531–34. It, too, copied the CO and government officials on an email about the payment dispute. See id. Emporium accused Vanquish of deducting money from the payments due Emporium on the basis of costs that

---

[4] USTRANSCOM misdated its letter of concern. See Vanquish I, 140 Fed. Cl. at 471 n.4. The letter's address block includes the date October 4, but the time stamp in the CO's signature block marks the correct date, October 28. See id.; Def.'s App. at 486. Moreover, the letter references events taking place weeks after October 4. Def.'s App. at 486.

[5] Vanquish later reiterated this position to a government official investigating the twelve missing shipments. See Pl.'s App. at 13–15. The investigator noted that Vanquish had identified "performance deficiencies" after auditing Emporium and that, as a result, Vanquish "estimated it did not owe any additional money to [Emporium]." Id. at 14–15.

Vanquish had not incurred. Id. And Emporium protested that Vanquish had not provided evidence to substantiate the audit results. Id.

### D.    Enter Izat Ullah and Omar Balal Logistics Services

On November 2, 2015, the plot thickened as Izat Ullah, who claimed to be an "agent" of Omar Balal Logistics Services ("OBLS"), emailed Vanquish's representative in Afghanistan to let him know that he—and not Emporium—had possession of the eleven missing trucks. Def.'s App. at 566. Mr. Ullah told Vanquish that if it wanted him to take the trucks to Bagram, Vanquish would have to contact Emporium and OBLS about supplying him with the money he would need for fuel and security escorts. Id. He explained that neither Emporium nor OBLS had paid him and that both had informed him that it was Vanquish's refusal to pay Emporium that was preventing Emporium and OBLS from doing so. Id. at 559–60, 564.

The Court notes that this was not the first time that Vanquish had received notice that Emporium was using OBLS as a subcontractor on the NAT 2.0 contract. In December 2014, shortly after Vanquish began performance on NAT 2.0, someone claiming to be "a subcontractor for OBLS" emailed the government about three of Vanquish's shipments that had stalled. Id. at 1149. This person complained that OBLS was not paying its subcontractors because Vanquish was not paying OBLS. Id. The subcontractor threatened that drivers would sell the cargo if they were not paid soon and urged the government to "talk to OBLS" about the impasse. Id. The government forwarded the email to Vanquish moments later and requested an explanation. Id. at 1148. The record does not include Vanquish's response to that email.

Nonetheless, not long after, in mid-January 2015, Vanquish sent Emporium a letter of concern regarding "the use of unauthorized subcontractors." Id. at 1155. Vanquish wrote, "The [government] has informed [Vanquish] of the use of third-tier subcontractors by [Emporium]." Id. Vanquish then instructed Emporium to take corrective action "to ensure that there is no further breech [sic] of the subcontract," which forbade Emporium from using unauthorized third-party subcontractors. Id.

Emporium, for its part, denied hiring OBLS to transport the shipments. Id. at 1156; see also id. at 1146–47, 1151–52. But Vanquish had reason to doubt Emporium's assurances. See id. at 1151–52. Specifically, after USTRANSCOM referred the three missing shipments to the U.S. Army Criminal Investigation Division, the investigating agent reported to Vanquish on January 9, 2015, that Emporium was using OBLS to deliver the shipments. Pl.'s App. at 22–23, 26. Vanquish's deputy program manager sent an update to Vanquish's leadership team that day recounting his phone call with the agent. Id. at 26. The agent "stated that Emporium subbed out the work to a company called OBLS," which "then subbed out the [shipments]" to individual truck drivers. Id. The Criminal Investigation Division "is digging up more and more information," the manager stated, and its agents "are completely satisfied with their investigation that this is what is going on." Id. The manager concluded, "The main issue is Emporium is subbing out work. They refuse to admit it." Id.

In any event, between November 2 and November 7, 2015, Vanquish communicated with Mr. Ullah in an effort to confirm that he actually was in possession of the shipments at issue. See

Def.'s App. at 559–65. Vanquish advised Mr. Ullah to return the shipments to their point of origin immediately. Id. at 562–63. Vanquish also warned Mr. Ullah that he was not an authorized subcontractor, that Emporium had used him to move cargo illegally, and that if he did not return the cargo immediately, he would be charged with theft of government property and OBLS would be blacklisted. Id. at 563.

Mr. Ullah was apparently unmoved. He again declined to return the shipments and threatened in turn that if he was not paid, he would alert USTRANSCOM to the payment disputes between Vanquish, Emporium, and OBLS. Id. at 559–60, 562, 564.

### E.    USTRANSCOM's Intervening Efforts to Secure Assurances of Performance From Vanquish

In the interim, on November 4, while these exchanges were taking place between Vanquish and Mr. Ullah, CO Tina Ellis emailed Vanquish. See Def.'s App. at 543. In her email, she noted that she had still not received a response to her October 28 letter of concern and asked Vanquish to "[p]lease provide a response immediately." Id. Vanquish agreed to submit its response within twenty-four hours and noted that the delay resulted from its recent receipt of "information regarding Emporium . . . directly related to the issues we had been experiencing." Id. at 542.

On November 7, 2015, Vanquish terminated Emporium's subcontract and enlisted the services of a new subcontractor. See id. at 547; see also id. at 487–88, 540. The next day, on November 8, the CO, having still received no response to the letter of concern, emailed Vanquish again. Id. at 545. She advised Vanquish that if she did not hear back by the next day, USTRANSCOM would "redirect the[] missions to another contractor." Id.

On November 10, USTRANSCOM issued Vanquish a cure notice. Id. at 549–50. It explained that Vanquish had not responded to USTRANSCOM's letter of concern. Id. It also reiterated that the dispute between Vanquish and Emporium regarding the offsets Vanquish had taken against the payments due Emporium did not relieve Vanquish of its contractual obligation to deliver the shipments on time. Id. at 550. If Vanquish did not deliver the shipments, the notice stated, the government "may terminate[] [them] for cause." Id.

### F.    Vanquish Tells USTRANCOM that the Shipments Were in the Hands of OBLS, a Subcontractor Emporium Had Improperly Hired and Whom It Was Not Paying

On the same day the cure notice was issued, November 10, Vanquish submitted a response to the letter of concern. Def.'s App. at 551–54.[6] It advised USTRANSCOM that

---

[6] Vanquish's response to the letter of concern is dated November 3. Def.'s App. at 553. But Vanquish apparently transmitted it to USTRANSCOM by email on November 10. See id. at 551. The CO's emails on November 4 and 8 indicate that USTRANSCOM had not received Vanquish's response by those dates. See id. at 543–45. In addition, as stated, USTRANSCOM's

Vanquish had learned that Emporium had hired OBLS to transport the missing shipments. Id. at 553; see also id. at 962–74 (May 2014 subcontract between Emporium and OBLS); id. at 975–76 (December 2014 email from Emporium to OBLS regarding OBLS's compliance with key provisions of Vanquish's NAT 2.0 contract). Vanquish went on to explain that Emporium apparently had stopped paying OBLS several months earlier and that OBLS was holding the shipments until it was paid. Id. at 553–54. At some point, Vanquish gathered, Emporium told OBLS that Vanquish was to blame for OBLS not being paid because Vanquish had not paid Emporium. Id. Vanquish wrote that OBLS would not deliver the shipments "until they are . . . paid by [Emporium] or Vanquish." Id. at 553; see also id. at 1341 (November 8, 2015 email among Vanquish management, relaying a third-party transportation company's assessment that OBLS was holding Vanquish's shipments until Emporium or Vanquish paid OBLS).

Vanquish also advised USTRANSCOM that Emporium had enlisted OBLS to deliver the shipments without its knowledge or consent. Id. at 553; see also id. at 1369–71. It further noted that Emporium's arrangement with OBLS contravened Vanquish's subcontract with Emporium, which included a provision prohibiting Emporium from using third parties to transport Vanquish's shipments. Id. at 553; see also id. at 1371.

Nonetheless, Vanquish acknowledged that "the completion of these missions and the delivery of the cargo withheld by OBLS falls within [Vanquish's] responsibility." Id. at 554. Vanquish advised USTRANSCOM that it would continue to try to negotiate a resolution with OBLS. Id. It also stated its intent to notify the Criminal Investigation Division that the cargo was in the hands of a company (OBLS) that lacked the authority to transport it. Id.

### G. Vanquish Tells USTRANSCOM That OBLS Has the Shipments; USTRANSCOM Extends Deadline for Vanquish to Secure Their Delivery

On November 18, 2015, two days before the deadline to deliver the twelve missing shipments, Vanquish's representative Vincent Hall updated the government on Vanquish's efforts to locate and recover them. Def.'s App. at 557–58. Mr. Hall stated that Vanquish had concluded that Mr. Ullah had the shipments and that they were "not within Emporium's control." Id. at 557. He also reported—based on information Vanquish had received days earlier from Red RMC, an Australian company that provided management services to APPF—that the shipments were sent to a compound belonging to the Afghan National Police and were not being held at an APPF facility. Id.; see also id. at 1342–48; Def.'s Mot. at 37. Mr. Hall acknowledged that "[i]t's a given that we have to get this cargo back into the hands of the [government]." Def.'s App. at 557. But, he explained, returning the shipments by November 20 would be "extremely difficult" without running afoul of rules prohibiting "bribery or payoffs." Id. at 558. USTRANSCOM responded on November 22 and extended the deadline for delivering the twelve missing shipments by four weeks, to December 15, 2015. Id. at 1350. Mr. Hall responded that Vanquish would "continue to work on getting this situation handled as quickly and efficiently as we possibly can." Id. at 1349.

---

November 10 cure notice stressed that Vanquish had not yet responded to the letter of concern. Id. at 549–50.

H.     **Vanquish Tells USTRANSCOM the Missing Shipments Are With APPF;**
       **Requests That Emporium Release Shipments to Vanquish**

By early December, Vanquish advised USTRANSCOM that—notwithstanding the information provided by Red RMC—it had concluded that the missing trucks were in fact sitting in APPF compounds. See Def.'s App. at 1383–87, 1394. Vanquish provided USTRANSCOM with the last known location data from the trucks' transponders. Id. at 1384–86, 1394, 1398–1421. According to the data Vanquish provided, the last pings for each of the TMRs showed that they were located within APPF security yards. See id. at 1394. Based on this information, USTRANSCOM told Vanquish that it would see what it could do to assist with APPF. Id. at 1383–84, 1387. USTRANSCOM maintained, however, that it "expect[ed]" Vanquish "to continue to resolve this issue." Id. at 1384.

To that end, on December 3, 2015, Vanquish emailed Emporium again and requested that Emporium "release the cargo." Id. at 572. Vanquish explained that the government would not pick up the cargo or pay Emporium. Id. Rather, Vanquish said, Emporium's only option was to deal with Vanquish, which offered to pick up the missing shipments from Emporium and return them to the government. Id.; see also id. at 567 (November 26, 2015 email from USTRANSCOM to Emporium, stating that Emporium's dispute with Vanquish "is between you and the prime contractor"); id. at 1381 (December 3, 2015 email among Vanquish's management, describing a recent meeting in which USTRANSCOM expressed that it would not intervene with Emporium to recover the shipments and that Vanquish "is an officially appointed representative of the [U.S.] government, and the only ones that can bring the cargo back"). It is not clear from the record whether Emporium responded to Vanquish's December 3 email.

I.     **Vanquish Fails to Meet Extended Delivery Deadline; Officially Declares**
       **Shipments Were Lost or Destroyed While in the Care of APPF**

The NAT 2.0 contract expired on December 15, 2015, the same day that USTRANSCOM had set as the deadline for delivering the missing shipments. See Def.'s App. at 1350, 1423. On December 20, the government asked Vanquish for an update. Id. at 1425–26. Vanquish answered, "We are still waiting on our former sub[contractor] to get back to us." Id. at 1425.

On December 24, the government again asked Vanquish to "provide the status and current physical location" of the twelve missing shipments. Id. at 588. Vanquish responded that day. Id. at 586–87. It stated that "APPF is responsible for the cargo" and that Vanquish did not know "[w]hether the TMRs are still with the APPF (who refuses to assist us) or are a combat loss while under APPF security." Id. at 587.

The government pointed out that this information conflicted with previous statements made by Vanquish's in-country representative, who had said that APPF was not escorting the shipments when they went missing. Id. at 586; see also id. at 557–58. The government noted that the shipments apparently had been transported without APPF's involvement "even though the TMRs specifically required [Vanquish] to use APPF escort from origin to destination." Id. at 586. Eric Barton, Vanquish's President and CEO, replied that it would prepare a "formal response to the TMRs under APPF control." Id. at 585.

Vanquish sent its formal response on January 7, 2016, in the form of a letter from Mr. Barton to CO Stevens. See id. at 584, 591. Mr. Barton stated that he was providing "formal notice that the shipments have been lost or destroyed as a result of a combat loss while in the care, custody and control of APPF" and that "[t]his loss occurred without the fault or negligence of [Vanquish]." Id. at 591.

Also on January 7, the government followed up on its December 20, 2015 exchange with Vanquish, in which Vanquish said that it was waiting on information from Emporium about the missing shipments. Id. at 1425–28. Vanquish again responded that it was "still waiting on our former sub[contractor]" to provide an update on the missing shipments. Id. at 1427.

When Mr. Barton learned of this email exchange, he advised Vanquish's management "to stop all written communication with the [government] about this." Id. at 1429. He pointed out that Vanquish had paid an attorney $20,000 to prepare a document saying the opposite of what had been said in the email—i.e., that a subcontractor might still have the cargo. See id. "We are not waiting for anything," he wrote. Id. "It is a combat loss," he said, "end of story." Id. And, he closed, "[n]o one needs to communicate another single thing about these 12 [TMRs] without my personal approval." Id.

## J.      USTRANSCOM Terminates Missions for Default

On January 9, 2016, USTRANSCOM initiated action to protect its interests in response to Vanquish's acknowledgement that the shipments were lost. See Def.'s App. at 594. "Now that [Vanquish] has officially . . . determined the cargo is unaccounted for," USTRANSCOM explained, the government would charge Vanquish for the cost of replacing the missing shipments, in accordance with PWS § 5.2.2.8. Id.; see also id. at 385 (PWS § 5.2.2.8.).

Vanquish protested USTRANSCOM's plan to recover from Vanquish the value of the missing shipments. See id. at 605. It sought to shift the blame from itself to APPF. See id. "The challenge we are faced with," Vanquish wrote on January 11, 2016, "is that we loaded the equipment, the equipment was then secured by the APPF . . . and the equipment was either stolen, sold, or otherwise disposed of by [APPF]." Id. Vanquish asserted that it was powerless to recover the missing shipments "once armed men with government authority take over the trucks and move the trucks to their secure location." Id.

On January 22, 2016, the government terminated the twelve missing shipments for default. Id. at 620–21; see also id. at 629 (incorporating FAR 52.212-4 into Vanquish's NAT 2.0 contract); FAR 52.212-4(m) (2012) (providing that "[t]he Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance"). The CO's letter to Vanquish recounted the events culminating in the government's decision. See Def.'s App. at 620–21. He cited the letter of concern and the cure notice that USTRANSCOM had issued in November after Vanquish missed the delivery deadlines for the shipments. Id. at 620; see also id. at 691–702 (TMRs listing delivery dates).

The CO also recalled the corrective action plan that Vanquish included with its response to USTRANSCOM's cure notice. Id. at 620–21. In it, Vanquish objected to the cure notice and argued that it could not legally compel OBLS to deliver the shipments "since OBLS is not an authorized subcontractor as required by the contract, and may well be associated with a terrorist organization." Id. at 546. The CO recounted USTRANSCOM's warning to Vanquish after receiving the corrective action plan that the government would terminate the shipments for default if they were not delivered soon. Id. at 621; see also id. at 555.

The CO concluded that Vanquish "failed to complete the requirements of [the NAT 2.0 contract] and TMRs." Id. at 621. Moreover, he continued, Vanquish "states it 'lost' the cargo and therefore fails to provide USTRANSCOM adequate assurances it will produce or deliver the cargo in the future." Id. The CO therefore terminated the shipments for cause under FAR 52.212-4. Id.

### K.   The Missing Shipments Are Recovered Based on Information Provided by Izat Ullah

In the meantime, the Office of the Special Inspector General for Afghanistan Reconstruction ("SIGAR") had, since December 2015, been conducting its own investigation to determine the fate of the missing shipments. See Pl.'s App. at 13–16. On December 12, 2015, a SIGAR agent interviewed several Vanquish employees about Vanquish's efforts to recover the shipments from OBLS. Id. Then, on December 22 and 23, USTRANSCOM emailed Mr. Ullah, the OBLS associate, to discuss how the government could recover the missing shipments from OBLS. Id. at 93–95.

For the next several months, USTRANSCOM exchanged emails with Mr. Ullah. See id. at 91–93, 104–18, 124–34. USTRANSCOM's contracting officer confirmed that Mr. Ullah controlled the missing shipments by asking him to send photographs of the shipping containers, which Mr. Ullah did in early January 2016. Id. at 91–93. Mr. Ullah also arranged for the delivery of two of the missing shipments during this time. Id. at 104–18. The first of those shipments was delivered to Bagram Airfield on January 29, 2016; the second arrived at Bagram in mid-February. Id. at 104–14. All along, the CO urged Mr. Ullah to attend an in-person meeting at Bagram Airfield to discuss the missing shipments and OBLS's payment dispute with Vanquish. See id. at 104, 124–25, 128–33.

In anticipation of an eventual meeting with Mr. Ullah, an Afghan national, SIGAR requested permission from Afghanistan's government to use body-worn recorders and other devices to record the conversation. See id. at 97. In a letter to Afghanistan's attorney general, SIGAR explained that it believed that Mr. Ullah "has stolen the containers while in transit from Kandahar Airfield to Bagram Airfield and is demanding money for their release." Id.

After Afghanistan's attorney general approved SIGAR's request, investigators sought the U.S. Ambassador's go-ahead. See id. at 100–01. SIGAR's January 2016 memorandum to the Ambassador explained that Vanquish subcontracted with Emporium to deliver the twelve shipments and that Emporium alerted Vanquish and USTRANSCOM that it would withhold

delivery until it received payment from Vanquish. Id. at 100. SIGAR also detailed "[r]ecent developments" suggesting that "a third Afghan company may . . . have [taken] possession of the containers . . . by theft." Id. SIGAR predicted that the recorded conversation with Mr. Ullah would lead to his arrest. Id. at 101.

The CO and investigators interviewed Mr. Ullah at Bagram Airfield on March 1, 2016. Id. at 142–43. Before the interview, investigators prepped the CO to elicit information from Mr. Ullah, including his reaction to the charge of "having stolen U.S. Government property." See id. at 457–58. According to SIGAR's report of the interview, Mr. Ullah said that he could arrange for the stalled shipments to be delivered once he was paid. Id. at 142. After the interview, investigators delivered Mr. Ullah to an Afghan prosecutor, and he was arrested. Id. at 143.

A week later, on March 7, 2016, a SIGAR special agent who participated in Mr. Ullah's interview and arrest reported to the CO that Mr. Ullah had provided information that would enable the government to recover the missing shipments. Id. at 145. "Amazing what a week in jail will do for someone," the special agent wrote. Id. The government recovered the shipments that day. See id. at 147–48 (March 8, 2016 Defense Criminal Investigative Service Report); see also id. at 149–52.

## IV.   The 2016 Contractor Performance Assessment Report

In March 2016, USTRANSCOM finalized for publication a CPAR that rated Vanquish's performance under the NAT 2.0 contract for the period beginning on December 16, 2014, and ending on December 15, 2015. Def.'s App. at 1434–42. The CPAR was initially drafted by CO Stevens in late January 2016; Vanquish submitted its comments on February 26, 2016; and the reviewing official provided his comments three weeks later, on March 21, 2016. Id.; see also id. at 1444–45.

As explained in greater detail below, CO Stevens assigned "marginal" ratings to Vanquish in two categories: management and quality. Id. at 1434–36. The brief narrative he prepared focused on Vanquish's inability during the performance period to recover and deliver the twelve missing shipments. See id. at 1435–36. In its comments, Vanquish disputed the ratings it had been assigned, characterizing the CPAR as "a gross distortion of the facts." Id. at 1438. The reviewing official, however, declined to revise the CPAR and instead concurred with the CO's assessment and ratings. See id. at 1440–41.

## V.   Fuel Shipments

The NAT 2.0 contract contemplates that a contractor may be liable for bulk fuel lost during transit. See Def.'s App. at 381 (PWS § 5.2.1.4.). It provides that "[f]uel losses up to one percent (1%), due to evaporation and other contributing factors (i.e.[,] inaccurate metering, changes in barometric pressure, etc.), are allowable and shall not establish a financial liability against the [c]ontractor." Id. "In instances where fuel losses exceed one percent," however, "the [c]ontractor shall be financially liable for the entire fuel loss amount." Id.

The contract makes the government responsible for loading and unloading fuel. See id. at 390 (PWS § 5.2.4.2.). In addition, it provides that "[f]uel uploaded at origin and delivered at destination shall be in accordance with U.S. Army Field Manual (FM) 10-67-1 standards." Id. at 380 (PWS § 5.2.1.).

In accordance with PWS § 5.2.1.4., the government deducted more than $150,000 from its payments to Vanquish for twenty-seven bulk fuel shipments that Vanquish delivered in 2015. See id. at 381; Compl. No. 20-346 ¶¶ 31, 59–62, ECF No. 1.[7] In determining the amount of fuel lost, it relied upon measurements that were recorded on TMRs, invoices, and government shipping reports for each of the twenty-seven missions. See Def.'s App. at 1181.

In Count II of the complaint in No. 20-346, Vanquish alleges that the government did not adhere to the Field Manual's guidelines when it measured the amounts of fuel downloaded at the delivery locations. Compl. No. 20-346 ¶¶ 38–41. Instead, Vanquish claims, the deductions were made from payments to Vanquish "solely on the basis of inaccurate and unreliable fuel measurements." Id. ¶ 41.

## VI.   The Pending Cross-Motions

The pending cross-motions for partial summary judgment involve claims made in three of the four consolidated cases. See Def.'s Mot. at 1. In Counts II and III of the second amended complaint in No. 17-96, Vanquish challenges the government's decision to terminate the twelve missing shipments for cause, alleging that the government acted in bad faith and that its termination decision was therefore arbitrary, capricious, and an abuse of discretion. Second Am. Compl. No. 17-96 ¶¶ 146–58, ECF No. 27. In Count IV of the amended complaint in No. 19-310, Vanquish similarly claims that the government's decision not to exercise Vanquish's second option period was made in bad faith. Am. Compl. No. 19-310 ¶¶ 127–31, ECF No. 105. And in Count V of that complaint, Vanquish contends that the government's 2016 CPAR was unfairly critical of Vanquish's performance under the NAT 2.0 contract and was similarly issued in bad faith. Id. ¶¶ 90–91, 133. Finally, in Count II of the complaint in No. 20-346, Vanquish alleges that the government breached the NAT 2.0 contract when USTRANSCOM reduced its payments to Vanquish for more than two dozen bulk fuel shipments. Compl. No. 20-346 ¶¶ 59–62.

In July 2022, the government moved for partial summary judgment as to these five counts. Def.'s Mot. at 46–55. Vanquish filed a response and cross-motion in August. See generally Pl.'s Cross-Mot. In its cross-motion, Vanquish argues that it is entitled to summary judgment as to its fuel claim. Id. at 40–41. The government filed its reply and response soon after. See Def.'s Reply in Supp. of Def.'s Mot. & Def.'s Resp. to Pl.'s Cross-Mot. ("Def.'s

---

[7] Shortly after Vanquish filed its complaint in No. 20-346, the Court ordered the case consolidated with Nos. 17-96, 18-1043, and 19-310. Order, ECF No. 8 (No. 20-346). Vanquish did not refile the complaint in the lead case, No. 17-96. The Court's citation to the complaint in No. 20-346 therefore refers to that case's electronic docket. Elsewhere in this opinion, however, the electronic case filing ("ECF") numbers in the Court's citations refer to the electronic docket of No. 17-96, where most of the various pleadings are filed.

Resp."), ECF No. 255. Vanquish filed its reply in support of its cross-motion in mid-September. See Pl.'s Reply in Supp. of Pl.'s Cross-Mot. ("Pl.'s Reply"), ECF No. 257. The Court has concluded that oral argument on the cross-motions is unnecessary.

## DISCUSSION

### I.    Legal Standards

#### A.    <u>Bad Faith</u>

As noted, Vanquish alleges in its complaints that USTRANSCOM acted in bad faith when it: (1) failed to extend Vanquish's contract by a year, Am. Compl. No. 19-310 ¶¶ 128, 130; (2) terminated the twelve transportation missions for cause, Second Am. Compl. No. 17-96 ¶¶ 114, 154–56; and (3) published a negative performance appraisal in the CPARs system, Am. Compl. No. 19-310 ¶¶ 90–91, 133. The government has moved for summary judgment as to each of these claims. Def.'s Mot. at 49–52.

It is well established that to prevail on claims that allege bad faith by government contract officials, Vanquish must overcome the "strong presumption" that such officials "exercise their duties in good faith." <u>Am-Pro Protective Agency, Inc. v. United States</u>, 281 F.3d 1234, 1239 (Fed. Cir. 2002). Clear and convincing evidence is required to rebut the presumption. <u>Id.</u> at 1239–40. That standard imposes a "very weighty" burden of proof. <u>Krygoski Constr. Co. v. United States</u>, 94 F.3d 1537, 1541 (Fed. Cir. 1996). To meet it, the evidence of bad faith must be sufficiently compelling that it "produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" <u>Price v. Symsek</u>, 988 F.2d 1187, 1191 (Fed. Cir. 1993) (quoting <u>Buildex Inc. v. Kason Indus., Inc.</u>, 849 F.2d 1461, 1463 (Fed. Cir. 1988)). This means that a plaintiff must produce "evidence of some specific intent to injure the plaintiff." <u>Galen Med. Assocs., Inc. v. United States</u>, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting <u>Torncello v. United States</u>, 681 F.2d 756, 770 (Ct. Cl. 1982)).

#### B.    <u>Summary Judgment</u>

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986). In ruling on a motion for summary judgment, all evidence must be viewed in the light most favorable to the nonmoving party, and all reasonable factual inferences should be drawn in favor of the nonmoving party. <u>Anderson</u>, 477 U.S. at 255; <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970). A fact is material for purposes of summary judgment if it "might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." <u>Id.</u> at 250.

In cases where the nonmoving party bears the burden of proof, the party moving for summary judgment may meet its burden of demonstrating the absence of a genuine issue of material fact "by showing the court that there is an absence of evidence to support the nonmoving party's case." <u>Dairyland Power Coop. v. United States</u>, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). Where, as is the case here, the

non-movant's case requires that it prove bad faith on the part of a government contracting official, the moving party (the government) must show the Court that there is an absence of evidence by which "a reasonable fact finder could find, by clear and convincing evidence, that the [government] did not act in good faith" when it effected the challenged actions. Am-Pro Protective Agency, 281 F.3d at 1241.

## II.     USTRANSCOM's Motion for Summary Judgment as to Count IV in No. 19-310 (Failure to Exercise Option)

As a general matter, "the government is not required to exercise an option period to a contract if the contract places no restriction on the government's discretion." Dekatron Corp. v. United States, 128 Fed. Cl. 115, 118 (2016) (citing Gov't Sys. Advisors, Inc. v. United States, 847 F.2d 811, 812–13 (Fed. Cir. 1988)). Nonetheless, "[a] contractor can recover for the government's failure to exercise an option if the government's failure was in bad faith." Bannum, Inc. v. United States, 80 Fed. Cl. 239, 249 (2008) (alteration in original) (quoting Hi-Shear Tech. Corp. v. United States, 53 Fed. Cl. 420, 436 (2002)).

In Count IV in No. 19-310, Vanquish alleges that USTRANSCOM acted in bad faith when it decided in October 2015 not to exercise its option to extend Vanquish's performance under NAT 2.0 for another year. Am. Compl. No. 19-310 ¶¶ 128, 130; see also Def.'s App. at 361. The government is entitled to summary judgment as to this claim because, based on the record before the Court, no reasonable fact finder could find, by clear and convincing evidence, that USTRANSCOM did not act in good faith when it decided not to extend Vanquish's contract by an additional year. See Am-Pro Protective Agency, 281 F.3d at 1241.

As described above, the evidence is undisputed that in October 2015, USTRANSCOM decided to reduce the number of NAT 2.0 contractors from eight to five because of what it viewed as a significant decline in the overall number of shipments. See Def.'s App. at 1260–61, 1282–91. The record also shows that—in addition to Vanquish—two other contractors were also not extended for a second option year. Id. at 1260, 1291. According to USTRANSCOM, it excluded Vanquish because it had both the lowest ratings on the Order of Merit Lists for two of three of the NAT 2.0 contract's mission types, and the highest prices for all three mission types. Id. at 1283–91. The CO explained that it was "not in the best interests of the Government to exercise [Vanquish's] second option year" given Vanquish's "significantly higher prices" and "poor[] performance." Id. at 1290–91.

Vanquish identifies no evidence in the record that casts doubt upon the accuracy of USTRANSCOM's assertions regarding Vanquish's relatively low ratings and high prices. Nor does it identify any evidence (much less clear and convincing evidence) that USTRANSCOM cited Vanquish's low ratings and high prices as a pretext for its real reason for not extending the contract an additional year—i.e., a desire to inflict injury on Vanquish. In fact, Vanquish does not even respond directly to the government's motion for summary judgment as to its claim that USTRANSCOM acted in bad faith when it decided not to exercise its option to keep Vanquish on for an additional year. See Pl.'s Cross-Mot. at 2–27. Therefore, the Court will grant the government's motion for summary judgment as to Count IV in No. 19-310.

**III.    The Government's Motion for Summary Judgment as to Count II in No. 17-96 (Default Termination) and Count V in No. 19-310 (Negative CPAR)**

**A.    Background**

As described above, on January 22, 2016, the government terminated the twelve transportation missions for default in accordance with FAR 52.212-4(m), which was incorporated into the NAT 2.0 contract. Def.'s App. at 620–21, 629. That provision authorizes such termination "in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance." FAR 52.212-4(m) (2012).

In explaining his decision to terminate the twelve missions for cause, CO Stevens cited Vanquish's failure to meet contractual requirements. See Def.'s App. at 620–21. Specifically, he pointed out, USTRANSCOM "tendered [the] subject cargo to [Vanquish] in good order and condition and [Vanquish] failed to deliver the cargo by the required delivery date." Id. at 621. Moreover, CO Stevens observed, Vanquish had formally declared in its January 7, 2016 email that the cargo associated with the TMRs was "lost." Id.; see also id. at 584, 591. Therefore, he concluded, Vanquish had "fail[ed] to provide USTRANSCOM adequate assurances it will produce or deliver the cargo in the future." Id. at 621.

**B.    Standard for Default Terminations**

In a termination for default case, the government has the initial burden of establishing that the contractor was in default. Emiabata v. United States, 102 Fed. Cl. 787, 791 (2012); see also Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987) (the government bears the burden of showing that a "termination for default was justified"). If the government meets its burden of showing that the contractor was in default, "then the burden shifts to the contractor to show that its failure to perform was excusable," Emiabata, 102 Fed. Cl. at 791 (citing Becho, Inc. v. United States, 47 Fed. Cl. 595, 600 (2000)), i.e., that it was "caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence such as, acts of God or the public enemy, acts of the Government in either its sovereign or contractual capacity, fires, floods, epidemics, quarantine restrictions, strikes, unusually severe weather, and delays of common carriers," FAR 52.212-4(f) (2012).

**C.    Evidence of Bad Faith**

In its response to the government's motion for summary judgment as to Count II of No. 17-96, Vanquish does not deny that the twelve shipments covered by the TMRs were not delivered by contractual deadlines. See generally Pl.'s Cross-Mot. Nor does it deny that they were not delivered by the several subsequent deadlines that USTRANSCOM set while it waited for Vanquish to respond to its cure notice and letter of concern. See id.; Def.'s App. at 486, 555. And Vanquish also does not take issue with USTRANSCOM's conclusion that the contractor could not provide any assurances that it would be able to recover and deliver the shipments. See Def.'s App. at 621. To the contrary, Vanquish told the government in January 2016 that the shipments had been "lost or destroyed." Id. at 591.

Further, although it claimed in its complaint that the "delay in the Government's receipt of the cargo was excusable as it was the result of events beyond Vanquish's reasonable control and without Vanquish's fault or negligence," Second Am. Compl. No. 17-96 ¶ 148, Vanquish appears to have abandoned that claim in opposing the government's motion for summary judgment, see generally Pl.'s Cross-Mot. Presumably it has abandoned that argument because, as the Court observed in Vanquish I, "[t]o the extent that the actions or inactions of Emporium were responsible for the cargo falling into the hands of unauthorized third parties, Emporium's negligence or fault would be attributable to Vanquish for purposes of the contract, even in the absence of actual fault or negligence on Vanquish's part." 140 Fed. Cl. at 478.

Vanquish nonetheless continues to press its claim that the termination of the twelve shipments for cause was "arbitrary, capricious, and an abuse of discretion." Pl.'s Cross-Mot. at 2; see also Second Am. Compl. No. 17-96 ¶ 152. Its theory is that—even if the default termination was objectively reasonable—it was subjectively motivated by USTRANSCOM officials' desire to inflict injury on Vanquish. See Pl.'s Cross-Mot. at 2–3 (observing that "[o]ne of the factors to consider in assessing whether a termination for cause was arbitrary, capricious or an abuse of discretion is 'whether the contracting officer acted with subjective bad faith' in issuing the termination" either because he "intended to harm Vanquish, or because [he] was actuated by animus in [his] dealings with Vanquish" (quoting Truckla Servs., Inc., ASBCA No. 57564, 17-1 BCA ¶ 36,638)). In other words, Vanquish's argument is that the contracting officer abused his discretion by "us[ing] default as a pretext for terminating a contract for reasons unrelated to performance." See Vanquish I, 140 Fed. Cl. at 480 (quoting McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1329 (Fed. Cir. 1999)).

The Court finds, however, that there is an absence of evidence sufficient to prove this claim to a reasonable fact finder in a clear and convincing fashion. To begin with, it is undisputed that USTRANSCOM gave Vanquish multiple opportunities to locate and recover the shipments itself and did not go ahead with the default termination until Vanquish had officially declared that the cargo was lost. See Def.'s App. at 486, 555, 591, 620–21, 1350, 1429. Moreover, the best evidence that an objectively reasonable default termination was motivated by animus would be either direct evidence that such animus existed and played a role in the termination decision or evidence that the agency had been more lenient with other contractors who were in default. But Vanquish provides neither. Instead, it strains to create an inference of bad faith based on: (1) isolated comments by government officials that are unrelated to the default termination and (2) the content of the performance appraisal that the agency prepared and published in the CPARs system. See Pl.'s Cross-Mot. at 4–27; see also Def.'s App. at 1434–42.

For example, Vanquish notes that in 2007, its President, Mr. Barton, was the subject of debarment proceedings that arose out of allegations that he had an improper relationship with a contracting officer when he served as a contractor in Iraq. Am. Compl. No. 19-310 ¶ 37. According to Vanquish, Mr. Barton was subsequently "cleared of all allegations of wrongdoing." Id. Nevertheless, Vanquish observes, a former lawyer for USTRANSCOM "has expressed the opinion that Mr. Barton should have been debarred for obtaining competitive advantages from a contracting officer with whom Mr. Barton was having a sexual relationship." Def.'s Answer to Am. Compl. No. 19-310 ¶ 37, ECF No. 164.

But Vanquish does not claim that this former lawyer played any role in deciding whether the missions should be terminated for cause. See Pl.'s Cross-Mot. at 23–24. It does not provide the context in which the statement was made. See id. Even read in a light most favorable to Vanquish, the former lawyer's statement and opinions are of little, if any, relevance.

Similarly, Vanquish highlights a brief email exchange between USTRANSCOM officials in January 2016, around the time USTRANSCOM was communicating with Mr. Barton about the missing shipments. Id. at 24; see also Pl.'s App. at 178; Def.'s App. at 591, 593–602. In that exchange, CO Stevens wrote of Mr. Barton, "I am surprised they didn't debar him." Pl.'s App. at 178. Lt. Cl. Jarrett Moffitt responded that he "believe[d] that Jason Logsdon [presumably a procurement official] tried to use this in his responsibility determination" and that he thought "this was one of the protest actions that held up NAT 2 at GAO." Id.

CO Stevens explained the context of his remark at his deposition. See id. at 432–33 (Stevens Dep. at 228:10–231:13). He recalled that Lt. Cl. Moffitt "had mentioned that Mr. Barton had some previous issues with the government" and that he had Googled Mr. Barton's name at Lt. Col. Moffitt's suggestion. Id. (Stevens Dep. at 228:25–229:3). He was then led to a news site that detailed the proposed debarment. Id. at 433 (Stevens Dep. at 229:4–7). CO Stevens testified that—based on what he read—he was surprised that Mr. Barton was not debarred. Id. (Stevens Dep. 229:8–10).

The comments of CO Stevens and Lt. Col. Moffitt reflect disapproval of what they understood Mr. Barton's conduct to have been, in an unrelated matter, some nine years earlier. See id. at 178. But by themselves they have little, if any, probative value with respect to whether either the negative CPAR or the default termination of the twelve missions were part of an effort to deliberately target Mr. Barton or Vanquish. In fact, CO Ellis had been warning Vanquish about the possibility of the default termination for several months, before CO Stevens apparently knew anything about Mr. Barton's brush with debarment. See Def.'s App. at 549–50, 555, 620–21.

Similarly irrelevant to whether the default termination or negative CPAR were effected in bad faith are comments that counsel for the government made during an oral argument held before the undersigned in 2018 on the parties' earlier cross-motions for partial summary judgment. Pl.'s Cross-Mot. at 25–27; see also Pl.'s App. at 189–250. Vanquish's counsel had urged the Court to deny the government's cross-motion in part because the parties had not had discovery. Pl.'s App. at 200 (Tr. of Oral Arg. at 12). Later, while arguing in support of the government's cross-motion, government counsel suggested that discovery could not absolve Vanquish of liability for the twelve missing shipments. See id. at 235–38 (Tr. of Oral Arg. at 47–50). He alleged that Vanquish knew that OBLS was acting on behalf of Emporium and that Vanquish's nonperformance was not excusable. See id. at 237–38 (Tr. of Oral Arg. at 49–50). In fact, counsel argued, Vanquish knew when it bid on the NAT 2.0 contract that OBLS, rather than Emporium, would be conducting its missions. See id. He warned that "[Vanquish] can walk themselves into a fraud claim if they're not careful with their trying to expand this lawsuit." Id. at 238 (Tr. of Oral Arg. at 50).

The Court criticized government counsel mildly for this comment, observing that it sounded as though he was threatening Vanquish because it was attempting to secure discovery and that doing so was "probably not appropriate." Id. But notwithstanding the Court's disapproval of counsel's tone at the argument held in 2018, his remarks have no bearing on whether USTRANSCOM officials terminated the twelve missions for default and published the negative CPAR in 2016 in order to harm Vanquish.

Vanquish also asks the Court to consider a 2017 conversation between its counsel and government counsel "regarding the potential for a global settlement" of this action. Id. at 180 (Maloney Decl. ¶ 4); Pl.'s Cross-Mot. at 25. According to Vanquish's counsel, during the discussion counsel for the government made it clear that Vanquish's proposal to convert the default termination to a termination for convenience was a nonstarter. Pl.'s App. at 180 (Maloney Decl. ¶ 5); see also id. at 183. Government counsel supposedly explained why the proposal was a nonstarter by telling counsel for Vanquish that USTRANSCOM officials disliked Mr. Barton, believed he should have been debarred in 2007, and "want[ed] to give him a 'black eye.'" Id. at 181 (Maloney Decl. ¶¶ 6–10); see also id. at 183.

Government counsel has disputed Vanquish's counsel's recollection of their conversation. Id. at 183. He has also objected that the alleged statement was inadmissible under Federal Rule of Evidence 408(a), which precludes a party from using "a statement made during compromise negotiations about [a disputed] claim" to prove that claim. Fed. R. Evid. 408(a); see also Def.'s Resp. at 21 n.10. The Court agrees with the government that Rule 408(a) is directly applicable here. Counsel allegedly made the statement at issue while discussing the prospects for settling Vanquish's claim that the termination for default was arbitrary, capricious, and an abuse of discretion. See Pl.'s App. at 180 (Maloney Decl. ¶ 4), 183–85. Vanquish therefore cannot use the statement to prove that USTRANSCOM was interested in causing injury to Mr. Barton and Vanquish, and that this animus is what caused them to issue the default termination and negative CPAR.

Finally, Vanquish spends many pages trying to persuade the Court that USTRANSCOM's bad faith in terminating the twelve missions for default may be inferred from the negative ratings assigned to Vanquish in the CPAR covering the period of contract performance between December 16, 2014, and December 15, 2015. See Pl.'s Cross-Mot. at 4–22; see also Def.'s App. at 1434–42. Vanquish further contends that the negative appraisal was also motivated by bad faith in its own right. See Pl.'s Cross-Mot. at 4–5. The content of the CPAR, according to Vanquish, creates a genuine dispute of material fact regarding whether both the default termination and the negative CPAR were the product of improper animus against Vanquish and Mr. Barton. See id. at 4–22; see also Def.'s App. at 1434–42. The Court is not persuaded.

CO Stevens served as the assessing official for the CPAR. See Def.'s App. at 1436. He assigned "marginal" ratings to Vanquish for the "management" and "quality" factors, and a "satisfactory" rating for the third factor ("schedule"). Id. at 1434–36. He assigned the marginal rating for quality because, he said, during the performance period Vanquish had "lost 12 shipments valued at approximately $1.4 [m]illion which meant the warfighter did not receive its critical cargo." Id. at 1435. He assigned a marginal rating to the management factor because, CO

Stevens observed, "after the cargo loss, [Vanquish] corporate management attempted to absolve [Vanquish] of any liability positing factual theories [i.e., that APPF had seized the cargo] that were contradicted by its own employees and [Global Distribution Management System] data." Id. at 1436. In addition, CO Stevens characterized Vanquish's management of its subcontractors as "poor[]." Id.

Vanquish contends that the narrative CO Stevens prepared contained inaccurate and misleading statements that were intended to discredit Vanquish and harm its business. Pl.'s Cross-Mot. at 4–5. Specifically, it contends that the CPAR gives "the false impression that 12 shipments . . . were lost and still not recovered simply because Vanquish had not paid its subcontractor." Id. at 4. Vanquish bases this assertion on a single sentence in the brief narrative for the quality factor in which CO Stevens observes that the government had received an email from Emporium in October 2015, in which it asserted that it lacked the funds to deliver the cargo "because of a lack of payment from [Vanquish]." Def.'s App. at 1435; see also id. at 518; Pl.'s Cross-Mot. at 4–6, 19–21. Vanquish dubs this statement "[t]he most fraudulent part of the CPAR." Pl.'s Cross-Mot. at 19.

But the statement at issue was not false, much less "fraudulent." USTRANSCOM had in fact received an email from Emporium (indeed, multiple emails) in which Emporium stated that it had the twelve shipments but could not move them until it received the payments it claimed were due from Vanquish. See Def.'s App. at 492–99, 518, 522–27, 531–36; see also id. at 486, 549, 549–50. The statement was also not misleading. It is undisputed that Vanquish did not make payments to Emporium for the twelve missions. Vanquish did not make payments because, it said, its subcontract with Emporium allowed Vanquish to withhold monies otherwise due to Emporium to reimburse Vanquish for fees and other charges Vanquish had incurred because of Emporium's allegedly poor performance. See id. at 534–35. And the record provides ample support for the CO's opinion that the payment dispute was at the root of Vanquish's inability to recover the shipments. See id. at 492–99, 518, 522–27, 531–36, 572–73; see also id. at 486, 549–50.

Vanquish also reads bad faith into CO Stevens' failure to include a litany of other alleged facts in his assessment. See Pl.'s Cross-Mot. at 4–22. These alleged facts include, among others: (1) that Emporium had given OBLS the shipments "contrary to Vanquish's specific instructions . . . not to use OBLS," id. at 6; (2) that the government "had learned a year earlier that Emporium was using OBLS to complete NAT missions for Vanquish" and yet had done nothing to stop it, id.; (3) that the government had investigated the missing shipments and recovered them from OBLS, a third-party subcontractor that Vanquish did not control, id. at 5–7, 15–19; and (4) that the government had accepted Emporium's explanation that the shipments were stalled as the result of a payment dispute with Vanquish without examining Vanquish's assertion that Emporium was not entitled to payment, id. at 5–7, 19–21. Vanquish observes that while the SIGAR reports and memoranda characterize the missing shipments as "stolen" and detail Mr. Ullah's "illegal activities" and arrest, id. at 15–19; see also Pl.'s App. at 100–01, 142–48, 457–58, the CPAR merely states that Vanquish "lost" the twelve shipments and "did not deliver the cargo during the rating period," Def.'s App. at 1435.

But even assuming it were relevant, the CO's initial assessment could not have mentioned the recovery of the shipments or SIGAR's resolution of the matter because at the time CO Stevens wrote the assessment, the shipments were still unaccounted for and SIGAR had not completed its investigation. See id. at 1444–45; Pl.'s App. at 142–52.

In addition, the appraisal is designed to capture the major events that occurred during the appraisal period, and in this case, the shipments remained missing during that period. See Def.'s App. at 1434; Pl.'s App. at 147–52. Moreover, the recovery of the shipments is included in the CPAR in the section containing the comments of Lt. Col. Moffitt as the reviewing official. Def.'s App. at 1441.

In any event, the argument that animus can be inferred because the assessing official did not include a fuller recitation of facts or update the assessment as he learned new information reflects a misapprehension about the appraisal process. A CPAR provides an agency appraisal of a contractor's performance over a one-year period. See FAR 42.1503; Def.'s App. at 1434. A CPAR is only required to document "major events" that occur during the applicable performance period. Pl.'s App. at 422 (Stevens Dep. at 186:4–6). Further, the assessing official is not expected to continuously update his assessment to reflect new facts that he learns; indeed, doing so would be unfair to the contractor who only has one opportunity to respond to the assessment. Id. at 426 (Stevens Dep. at 202:2–11).

The CPAR at issue here, for example, did not mention the termination for cause because it occurred outside the period of performance. Id. at 431 (Stevens Dep. at 222:2–5); see also Def.'s App. at 620–21,1434–36. Instead, its focus was on the fact that during the appraisal period—for whatever underlying reasons—Vanquish had lost control of twelve shipments worth approximately $1.4 million, "which meant the warfighter did not receive its critical cargo." Def.'s App. at 1435. And because Vanquish was accountable for the acts and omissions of its subcontractor, Emporium, facts about which of the two bore greater responsibility for the shipments falling into the hands of Mr. Ullah were not especially relevant for purposes of the appraisal. See Vanquish I, 140 Fed. Cl. at 478.

To be clear, the Court is not saying that an agency is not obligated to provide a factually accurate CPAR. But what Vanquish is complaining about here is not so much that the appraisal was factually inaccurate. Its complaint is that—in its view—the CPAR did not contain enough facts to paint a fuller picture of the events surrounding its loss of the twelve shipments. See Pl.'s Cross-Mot. at 4–6, 15, 19–22. Vanquish contends that had additional facts been included, they would have shown that other entities shared some blame for the shipments' disappearance. See id. But the assessing official was not writing a comprehensive analysis and review of all of the possible reasons why the shipments went missing; he was providing information addressing Vanquish's performance of its contractual obligations during a discrete period of time. See Def.'s App. at 1434–36; Pl.'s App. at 421 (Stevens Dep. at 183:22–184:3), 427 (Stevens Dep. at 206:1–5), 431 (Stevens Dep. at 221:23–222:5). The contractor's interest in having what it considers the full story told is vindicated through its right to file a written response to the initial assessment, which is made a part of the appraisal package that is publicly available. See Def.'s App. at 1436–40. No bad faith can be inferred from the assessing official's failure to incorporate opposing viewpoints into his narrative.

Vanquish, in fact, exercised its right to respond here, submitting a detailed rebuttal of the negative performance ratings CO Stevens assigned. Id. Tellingly, when Vanquish responded to the initial assessment in real time, it did not claim that the statements about its failure to pay Emporium were misleading or that USTRANSCOM bore some responsibility for the loss of the cargo because it allegedly "acquiesced" in Emporium's use of OBLS. See id.; Pl.'s Cross-Mot. at 6. Rather, the overriding theme of Vanquish's response was one that it no longer appears to reference, which is that the CPAR was inaccurate because it had failed to lay blame for the loss of the shipments on APPF. See Def.'s App. at 1436–40; see also Pl.'s Cross-Mot. at 22.

Similarly, Vanquish referred to the payment dispute in its response to the assessing official's comments. Def.'s App. at 1439. But it did not complain (as it does here) that mentioning its failure to pay Emporium created the misleading impression that the lack of payment was the sole cause of the loss of the shipments. See id.; Pl.'s Cross-Mot. at 5–6, 19–21. It also did not assert that the CO's assessment should have included a discussion concerning whether Vanquish's position in the payment dispute was correct. See Def.'s App. at 1439; Pl.'s Cross-Mot. at 5–6, 19–21. Vanquish took the opposite approach, complaining that "[t]he issues of prime to subcontractor payment questions or disputes brought to the Contracting Office by the sub-contractor are not the business of the Contracting Office nor belong on this CPAR." Def.'s App. at 1439. Vanquish's argument that USTRANSCOM's bad faith can be inferred from its failure to mention facts that Vanquish did not ask to be included in the CPAR in real time simply lacks credibility.

The Court holds, therefore, that there is an absence of evidence to show that the agency issued the default termination or published the negative CPAR in order to inflict injury on Vanquish or its President. The government's motion for partial summary judgment as to those claims will therefore be granted.

## IV. The Parties' Cross-Motions for Summary Judgment as to Count II in No. 20-346 (Vanquish's Fuel Claim)

The government deducted some $150,000 from the payments it owed Vanquish for twenty-seven bulk fuel shipments that Vanquish delivered in 2015. See Compl. No. 20-346 ¶ 31. Vanquish alleges that the government did not comply with contractual requirements to use the processes for measuring bulk fuel detailed in Army Field Manual 10-67-1 when it determined the volume of fuel at uploading and downloading. Id. ¶¶ 34, 38, 59–60; see also Def.'s App. at 380 (PWS § 5.2.1.). Therefore, it contends, the government lacked a reliable basis for making the deductions it did with respect to the twenty-seven shipments at issue. Compl. No. 20-346 ¶¶ 31–32, 59–60.

The government seeks summary judgment as to this claim on the grounds that Vanquish—which has the burden of proving that the contract was breached—has not provided any evidence in support of its allegations that the required procedures were not followed with respect to any of the shipments. Def.'s Mot. at 53–54; Def.'s Resp. at 27. Further, the government observes, Vanquish has not produced any evidence that any of the fuel

measurements government personnel recorded on TMRs were inaccurate. Def.'s Mot. at 53–54; Def.'s Resp. at 25.

The Court agrees. Vanquish "bears the burden of proving by preponderant evidence 'the fundamental facts of liability and damages.'" Renda Marine, Inc. v. United States, 66 Fed. Cl. 639, 647 (2005) (quoting Wilner v. United States, 24 F.3d 1397, 1401 (Fed. Cir. 1994)). Because Vanquish, the non-movant, bears the burden of proof as to its claim, summary judgment is appropriate if the Court finds there is no evidence in the record sufficient to persuade a reasonable fact finder: (1) that USTRANSCOM did not use the Army Field Manual's procedures to measure fuel volume at the uploading and downloading points; (2) that not using those procedures resulted in inaccurate measurements; and (3) that the inaccuracies that resulted disfavored Vanquish. See Dairyland Power Coop., 16 F.3d at 1202.

Vanquish does not explain in what respects the procedures USTRANSCOM used to measure fuel volume for the twenty-seven missions deviated from the Army Field Manual. See Pl.'s Cross-Mot. at 27–36, 41. It also does not identify any evidence that the fuel measurements for any of the twenty-seven missions were inaccurate. See id. Rather, its opposition to summary judgment is based on its contention that USTRANSCOM did not maintain records of how the fuel was measured. Id. at 1, 36, 41. Therefore, according to Vanquish, the government "cannot establish that any fuel measurement was reliable or compliant with the Contract." Id. at 1.

But it is Vanquish and not the government that has the obligation of proving that the measurements recorded on the forms were based on an unreliable methodology. See United Launch Servs., LLC v. United States, 139 Fed. Cl. 664, 681 (2018). And Vanquish has not identified any evidence in the record that raises a genuine issue regarding USTRANSCOM's compliance with the NAT 2.0 contract or whether the fuel measurements taken for the twenty-seven missions in question were otherwise reliable.

Instead, Vanquish refers the Court to USTRANSCOM's response to Vanquish's Interrogatory 10 and the deposition testimony of CO Stevens. Pl.'s Cross-Mot. at 30–36. In Interrogatory 10, Vanquish asked whether "the fuel measurements at the origin and destination locations that were used to impose each of the fuel pilferage deductions . . . [were] conducted in accordance with Army Field Manual 10-67-1, as required by [the PWS]." Def.'s App. at 1188 (Pl.'s Interrog. No. 10). The government responded that "[i]t was common practice in Afghanistan in 2015 to take fuel measurements without documenting how the fuel measurements were taken." Id. at 1195 (Def.'s Resp. to Pl.'s Interrog. No. 10). "[C]onfidence in individual measurements," it asserted, "was rooted in confidence in a web of measurements." Id. The government explained,

> Each of the destination locations referenced in Interrogatory No. 10 was required to keep a daily log of fuel issued from that location, and received at that location. In addition, each such location was required [to] submit a monthly report summarizing the total amounts issued and received on each day of the month. Various Army units reviewed the [reports] on either a regular basis (as part of the regular monitoring of fuel availability conducted by a special unit stationed at the Bagram base), or during occasional inspections of local units by superior officers

at the battalion level or brigade level. Any discrepancy that emerged from the web of reported quantities would have attracted attention, as a matter of routine; fuel supplies were important.

Id. at 1195–96 (citations omitted).

USTRANSCOM also advised Vanquish in its response that Kenneth Harrington, from the United States Army Petroleum Center, could testify about the "network of measurement and reporting requirements" and that Chief Warrant Officer 4 Travis Thibodeaux, also from the United States Army Petroleum Center, could "testify generally about the success of the reporting system in Afghanistan." Id. at 1194–95. Neither one, according to the government, could "recall any significant unexplained fuel shortages or surpluses in Afghanistan." Id. at 1196.

The government also identified two individuals who measured bulk fuel shipments at two facilities that received sixteen of the twenty-seven shipments at issue. Id. at 1196–97. It was able to contact one of those individuals, Staff Sergeant Shepherd, who described how he measured the fuel in the facility's storage tanks and completed logs and reports, and how he measured the fuel that he unloaded from one of the shipments at issue. Id. at 1197–98. It also cited the example of Sergeant Mote, who performed the measurements when TMR #AEC0120 was delivered, and discovered that only 6,802 of the 10,000 gallons of fuel expected was delivered. Id. at 1200. According to the government, "Sergeant Mote checked his measurements more than once, and he sought guidance from his supervisor because he considered the situation so unusual." Id.

So far as the Court can tell, Vanquish did not depose any of the individuals identified in the government's answer to Interrogatory 10 or any of those who signed off on the twenty-seven TMRs. Instead, it questioned the CO about his knowledge of whether any of the measurements "at either end of th[e] 27 TMRs . . . were taken in accordance with the Field Manual 10[-]67-1." Pl.'s App. at 401 (Stevens Dep. at 103:23–104:2). The CO did not know much; he responded that he understood that Army personnel "were following certain procedures" for measuring bulk fuel, but that he was unsure whether those procedures satisfied "every aspect" of the Field Manual. Id. at 402 (Stevens Dep. at 105:2–7).

As noted, it is not the government's burden to prove the soundness of the methodology it used to measure the fuel shipments. See Renda Marine, 66 Fed. Cl. at 647. It is Vanquish that has alleged that the government did not follow the Field Manual or employ reliable procedures for measuring fuel when it identified discrepancies for the twenty-seven missions. Nonetheless, even after discovery, Vanquish cannot identify a single piece of evidence to support those allegations. Vanquish has failed to raise a genuine dispute as to whether USTRANSCOM followed the Field Manual or whether the measurements it recorded were accurate. The government is therefore entitled to summary judgment as to this claim.

## CONCLUSION

On the basis of the foregoing, the government's motion for partial summary judgment, ECF No. 248, is **GRANTED** as to Counts II and III of the second amended complaint in No. 17-96, Counts IV and V of the amended complaint in No. 19-310, and Count II of the complaint in No. 20-346. Vanquish's cross-motion for partial summary judgment as to Count II of the

complaint in No. 20-346, ECF No. 253, is **DENIED**. The parties shall file a joint status report within 30 days of the date of this opinion advising the Court on the issues remaining for trial and proposing further proceedings.

   **IT IS SO ORDERED.**

         s/Elaine D. Kaplan      
         ELAINE D. KAPLAN
         Chief Judge